UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

# 97-8847
# CIV-RYSKAMP
## MAGISTRATE JUDGE, VITUNAC

ARTHUR C. JOHNSON,

     Plaintiff,

v.

JOAN KOWAL, individually and in
her capacity as Superintendent
of the Palm Beach County School
District; GLEN TORCIVIA, individually
and in his capacity as counsel to
Superintendent of the Palm Beach
County School District; PALM BEACH
COUNTY SCHOOL BOARD, a
subdivision of the State of Florida
Department of Education; JOANNE
KAISER, individually and in her capacity
as Chief Personnel Officer for the Palm
Beach County School District, and
CYNTHIA PINO individually and in
her capacity as Associate Superintendent
for Accountability and School Improvement
of the Palm Beach County School District,

     Defendant.

_____/

## PETITION FOR REMOVAL

COMES NOW, the Petitioner/Defendants, JOAN KOWAL, individually and in her

capacity as Superintendent of the Palm Beach County School District; GLEN TORCIVIA,

individually and in his capacity as counsel to Superintendent of the Palm Beach County

School District; PALM BEACH COUNTY SCHOOL BOARD, a subdivision of the State of

Florida Department of Education; JOANNE KAISER, individually and in her capacity as

1



Chief Personnel Officer for the Palm Beach County School District, and CYNTHIA PINO individually and in her capacity as Associate Superintendent for Accountability and School Improvement of the Palm Beach County School District, by and through their undersigned counsel, pursuant to F.R.C.P. 81(c) and 28 U.S.C. § 1441, 1443, and 1446, and files this, their Petition for Removal of a state court action from the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida, in which it is pending, to the United States District Court, in and for the Southern District of Florida, and respectfully states as follows:

1.    The Respondent/Plaintiff, ARTHUR C. JOHNSON, has commenced this action in state court. The Complaint filed in state court seeks relief under, and pursuant to the Fourth and Fourteenth Amendments of the United States Constitution, (See Counts II and III).

2.    The only activity in the state court action was the filing of the Summons and Complaint.

3.    This Petition for Removal is filed within twenty days of service of the Complaint. It is also filed within the time permitted to file a Response to the Complaint.

4.    A copy of this Petition for Removal is being filed with the Clerk of the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

5.    The attached Exhibits are a copy of all documents in the possession of the Defendants relating to the state court action, which consists of the Summons (Exhibit A) and the Complaint (Exhibit B).

WHEREFORE, the Petitioner respectfully requests this Honorable Court to take

2

jurisdiction of this action and that removal of the state court action to this court be hereby accomplished, and for such other and further relief as this court deems just and appropriate.

Respectfully submitted,

LAW OFFICES OF GLEN J. TORCIVIA, P.A.

GLEN J. TORCIVIA, ESQUIRE
Attorney for the Defendants
One Clearlake Centre, Suite 1504
250 South Australian Avenue
West Palm Beach, Florida  33401
(407) 832-0644
Florida Bar No. 343374

STATE OF FLORIDA
COUNTY OF PALM BEACH

This day personally appeared before me, GLEN J. TORCIVIA, being duly sworn, deposes and says that he is counsel for the Petitioners/Defendants JOAN KOWAL, individually and in her capacity as Superintendent of the Palm Beach County School District; GLEN TORCIVIA, individually and in his capacity as counsel to Superintendent of the Palm Beach County School District; PALM BEACH COUNTY SCHOOL BOARD, a subdivision of the State of Florida Department of Education; JOANNE KAISER, individually and in her capacity as Chief Personnel Officer for the Palm Beach County School District, and CYNTHIA PINO individually and in her capacity as Associate Superintendent for Accountability and School Improvement of the Palm Beach County School District, and that he has prepared and read the foregoing Petition for Removal

3

and that the matters set forth and contained therein are true and correct to the best of

his knowledge and belief.

_____

GLEN J. TORCIVIA

Sworn to and subscribed before me this _3rd_ day of November, 1997, by Glen J.
Torcivia.

_____

LISA A. DIBBLE, NOTARY PUBLIC

Personally known  _x_  or produced identification _____.

Lisa A. Dibble
MY COMMISSION # CC665173 EXPIRES
July 27, 2001
BONDED THRU TROY FAIN INSURANCE, INC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Petition for
Removal was furnished by U.S. Mail to: Mark R. Osherow, Kenneth J. Schwartz, and
Laura P. Riddle, OSHEROW & SCHWARTZ, P.A., Sanctuary Center, 4800 North Federal
Highway, Suite 105, Building B, Boca Raton, Florida 33431 on this 3rd day of November,
1997.

_____

GLEN J. TORCIVIA, ESQUIRE

4

CIVIL ACTION SUMMONS

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO. **CL 97 009239**

GENERAL JURISDICTION DIVISION

ARTHUR C. JOHNSON,

     Plaintiff,

v.

JOAN KOWAL, individually and in
her capacity as Superintendent
of the Palm Beach County School
District; **GLEN      TORCIVIA**,
individually    and    in    his
capacity     as     counsel    to
Superintendent    of    the    Palm
Beach County School District;
**PALM BEACH COUNTY SCHOOL BOARD**,
a subdivision of the State of
Florida       Department       of
Education; **JOANNE     KAISER**,
individually    and    in    her
capacity    as    Chief    Personnel
Officer    for    the    Palm    Beach
County  School  District;  and
**CYNTHIA PINO** individually and
in her capacity as Associate
S u p e r i n t e n d e n t      f o r
Accountability   and   School
Improvement of the Palm Beach
County School District,

     Defendants.

_____/



## S U M M O N S

THE STATE OF FLORIDA:

     To All and Singular the Sheriffs of the State:

     **YOU ARE COMMANDED** to serve this Summons and a copy of the Complaintin
this action on Defendant:

TO:    **GLEN TORCIVIA**
       **ONE CLEAR LAKE CIR.**
       **250 S. AUSTRALIAN AVENUE, SUITE 1504**
       **WEST PALM BEACH, FL 33401**


     Each Defendant is required to serve written defenses upon OSHEROW &
SCHWARTZ, P.A., attorney for Plaintiffs, whose address is:  4800 N. Federal
Highway/Bldg. "B"/\Suite 105, Boca Raton, Florida 33431 within 20 days after
service of this Summons on that Defendant, exclusive of the day of service,
and to file the original of the defenses with the Clerk of this Court either
before service on attorneys for Plaintiff or immediately thereafter.  If a
Defendant fails to do so, a Default will be entered against that Defendant for
the relief demanded in the Complaint or Petition.


     WITNESS my hand and seal of this Court on _____, 1997.


                              DOROTHY H. WILKEN
                              As Clerk of the Court

                              **LILLIAN DANIEL**
                              _____
                                   As Deputy Clerk


OSHEROW & SCHWARTZ, PA
Attorneys for the Plaintiff
4800 N. Federal Highway
Bldg. "B"/Suite 105
Boca Raton, FL   33431
Telephone: (561) 447-7080
Facsimile: (561) 447-7166

BY: _____
       MARK R.OSHEROW
       Fla. Bar No:  997013


2



IN THE CIRCUIT COURT IN AND FOR THE
FIFTEENTH JUDICIAL CIRCUIT FOR PALM
BEACH COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. CL 97 009239

**ARTHUR C. JOHNSON,**

      Plaintiff,

v.

**JOAN KOWAL**, individually and in
her capacity as Superintendent of the
Palm Beach County School District;
**GLEN TORCIVIA**, individually and in
his capacity as counsel to
Superintendent of the Palm Beach
County School District; **PALM
BEACH COUNTY SCHOOL
BOARD**, a subdivision of the State of
Florida Department of Education;
**JOANNE KAISER**, individually and in
her capacity as Chief Personnel Officer
for the Palm Beach County School
District; and **CYNTHIA PINO**
individually and in her capacity as
Associate Superintendent for
Accountability and School
Improvement of the Palm Beach
County School District,

      Defendants.

_____/

**COMPLAINT**



*Complaint*
*Johnson v. Kowal, et al*
*Page 3*

                                                                    **PAGE**

COUNT X, INJUNCTION ............................................................   73-75

COUNT XI, SPECIFIC PERFORMANCE ..................................   75-78

COUNT XII, ABUSE OF POWER ............................................   78-80

COUNT XIII, TORTIOUS INTERFERENCE WITH CONTRACT ..........   80-82

COUNT XIV, TORTIOUS INTERFERENCE WITH
    EMPLOYMENT RELATIONSHIP ....................................   82-83

COUNT XV, RESCISSION OF SETTLEMENT AGREEMENT ..............   84-88

COUNT XVI, DEPRIVATION TO PLAINTIFF, PARENTS,
    STUDENTS AND COMMUNITY OF ADEQUATE
    AND UNIFORM EDUCATION UNDER ARTICLE 9,
    SECTION 1 OF THE FLORIDA CONSTITUTION ......................   89-92

PRAYER FOR RELIEF ............................................................   92-94

DEMAND FOR JURY TRIAL ..................................................   94

ATTORNEY SIGNATURE, OSHEROW & SCHWARTZ, P.A,
    MARK R. OSHEROW, KENNETH J. SCHWARTZ, AND
    LAURA P. RIDDLE ........................................................   94

VERIFICATION ..................................................................   95

*Complaint*
*Johnson v. Kowal, et al*
*Page 4*

## PRELIMINARY STATEMENT

Plaintiff, **ARTHUR C. JOHNSON**, sues Defendants, **JOAN KOWAL, GLEN TORCIVIA, PALM BEACH COUNTY SCHOOL BOARD, JOANNE KAISER,** and **CYNTHIA PINO**, seeking damages in excess of $15,000.00 exclusive of interest, costs and fees, and for equitable relief, and alleges:

1.      This is an action for damages and other relief against Defendants **JOAN KOWAL** ("Kowal"), **JOANNE KAISER** ("Kaiser"), and **PALM BEACH COUNTY SCHOOL BOARD** ("PBCSB"), for violation of Plaintiff's right to procedural due process, under the laws of the State of Florida, particularly under the Constitution of The State of Florida, Article One, Section 9, mandating equal protection and due process of law,  under Florida Statutes,§§231.29, 231.291, 231.36, 231.001 and 286.011, and under PBCSB Policy 3.27. **Count I, *infra.***

2.      This is also an action for damages and other relief against Defendants Kowal, Kaiser and PBCSB, which arises in part under the Fourteenth Amendment to the United States Constitution, and under Article 1, Section 9 of the Florida Constitution. Plaintiff's claims thereunder are premised on both procedural and substantive due process, in that Plaintiff was neither afforded a pre-termination hearing in which to protect his property rights, nor a post-termination hearing in which to protect his liberty rights, resulting in Plaintiff's loss of both. The Defendants' conduct, individually and as co-conspirators, caused the deprivation of Plaintiff's Constitutionally protected rights, and

*Complaint*
*Johnson v. Kowal, et al*
*Page 5*

continues to cause Plaintiff to be deprived of his property and liberty interests. **Counts II and III,**

*infra.*

3.    This is also an action for damages and other relief against Defendants Kowal, PBCSB,

and **GLEN TORCIVIA** ("Torcivia") for violation of Florida Statutes, §286.011, known as the

"Sunshine Law", by holding government meetings, and/or conducting government activities, and/or

deciding government matters, and/or "polling" members of Defendant PBCSB outside the presence

of the People of the State of Florida; and in doing so, causing direct and personal harm to the

Plaintiff, a citizen of Palm Beach County, and the State of Florida. **Count IV,** *infra.*

4.    This is also an action for damages and other relief against Defendants Kowal, Torcivia,

Kaiser, and **CYNTHIA PINO** ("Pino") for their acts and actions which constituted a Civil

Conspiracy against Plaintiff. **Count V,** *infra.*

5.    This is also an action for damages and other relief against Defendants Torcivia, Kaiser

and Pino for Aiding and Abetting in the Commission of Tortious Acts, for their actions which assisted

Defendant Kowal and furthered the goals of Defendant Kowal in causing harm to Plaintiff. **Count**

**VI,** *infra.*

6.    This is also an action for damages and other relief against Defendants Kowal and

Torcivia for their Defamation of Plaintiff. **Count VII,** *infra.*

*Complaint*
*Johnson v. Kowal, et al*
*Page 6*

7.    This is also an action for damages and other relief against Defendant PBCSB for its Breach of the purported Settlement Agreement signed by Plaintiff on July 16, 1997. **Count VIII,** *infra.*

8.    This is also an action for damages and other relief against Defendant PBCSB for its breach of Plaintiff's valid employment contract with Defendant PBCSB, as a result of Plaintiff's constructive termination prior to the completion of said contract. **Count IX,** *infra.*

9.    This is also an equitable action against Defendants Kowal, Torcivia, and PBCSB for both Temporary and Permanent Injunctive Relief to prevent Defendants Kowal, Torcivia, PBCSB, or any member, agent, attorney, employee, or conduit of Defendant PBCSB from further publication of statements defamatory to Plaintiff. **Count X,** *infra.*

10.    This is also an equitable action against Defendant PBCSB for Specific Performance to require Defendant PBCSB to reinstate Plaintiff, and to prevent any further adverse employment action against Plaintiff without affording him all process to which he is due. **Count XI,** *infra.*

11.    This is also an action for damages and other relief against Defendant Kowal for Abuse of Power as a result of her tortious and otherwise illegal action adverse to Plaintiff, while she held the position of Superintendent of the Palm Beach County School District. **Count XII,** *infra.*

*Complaint*
*Johnson v. Kowal, et al*
*Page 7*

12.    This is also an action for damages and other relief against Defendants Kowal and Torcivia for Tortious Interference with Plaintiff's employment contract with Defendant PBCSB. **Count XIII,** *infra.*

13.    This is also an action for damages and other relief against Defendants Kowal and Torcivia for Tortious Interference with the employment relationship between Defendant PBCSB and Plaintiff. **Count XIV,** *infra.*

14.    This is also an equitable action against Defendant PBCSB for Rescission of the purported Settlement Agreement entered into between Plaintiff and Defendant PBCSB. **Count XV,** *infra.*

15.    This is also an action for Declaratory Judgment to hold that Defendant PBCSB has deprived Plaintiff, teachers, parents, students and the community of Palm Beach County of adequate and uniform education under Article 9, section 1 of the Florida Constitution. **Count XVI,** *infra.*

## RELIEF SOUGHT

16.    This action seeks monetary damages, equitable relief, declaratory judgment, temporary and permanent injunctive relief, and punitive damages, upon the proper showing, pursuant to the United States Constitution, the Constitution of the State of Florida, Florida Statutes, Regulations,

*Complaint*
*Johnson v. Kowal, et al*
*Page 8*

Policies, and law, as well as pre- and post judgment interest, reasonable attorneys fees, costs and

disbursements that result from bringing this action.

## JURISDICTION

17.     Jurisdiction over this action is based upon Florida Statutes § 47.011, and §286.011.

## PARTIES

18.     Plaintiff, who is the former Area Two Executive Director for the Palm Beach County

School District and the former Principal of Spanish River High School, a Florida Public Secondary

School located in Boca Raton, Palm Beach County, Florida, is a resident of Palm Beach County, and

is sui juris.

19.     Defendant Kowal, who at all times relevant hereto, was the Superintendent of the

Palm Beach County School District, is a resident of Palm Beach County, and is sui juris.

20.     Defendant Torcivia, who at all times relevant hereto was an attorney retained by

Defendants Kowal and/or PBCSB for alleged investigation purposes,  is a resident of Palm Beach

County, and is sui juris.

*Complaint*
*Johnson v. Kowal, et al*
*Page 9*

21.    Defendant PBCSB is a subdivision of the State of Florida Department of Education.

22.    Defendant Kaiser, who at all times relevant hereto was the Chief Personnel Officer for the Palm Beach County School District, is a resident of Palm Beach County, and is <u>sui juris</u>.

23.    Defendant Pino, who at all times relevant hereto was the Associate Superintendent for Accountability and School Improvement for the Palm Beach County School District, is a resident of Palm Beach County, and is <u>sui juris</u>.

## VENUE

24.    Venue is proper in Palm Beach County, Florida where the Defendants reside and/or the causes of action accrued.

## CONDITIONS PRECEDENT

25.    All conditions precedent to the filing of this lawsuit have been performed, have occurred or have been waived.

*Complaint*
*Johnson v. Kowal, et al*
*Page 10*

## ADMINISTRATIVE REMEDIES

26.     For all causes of action herein against Defendant PBCSB, for which Defendant PBCSB may be held liable, and which lie in tort, such claims have been presented to the State of Florida Department of Insurance, the State of Florida Department of Education, Defendant PBCSB and/or other administrative bodies of the State of Florida for further administrative proceedings.

27.     For all other causes of action herein against Defendant PBCSB, for which Defendant PBCSB may be held liable, and which do not lie in tort, such claims have not been presented to the State of Florida Department of Insurance, the State of Florida Department of Education, Defendant PBCSB and/or other administrative body of the State of Florida for further administrative proceedings.  Plaintiff was not required to take any additional administrative action due Defendant PBCSB's denial of Plaintiff's due process rights, and, *inter alia*, for the following reasons:

a.     As a result of Defendant PBCSB's denial of Plaintiff's due process rights prior to his termination, administrative remedies which may have otherwise been available have failed to accrue, have been excused, or have been waived by Defendant PBCSB.

b.     As a result of Defendant PBCSB's denial of Plaintiff's due process rights prior to his termination, Defendant PBCSB is estopped from asserting failure to exhaust administrative remedies as ground for dismissal of this action.

*Complaint*
*Johnson v. Kowal, et al*
*Page 11*

c.       Due to the fact that the validity and the constitutionality of Defendant PBCSB's administrative procedures are at issue, no appropriate administrative remedies exist.

d.       As a result of Defendant PBCSB's denial of Plaintiff's due process rights prior to his termination, Defendant PBCSB relinquished jurisdiction to adjudicate this dispute.

e.       Any possible administrative procedures that may have been available would not properly and fully address Plaintiff's needs.

f.       Plaintiff has previously been told that administrative action had already occurred and that such remedies were already exhausted at the time of this dismissal and/or coerced resignation.

g.       Further administrative action would operate only to protract litigation, result in added expense and inconvenience to all concerned,  and the ultimate results would conform to the conclusion that this Court should reach.

h.       Further administrative action would be inconsonant with the purposes of the Administrative Procedures Act.

i.       No appropriate administrative procedures exist at this juncture to address Plaintiff's causes of action.

*Complaint*
*Johnson v. Kowal, et al*
*Page 12*

     j.      Defendant PBCSB implemented and executed official government policy which caused Plaintiff to be terminated and/or coerced under duress to resign, from employment with the School Board of Palm Beach County, Florida, for which no administrative remedies exist by which to cure such unlawful actions.

     k.      For all acts of Defendants Kowal, Torcivia, Kaiser and Pino individually or collectively and as co-conspirators, committed outside the scope of their employment, no administrative procedures are required, exist, or have been waived prior to institution of this action against said Defendants.

*Complaint*
*Johnson v. Kowal, et al*
*Page 13*

## STATEMENT OF THE FACTS

28.    Plaintiff began his career as an educator in the State of Florida in 1968, after obtaining a Bachelor's of Arts degree from the University of South Florida.  Plaintiff served as a teacher at the Pineview Gifted School, in Sarasota Florida from 1968 to 1969.  While at Pineview, Plaintiff served as the Physical Education Program Coordinator, coordinating the physical education programs for 900 students at both Pineview and Alta Vista Elementary School. Starting in 1970, following receiving his Masters Degree from Florida State University,  Plaintiff served as a teacher at W.T. Moore Elementary School in Tallahassee Florida.

29.    By 1972, Plaintiff was elevated to the position of Elementary School Principal at Crawfordville Elementary in Wakulla County, Florida.  While at Crawfordville, Plaintiff implemented multi-sensory reading programs, raising school-wide achievement scores to grade level expectancy, from a two year deficit prior to his arrival at Crawfordville.

30.    As a result of his success at Crawfordville, Plaintiff was hired to serve as Principal of Zolfo Elementary School, a large elementary school located in Hardee County, Florida.  During Plaintiff's short tenure at Zolfo, he implemented a school-based management program for the district, and served as a School Board Negotiator.

31.    Plaintiff's career reached new heights in 1976, when he was hired by Williston High

*Complaint*
*Johnson v. Kowal, et al*
*Page 14*

School, in Levy County, Florida. While at Williston, Plaintiff implemented a tough disciplinary program to restore a safe school environment, worked closely with community and staff to cure years of strife that had existed in that relationship, and raised the school's standardized achievement test scores to grade level (a three year gain). Additionally, Plaintiff continued serving as a School Board Negotiator.

32.    In 1983 Plaintiff, who had since obtained his Doctorate in Educational Administration and Reading Development from Florida State University, began serving as a Palm Beach County High School Principal, at Boca Raton Community High School. Plaintiff signed a one year contract with Defendant PBCSB, which was renewed for the next two school years (1984/85 and 1985/86, known as FY 85 and FY 86 respectively). A copy of Plaintiff's first contract, and his 1984 renewal notice, is attached hereto as Plaintiff's Exhibit 1. [1] While at Boca High, Plaintiff restructured the school's curriculum and discipline system, which had been in a state of disarray. Within three years, Boca Community achieved the "Center of Excellence" distinction from Defendant PBCSB, and was ranked first in the county based on their academic achievement test scores.

33.    In 1986, following his three highly successful years at Boca Raton Community High School, Plaintiff signed a new three (3) year contract with Defendant PBCSB to serve as the Principal of Spanish River High School, Palm Beach County's largest public high school, educating nearly three thousand students. A copy of this contract is attached hereto as Plaintiff's Exhibit 2. Plaintiff served

_____

[1]This is the standard procedure for new Palm Beach County Principals, that is, to be given a three year series of one year contracts which get renewed, or not renewed, on an annual basis, as a form of probationary employment.

*Complaint*
*Johnson v. Kowal, et al*
*Page 15*

as the Principal of Spanish River High School for the full term of the contract, which started in FY 1987, and concluded in FY 1989, upon Plaintiff's receiving reappointment for the same position on an annual basis.   Plaintiff's contracts with Defendant PBCSB as Principal of Spanish River High School, continued for ten (10) years, the most recent contract being a three (3) year contract, beginning in July of 1995 (FY 1996) and continuing through June, 1998 (FY 1998). A copy of Plaintiff's most recent contract with Defendant PBCSB is attached hereto as Plaintiff Exhibit 3.

34.    During the Plaintiff's tenure as Principal of Spanish River, he consistently received excellent evaluations ("above expectation") from a series of supervisors, namely Bruce McDonald, Fran Gill, Calvin Taylor, Carmen Archetti,  H.G. Berryman, and Elizabeth M. Decker,  high praise from parents and teachers, and positive news coverage from local and regional media.  During Plaintiff's tenure as Spanish River Principal, the school achieved the distinction of "Center of Excellence" from Defendant PBCSB and Merit School distinctions from the State of Florida. Spanish River also became the *number one* school in the School District based upon standardized test scores, and consistently had the *highest graduation rate* and *lowest drop-out rate* in the School District. The students of Spanish River received thirty (30) state and national championship awards in both academics and athletics.  Ten (10)  of his Assistant Principals became Principals during this time period.

35.    While at Spanish River, Plaintiff served three times as President of the Palm Beach Senior High Principals Association, twice as President and once as Vice President of the Palm Beach

*Complaint*
*Johnson v. Kowal, et al*
*Page 16*

Principals' Association, and the Palm Beach Representative and co-founder of the South Florida

Council of School Administrators. Plaintiff also received the following awards and recognitions:

    a.    Distinguished Educator, University of Florida Commencement Exercises Honor,

December, 1991.

    b.    Principal of the Year, Southern Interscholastic Press Association, March, 1990.

    c.    Exemplary Principal Award, U.S. Department of Education, November, 1987.

    d.    Educator of the Year, Boca Raton Rotary, November, 1987.

    e.    Bronze Leadership Award, Junior Achievement, 1987.

    36.    Plaintiff has been the focus of countless laudatory newspaper and magazine articles,

as well as featured on local television stations. Plaintiff also wrote numerous articles on education

which were published in education publications throughout the State, as well as in local newspapers

and magazines. A sampling of articles are attached hereto as Plaintiff's Composite Exhibit 4.

    37.    In September, 1996, Plaintiff, who was still under his 1995 Contract of Employment

for Supervisors and Administrators with Defendant PBCSB, and after receiving his notice of

reappointment for the FY 1997 as Principal of Spanish River High School (Plaintiff's Exhibit 5), was

promoted to the position of Area Two Executive Director, a senior administrative position within the

Palm Beach County School District, outside of the Boca Raton Community. No new contract was

executed between the Plaintiff and Defendant PBCSB; however, on September 25, 1996, Plaintiff

*Complaint*
*Johnson v. Kowal, et al*
*Page 17*

received a "change of position" notification, a copy of which is attached hereto as Plaintiff's Exhibit 6, which denoted his promotion to Area Two Executive Director, and stated that "Your appointment is subject to annual reappointment effective each July 1." On June 10, 1997, Plaintiff received a "Notification of Reappointment FY98", which reappointed him to the position of Area Two Executive Director for an additional twelve (12) month period (Plaintiff's Exhibit 7) . This reappointment notice was identical to all other contract reappointment notices, under which Plaintiff has remained employed by Defendant PBCSB since his first contract in 1983. Therefore, as of June 10, 1997, Plaintiff was a contract employee of Defendant PBCSB for the 1997-1998 school year (FY1998), thereby creating a property interest in his employment, as defined in and by the United States Constitution, Article 14, and the Constitution of the State of Florida, Article 1, §9.

38.     During each year of the Plaintiff's employment as Principal at both the Boca Raton Community High School and Spanish River High School, he received annual evaluations of his performance. Copies of his 1995 and 1996 evaluations are attached hereto as Plaintiff's Exhibits 8 and 9. In each evaluation that was conducted, Plaintiff consistently received the *highest praise* for his efforts in virtually all aspects of his job performance.

39.     In the spring of 1996, Defendant Kowal was hired by Defendant PBCSB to serve as the Superintendent of Schools for Palm Beach County, replacing embattled Superintendent Monica Uhlhorn. Defendant Kowal entered the Palm Beach County School District from a position in the Volusia County, Florida, school system. At the end of Defendant Kowal's first summer as

Superintendent, she had appointed Plaintiff to his new position as Area Two Executive Director, a position which had Plaintiff reporting directly to Defendant Kowal and serving on her so-called "Leadership Team." While Plaintiff's outstanding job performance supported this appointment, there was much vocal speculation in the community that this appointment was a means by which to eviscerate Plaintiff's power in the Boca Raton community.[2]

40.    Problems began to arise for Plaintiff during the 1996-1997 school year, with conflicts and politics playing a key role in the hierarchy of the Palm Beach County School District. Plaintiff began to receive criticism from those in the administration close to Defendant Kowal, in particular Defendants Kaiser and Pino, for being "too independent." In addition, Plaintiff had several instances where he was berated and belittled by administration personnel, particularly by Defendant Pino, who had been appointed by Defendant Kowal from her former school district in Volusia County, and by Defendant Kaiser. Defendant Kowal herself went so far as to warn Plaintiff that she was cognizant of his alleged "aspirations" to take over as Palm Beach County Superintendent of Schools, and that such event would "never happen." It became clear to Plaintiff that his independent and innovative style was becoming a threat to Defendant Kowal and her underlings, notwithstanding the inordinate success and accomplishment his achievements had contributed to the School District as a whole.

---

[2] As is reflected by the attached articles, Plaintiff's Composite Exhibit 4 , Plaintiff was highly respected and revered in the Boca Raton, Florida community, throughout Palm Beach County, and by the students in his schools. This earned praise lead to jealousy by member of the administration as reported to him by others. Additionally, Plaintiff was informed on numerous occasions that he was seen as a "political threat" to those in the upper levels of the school system.

*Complaint*
*Johnson v. Kowal, et al*
*Page 19*

41.    During the 1996/1997 school year, the Palm Beach County School District was the focus of public and media attention as a result of three incidents: (1) the Olympic Heights/ Athletic Grade Change episode (Olympic Heights Incident), (2) the Citrus Cove/ Patrol Trip Chaperone controversy (Citrus Cove Incident), and (3) the Spanish River/ Jeff Tytler Suspension (Tytler Incident).

42.    The Olympic Heights Incident involved allegations that the Principal of Olympic Heights High School had changed the grades of a student/football player so that the student could maintain his eligibility to participate in the school's athletics program. Due to Plaintiff's two decades of experience as a High School Principal, he wrote a news article to clarify the facts surrounding this incident, which was published by local media.   As a result of the publicity surrounding the Olympic Heights Incident, allegations surfaced that there was a high school athlete at Boca Raton Community High School who had been allowed to participate in the school's athletics program although, due to deficiencies in the student's attendance requirements, his participation was in violation of the existing rules of the Florida High School Activities Association.  As a member of the School District's Interscholastic Athletic Eligibility Committee (IAEC), Plaintiff was involved in the IAEC's investigation of these incidents, and kept Defendant Kowal's office apprised of the investigation.  The findings resulting from the investigation were orally reported to Defendant Kowal's office, who was later also provided with a written report.  The incident was quickly disposed of as non-actionable under Florida High School Athletic Association rules and Palm Beach County School District policies.  As a result of Plaintiff's report on these incidents to Defendant Kowal, Plaintiff was

*Complaint*
*Johnson v. Kowal, et al*
*Page 20*

telephoned by Defendant Pino, the Associate Superintendent for Accountability and School Improvement. Defendant Pino criticized Plaintiff, not for his handling of the situation, the media, or for the contents of his report; instead, Plaintiff was criticized for not reporting directly to Defendant Pino so that she could be involved in the process, and personally report of the incident to Defendant Kowal, although Defendant Pino was in no way involved in the investigation of these incidents.[3]

43.     The Citrus Cove Incident, in which a bus load of students on a field trip to Washington D.C., were left on a bus for a short period time (estimated at twenty (20) minutes), with the bus driver, among thousands of safety patrol members,  while the chaperons went into an exhibit. This incident was never brought up at any meeting, public or otherwise, by Defendants PBCSB, Kowal, or others in the administration.  In fact, no action was or would have been taken by Defendants Kowal, PBCSB, or the School District administration as a result of the chaperon's actions, had it not been for the actions of a parent-advocate, who pressed the School District for some kind of action; and due to the parent-advocate's continued pressure, the media became involved.  At a PBCSB meeting, which was open to the public, Plaintiff was asked for a comment on the actions of the chaperones.  Due to the fact that Citrus Cove was an Area Two School, Plaintiff was interviewed at a School Board meeting regarding the incident.   Plaintiff responded that the students were safe at all times and that the district routinely sends thousands of students home on a daily basis without the benefit of chaperones.   The next day, Defendant Kowal publicly criticized the chaperones in the

_____

[3] Plaintiff had previously been warned by then acting Executive Director, Dr. John Munroe, that Defendant Pino was "intimidated" by Plaintiff. He had also been informed that Defendant Kowal knew of Defendant Pino's dictatorial tactics with school system employees, yet did nothing to try to curb her activities.

media, all of whom were School District employees, prior to any formal investigation into the matter. It should be noted that Plaintiff was responsible for administering discipline to the chaperones. Due to the fact that Plaintiff's remarks to the press, and later to others in defense of Defendant Kowal's position, were incorrectly viewed by Defendant Kowal as contrary to her own, she criticized Plaintiff for his remarks, accused him of speaking against her in public, and being "pejorative" towards her in public. Due to what can only be assumed to be her own paranoia, Defendant Kowal went on to accuse Plaintiff of attempting to get her job by stating that if "he wanted to be Superintendent he had to go somewhere else, because she was staying for ten years."[4] The Citrus Cove Incident, although ended by official silence on the matter in public, would serve as the first step in Defendant Kowal's campaign to oust Plaintiff from his employment.

44.     On or about March 1, 1997, Jeff Tytler (Tytler), a popular Spanish River High School in-school suspension teacher[5], was suspended from his employment for displaying drawings made by some of his students in his classroom, which were purportedly inappropriate for display, as well as allowing his students to maintain an area of the room, created by the students, known as the "Slacker's Box", which, apparently, added comic relief to the in-school suspension program. The drawings and the "Slacker's Box" were discovered in Tytler's  classroom by Eric Davis, a school security supervisor, while looking for a particular substitute teacher. The offensive drawings were

---

[4] As a point of fact, statistically the average tenure of a metropolitan Superintendent is approximately three (3) years.

[5] The In-School Suspension program allows students who have been suspended from school to remain in school and continue their class work, in a controlled, disciplined environment, away from the rest of the student body.

*Complaint*
*Johnson v. Kowal, et al*
*Page 22*

immediately removed from the classroom. At no point prior to Eric Davis bringing these drawings and the "Slacker's Box" to the administration's attention had Defendants Kowal, PBCSB, any member of the administration, any teacher, any parent or any student complained about what was on display in the classroom or about the "Slacker's Box."

45.     In addition, Tytler, who was known throughout the school community to be very well respected by faculty and students alike for his no-nonsense approach to handling some of the school's toughest disciplinary cases, had only received one complaint from a student during his tenure at Spanish River, and that complaint, upon investigation, proved to be groundless, and unrelated to the drawings or the "Slacker's Box".

46.     Following the suspension of Mr. Tytler (at which time Plaintiff had been out of Spanish River High School of seven (7) months), there was no public response to the incident, and Plaintiff was never approached by the administration or Kowal as a result. This incident, as well as a video recording, made by Eric Davis, of the in-school suspension classroom, were reviewed by (1) the States Attorney's office; (2) the Palm Beach County School District Professional Standards Committee; (3) the Palm Beach County School District Legal Department; (4) Palm Beach County School District Security Department; and (5) the Palm Beach County School District Personnel Department.    None of these bodies, or (6) the Principal of Spanish River High School, or Defendants (7) Kowal, (8) Kaiser, (9) Pino and (10) PBCSB, found any further action was warranted.

*Complaint*
*Johnson v. Kowal, et al*
*Page 23*

47.     There has never been any evidence presented to Plaintiff by any Defendant herein, or any other person or entity, that the events which occurred in Tytler's classroom occurred during Plaintiff's tenure as Principal of Spanish River High School. This includes no evidence that the drawings which were the focus of the controversy were ever displayed during Plaintiff's tenure as Spanish River Principal.

48.     On or about April 30, 1997, Barbara Porcher and Elizabeth Decker[6], the Principal of Spanish River High School and the Area One Executive Director (serving Spanish River High School), respectively, met with Tytler to evaluate his actions, and as a result of this meeting, Tytler was returned to work the following day. However, on May 5, 1997, Tytler was informed by Principal Porcher that the investigation of this incident was being reopened.[7]

49.     On or about May 21, 1997, Plaintiff met with Defendant Kowal to introduce transfer principal Janis Andrews. During the meeting, Defendant Kowal made a snide and embarrassing comment about Plaintiff in front of Ms. Andrews to the effect that Plaintiff was always "writing on

---

[6] As a result of the Tytler Incident, Barbara Porcher was demoted to Assistant Principal classification and transferred to the District Office; Elizabeth Decker was transferred to a different area, but continued to served as Executive Director.

[7] This action came after this story was leaked to a local television station, and Defendant Kowal, at a pre-board meeting attended by Plaintiff and other administration members, ordered the investigation reopened, allegedly as a means to stall the television station's investigation until after the school year. The story was allegedly leaked the day Mr. Tytler was returned to work, by teacher Stephanie McCoy, representing herself to the media as Bonnie Plucinski, Spanish River Assistant Principal. Ms. McCoy had previously been informed that her annual contract was not to be renewed due to poor performance; in addition, she is the sister of Sandy Roberts, who was escorted by Eric Davis through Mr. Tytler's classroom to view the drawings. Most significantly, throughout this episode, **there has never been any evidence that the drawings deemed offensive were ever on the walls of Tytler's classroom while Plaintiff was Principal.**

*Complaint*
*Johnson v. Kowal, et al*
*Page 24*

his laptop," more than likely "playing video cards." This parallels several earlier instances wherein Defendant Pino, when at meetings attended by Plaintiff, would leave her seat to try to "catch him" playing video games on his computer. Unfortunately for Defendant Pino, Plaintiff was always discovered taking notes or working on other work related matters.

50.     Despite the increased level of unfounded hostility which was directed at Plaintiff from Defendants Pino and Kowal, Plaintiff continued in his position and was never approached or questioned with regard to the Tytler Incident by Defendant Kowal or any other administration personnel.

51.     On the morning of June 2, 1997, Plaintiff received a telephone call from Defendant Torcivia, an independent counsel retained by Defendants PBCSB and/or Kowal, to discuss the Tytler Incident. Plaintiff was informed at this time that he was <u>not</u> the subject of the School District's investigation into the Tytler incident, that Plaintiff should consider firing Eric Davis, the school security supervisor who discovered the drawings in Tytler's classroom, and that "the Tytler situation will not jeopardize your job since you have such a great record and were not directly involved."

52.     That same day, Plaintiff was screened as one of three finalists for a position as Associate Superintendent, a position which supervises the five area executive directors. Although Plaintiff was informed by several members of the selection committee that he was by far the most qualified for the position, he was not selected. It should be noted that although the selection

*Complaint*
*Johnson v. Kowal, et al*
*Page 25*

committed has twelve (12) members, only four (4) members vote. Of those four, one was Defendant

Pino, and two others were from Defendant Pino's department.

53.    Later that same afternoon, June 2, 1997, Plaintiff received a "pre-disciplinary" letter

from Defendant Kaiser, Chief Personnel Officer, requesting Plaintiff's presence at a June 5, 1997

meeting to discuss "job performance," and encouraged Plaintiff to seek "representation." A copy of

this letter is attached hereto as Plaintiff's Exhibit 10.   When Plaintiff confronted Defendant Kaiser

that same day regarding this letter, he was informed that it was "just a formality," he should disregard

it, that it was "sent in error,"  and that this meeting would really focus on Tytler and Spanish River

High School.

54.    On the evening of June 2, 1997, Plaintiff sought the advise of Dr. Joseph Orr ("Dr.

Orr"), the Executive Director of the Palm Beach County School Administrators Association, a

position in which Dr. Orr counsels and represents school system employees. Dr. Orr's representation

of Plaintiff was made known and was known by Defendants Kowal, Kaiser, Pino and the PBCSB

Personnel Department.  Dr. Orr informed the Personnel Department that Plaintiff would be unable

to attend the meeting due to the fact that he and Plaintiff's counsel, attorney Carey Haughwout, were

unavailable. Dr. Orr also contacted Defendant Kowal regarding the June 2, 1997 letter to Plaintiff,

and was informed that (a) the letter was a mistake, and (b) that she intended to meet with Plaintiff

privately.  Therefore, based on this representation from Defendant Kowal, Plaintiff agreed to attend

the June 5, 1997 one-on-one meeting with Defendant Kowal, without representation.

Complaint
Johnson v. Kowal, et al
Page 26

55.    On June 5, 1997, Plaintiff arrived for the "informal" meeting with Defendant Kowal,

that was supposed to take place in Defendant Kowal's office.  Upon his arrival, Plaintiff was directed

to the personnel office, where he discovered that his "private meeting" with Defendant Kowal was

now being attended by Defendants Kowal, Torcivia, Kaiser, and Don Schappert of the school police.

Plaintiff immediately stepped out of the meeting in order to contact Dr. Orr, who advised him to leave

the meeting due to Plaintiff's lack of representation, and Defendant Kowal's misrepresentation as to

the purpose and conduct of their scheduled "informal" meeting.


56.    Upon returning to the meeting, Plaintiff was informed by Defendant Kowal, his

superior,   that  he  was  required  to  remain  at  this  meeting,  or  risk  being  "charged  with

insubordination," and kicked off of Defendant Kowal's "leadership team," despite the fact that

Plaintiff again pointed out that his representatives were unavailable to attend the meeting.  Therefore,

due to this coercion and duress, Plaintiff remained in the meeting and watched the video recording

of the drawings from Tytler's classroom, which he had never seen before.[8]  After viewing the video

tape, and discussing Tytler's role, Defendant Kowal dismissed Defendants Kaiser and Torcivia, and

Plaintiff was informed by Defendant Kowal that Plaintiff and Defendant Kowal would together

"conclude the investigation" upon Plaintiff's return from vacation,  and "any further communication

would not require lawyers or other representatives."

---

[8] Indeed, no evidence was ever adduced that the drawings were known to Plaintiff, or were displayed
prominently or otherwise on the walls in Tytler's classroom while Plaintiff was a Principal at Spanish River High
School.

*Complaint*
*Johnson v. Kowal, et al*
*Page 27*

57.    On June 10, 1997, Plaintiff received his reappointment letter, as a result of which Plaintiff remained Area Two Executive Director for fiscal year 1998. (Plaintiff's Exhibit 7).

58.    In July 1997, Tytler received a non-reappointment letter due to a technicality in his paper work: his failure to receive a hard copy of his certification from the Florida Department of Education. Such certificates are often provided to teachers late due to delays at the Department of Education, and are not usually the basis for good faith non-reappointment.

59.    On July 7, 1997, Defendant Kowal personally conducted Plaintiff's annual employment evaluation, which lasted approximately two (2) hours. Throughout the evaluation, Defendant Kowal's statements were highly complementary of Plaintiff's job performance. As was his usual practice, Plaintiff provided Defendant Kowal with a binder of documents that outlined what he had accomplished over the past year as Area Two Executive Director. Defendant Kowal never informed Plaintiff during this evaluation that she felt his job performance was insufficient or otherwise lacking in any way. At the close of the evaluation, Defendant Kowal shifted the focus of their discussion to the Tytler Incident. Defendant Kowal never indicated that she believed Plaintiff had any knowledge of the drawings, of the "Slacker's Box", or that the Tytler Incident had any effect upon his performance as Area Two Executive Director or as Principal of Spanish River High School. Although Plaintiff, who had worked closely with Tytler, pointed out to Defendant Kowal that Tytler was highly regarded by students and faculty, Defendant Kowal was adamant that she was "outraged" by Tytler's actions. As the meeting closed, Plaintiff informed Defendant Kowal that Plaintiff's

representative, Dr. Orr, was leaving the country on July 8th for a four week vacation in Australia.

Defendant Kowal acknowledged that she was well aware of Dr. Orr's unavailability since the School

District had other personnel issues which were being scheduled prior to Dr. Orr's departure.

60.     As Plaintiff left his July 7, 1997 evaluation with Defendant Kowal, Plaintiff was

handed a letter from Defendant Kowal informing Plaintiff that he was "requested to attend a meeting"

with Defendants Kowal, Torcivia, and Dr. Benjamin Marlin, Associate Superintendent for School

Administration, on July 10, 1997. Due to the fact that Plaintiff's "employment" was to be discussed,

Plaintiff was "advised" that he "may bring a representative to this meeting." A copy of this letter is

attached hereto as Plaintiff's Exhibit 11.

61.     Dr. Orr, Plaintiff's personal representative, left the United States for a month's vacation

in Australia on July 8, 1997.

62.     Although Plaintiff was informed via the July 7, 1997 letter that he was required to

attend the July 10, 1997 meeting with Defendant Kowal, Plaintiff was never placed on written notice

of any specific claims against him which would be the focus of such meeting, that such meeting was

disciplinary in nature, or that such meeting may result in Plaintiff's demotion or termination, as

required by Florida Statutes, §231.29. Due to the fact that Dr. Orr was out of the United States,

Plaintiff contacted Carrie Haughwout to assist him with regard to the July 10, 1997 meeting. Ms.

Haughwout telephoned Defendant Torcivia on July 8, 1997, and was at that time informed that the

meeting on July 10 was to discuss "Dr. Johnson's continuation of employment." This was the first and only time prior to the July 10, 1997 meeting that Plaintiff or Ms. Haughwout (who does not practice administrative/employment law), were informed in any manner of the possibility of Plaintiff being the subject of disciplinary action, let alone possible termination of his employment with the Palm Beach County School District, after so many years of exemplary service, in violation of Florida Statutes, §231.29. Due to Ms. Haughwout's acknowledged inexperience and unfamiliarity with School District proceedings, of which she informed Defendant Torcivia, Ms. Haughwout had sought to delay the July 10, 1997 meeting until Dr. Orr returned from his vacation, so that Plaintiff would be properly represented at such hearing. In refusing her request, Defendants Kowal and/or Torcivia informed Ms. Haughwout that the July 10, 1997 meeting was merely a "fact finding matter," that the discussions would be "informal," and that "Dr. Orr's presence would not be needed." This statement, thus, effectively retracted the July 8, 1997 "continuation of employment" statement.

63. On July 10, 1997, Plaintiff and Ms. Haughwout met with Defendants Kowal and Torcivia. Plaintiff was thereafter informed that the focus of this meeting was "disciplinary action" against Plaintiff for the Tytler Incident. Although Plaintiff again advised of his lack of contemporaneous knowledge of this Incident, due in part to the fact that he had not been the Principal of Spanish River High School since August, 1996, Defendant Kowal stated *she* had "made her decision": that Plaintiff was to either to resign, accept a demotion to Assistant Principal (with a 60

*Complaint*
*Johnson v. Kowal, et al*
*Page 30*

day unpaid suspension and a $23,000.00 per year reduction in salary,[9]) or be immediately terminated. The effect of Defendant Kowal's pronouncement was that Plaintiff would not be provided with a termination hearing. Such a hearing would have given Plaintiff the opportunity to address the evidence, and rebut the claims of Defendant Kowal, although, even at this purported "discovery meeting," no evidence whatsoever was presented to show that the offensive drawings were displayed or that the "Slacker's Box" was used during Plaintiff's tenure at Spanish River High School, or that Plaintiff ever had knowledge thereof.

64.    Defendants Kowal and Torcivia further informed Plaintiff that they had discussed his termination with each member of Defendant PBCSB[10], after showing the members a videotape recording of Tytler's classroom, purported to be "evidence" supporting Plaintiff's termination. Defendants Kowal and/or Torcivia thereafter had polled each member of Defendant PBCSB, and allegedly had enough "votes" to have Plaintiff terminated from his employment.[11] Defendant Kowal departed the meeting, and negotiations between Defendant Torcivia and Plaintiff's counsel, who was thoroughly unprepared for this onslaught, continued. After Defendant Kowal's departure, Plaintiff commented to Defendant Torcivia that "Kowal has a hidden agenda" to which Defendant Torcivia replied "I have not heard her say that but I have heard that from others."

---

[9] When presenting Plaintiff's "demotion" option, Defendant Kowal informed Plaintiff that he would only be eligible for advancement in the School District if and when he "learned how to supervise his students."

[10] The PBCSB members were Paulette Burdick, Sandra Richmond, Jody Gleason, William Graham, Bob Hayes, Diane Heinz, and Dorthoy Montgomery.

[11] Such actions of Defendants Kowal, Torcivia and PBCSB constituted a violation of Florida Statutes, §286.011, which is discussed further in Count IV, *infra*.

*Complaint*
*Johnson v. Kowal, et al*
*Page 31*

65.     Following this meeting, Defendant Kowal was contacted by members of the administration, including Dave Cantley, Lake Worth High principal, regarding her attempts at "ousting" Plaintiff. Defendant Kowal remained firm that her actions with regard to Plaintiff were justified and proper under the circumstances. However, Defendant Kowal provided no basis in fact whatsoever to reach such a determination, other than her own self serving agenda and paranoid fear of potential media criticism of her own handling of the Tytler Incident, despite her attempts to neutralize the media.

66.     On July 16, 1997, for the first time, Plaintiff was presented with a written agreement (Settlement Agreement), which he was informed he was required to sign immediately before Defendant Kowal held a press conference later that day. A copy of the purported Settlement Agreement is attached hereto as Plaintiff's Exhibit 12. The purported Settlement Agreement, to be entered into between Plaintiff and Defendant PBCSB, was for the purpose of terminating Plaintiff's employment and releasing the School District from all issues pertaining to Plaintiff's employment with the School District, including all issues related to the conclusion of his employment. [12] In alleged consideration of Plaintiff ending his long and distinguished career as an educator, Defendant PBCSB purposed to pay Plaintiff Thirty One Thousand Dollars ($31,000.00),[13] less than half his annual salary

---

[12] This document came about without ever being the focus of any public debate or discussion by Defendant PBCSB, as is required by Florida Statutes §286.011. Additionally, while the purpose of this agreement was to terminate Plaintiff's employment contract, it is telling that the first four (4) paragraphs thereof involve releasing Defendant PBCSB from any liability for their actions. At no time prior to this meeting had Defendant PBCSB been the focus of wrong doing. Any release of Defendant PBCSB was effectively voided by Plaintiff on or about August 7, 1997, if not earlier (see Counts VIII and XV, *infra*.)

[13] The total amount of the settlement was $135,656.43: $104,000.00 of which constituted Plaintiff's earned terminal pay for unused vacation and sick leave.

*Complaint*
*Johnson v. Kowal, et al*
*Page 32*

to which he was entitled to under his employment contract.

67.    On or about July 30, 1997, Defendant PBCSB, without prior hearing, approved the purported Settlement Agreement.

68.    As a result of all of the coercive tactics employed by Defendants Kowal, Kaiser, Pino and  Torcivia, Plaintiff was placed under extreme duress to execute the purported Settlement Agreement immediately upon presentation.  The threat of immediate termination employed by Defendants Kowal and Torcivia, and calculated to force Plaintiff from his position as Area Two Executive Director and "out of the system" altogether, left Plaintiff with no reasonable alternatives but to sign the purported Settlement Agreement.  Due to Plaintiff's lack of knowledge and lack of competent representation, he was unaware of the fact that Defendants Kowal and Torcivia's threats of imminent termination were baseless, since the collusive actions of Defendants Kowal, Torcivia, and PBCSB (i.e.: private meetings and polling of PBCSB Members) were in violation of the Sunshine Law and therefore invalid, and void or voidable.

69.    As a result of Defendants Kowal and Torcivia's actions, Plaintiff was never afforded proper representation during the Defendants' onslaught: Defendants Kowal and Torcivia knew that Plaintiff's counsel was far too inexperienced and uninformed with these matters to provide effective assistance of counsel, and further, Defendants Kowal and Torcivia knew (and intentionally orchestrated their plan with such knowledge) that Dr. Orr, who would have been able to competently

*Complaint*
*Johnson v. Kowal, et al*
*Page 33*

assist Plaintiff during these episodes, was on the other side of the globe, and unavailable to assist

Plaintiff at this critical point in his career.

70.     Based on the actions of Defendants Kowal and Torcivia, Plaintiff was placed under

intense psychological pressure to sign the Settlement Agreement by Defendants Kowal and Torcivia,

based upon their misinformation, illegal conduct and breach of fiduciary responsibilities.

71.     After Plaintiff signed the purported Settlement Agreement,  Defendant Kowal held a

meeting of Palm Beach County Principals, at which she and Defendant Torcivia, in contravention of

the explicit and implied terms of the purported Settlement Agreement, and in violation of Plaintiff's

substantive due process rights, accused Plaintiff of both active participation in and prior knowledge

of the Tytler Incident. Again, evidence was not procured to substantiate these claims, and Plaintiff

was not provided an opportunity to refute same.

72.     Defendant Kowal also contacted local media regarding the Tytler Incident, and

Plaintiff's purported resignation, during which she made numerous unsubstantiated remarks

concerning Plaintiff.

73.     Although the purported Settlement Agreement released claims under Title VII of the

Civil Rights Act of 1964 and under the Age Discrimination in Employment Act, Plaintiff was <u>never</u>

afforded the mandated requirements of a "knowing and voluntary waiver of rights" under 29 U.S.C.

*Complaint*
*Johnson v. Kowal, et al*
*Page 34*

626 (f) (F) and 29 U.S.C. 626 (f) (G). These provisions mandate, among other things, that an individual must be given a period of at least twenty-one (21) days within which to consider an agreement, that *the agreement* itself must provide for an additional seven (7) days following the execution of the agreement, so that the individual may revoke any such agreement, and that the agreement shall not become effective or enforceable until the revocation period has expired. The purported Settlement Agreement between Plaintiff and Defendant PBCSB specifically omitted these terms, which coincidently furthered Defendants' conspiratorial interests.

74.    Defendants Kowal and PBCSB were all well aware of the requirements of 29 U.S.C. 626, having referred to its provisions in the past in settlements of other claims in which rights under the above-referenced statutes were to be waived. (See Plaintiff's Exhibit 13, a settlement agreement entered into by former School District employee Doug Long.)

75.    Defendants Kowal, Torcivia, Kaiser, and Pino sought to deprive Plaintiff of his lawful rights, and in doing so, illegally and improperly neglected their own obligations to Plaintiff, in furtherance of their conspiracy, and to the detriment of Plaintiff. Defendants' scheme and plan required that Plaintiff's termination be effective upon the approval of Defendant PBCSB, notwithstanding the duress and coercion to which Defendant's subjected Plaintiff and notwithstanding the known illegality of their acts in forcing the execution of the purported Settlement Agreement.

76.    On August 7, 1997, Dr. Orr, having since returned from his vacation and having

*Complaint*
*Johnson v. Kowal, et al*
*Page 35*

learned of the actions taken against Plaintiff by Defendants Kowal, Torcivia and PBCSB, personally

delivered a document to Defendant Kowal in which Plaintiff withdrew and rescinded the purported

Settlement Agreement in its entirety.[14]  In addition, Dr. Orr returned to Defendant PBCSB One

Hundred Thirty Five Thousand Six Hundred and Fifty Six Dollars and 43/100 ($135,656.43,) which

had been provided to Plaintiff as part of the purported Settlement Agreement.  This amount

constituted a settlement payment of only $31,000.00; the balance of approximately $104,000.00 was

Plaintiff's earned terminal pay for unused vacation and sick leave.


77.     On or about August 8, 1997, Plaintiff reported for work pursuant to his employment

contract with Defendant PBCSB, in his capacity as Area Two Executive Director.


78.     On or about August 8, 1997, Defendant Kowal wrote a letter to Plaintiff, wherein she

informed Plaintiff that his rescission of the purported Settlement Agreement was not accepted, and

returned the check for $135,656.43 which Plaintiff had sent to PBCSB with his rescission.  A copy

of this letter and the check is attached hereto as Plaintiff's Exhibit 14.


79.     On or about August 11, 1997, Plaintiff was informed by Nancy Courtney, an employee

of Defendant PBCSB in the Personnel Department, through his personal representative Dr. Orr, that

he was "considered retired" and therefore should not report for further employment assignment.

Therefore, Plaintiff was effectively terminated from his employment.

---

[14] Plaintiff contends that he did so, notwithstanding that the purported Settlement Agreement was void or
voidable , at any time, in the first instance.

*Complaint*
*Johnson v. Kowal, et al*
*Page 36*

80.    At no time prior or following Plaintiff's forced resignation and termination was he afforded the opportunity to request a hearing or any other fact finding meeting to contest the actions of Defendants Kowal, Torcivia and PBCSB, and no formal determination of probable cause for termination, demotion or suspension was ever made or considered by any properly convened meeting of Defendant PBCSB or its representatives.

81.    Defendant, PBCSB, by and through its agents and representatives, impliedly represented that during the course of Plaintiff's employment, Defendants Kowal, Torcivia, Kaiser and Pino would act in good faith and would deal fairly and honestly with him.

82.    Based on the terms and conditions of Plaintiff's employment, he was informed and understood that upon acceptance of employment he would continue to be so employed, as long as his actual job performance was satisfactory. Plaintiff understood and believed that the laws and policies of the State of Florida, the Palm Beach County School District, and Defendant PBCSB afforded him the right not to be discharged without cause. Up until the time of termination and/or forced resignation under coercion and duress, Plaintiff had not previously been advised, in writing, that his job status was in jeopardy, that his job performance was anything other than exemplary, that he was facing termination, or that he was facing a four (4) level reduction in job classification, along with a substantial pay cut, if he wished to remain an employee of Defendant PBCSB during Defendant Kowal's tenure as Superintendent.

83. Plaintiff was never provided by Defendants, and in particular by Defendant Kowal, any notice that his work performance was less than satisfactory in any way.

84. Prior to Plaintiff's termination and/or forced resignation, he was never afforded sufficient notice to contest the unfounded allegations levied against him by Defendants Kowal and Torcivia, which lead to his termination and/or forced resignation.

85. Moreover, Plaintiff was never afforded an opportunity to be heard to contest his termination and/or forced resignation, or to address the accusations against him being made by Defendants. Plaintiff was also never afforded the opportunity to confront and cross-examine his accusers, any witnesses against him, or to present evidence on his own behalf to contest his discharge and/or forced resignation.

86. As noted above, on July 10, 1997, Plaintiff was advised by Defendants Kowal and Torcivia that Defendant Torcivia had polled members of Defendant PBCSB, that Defendants Kowal and Torcivia had enough votes to terminate Plaintiff, that his termination was effectively a "done deal," and that any formal action of Defendant PBCSB would be merely a perfunctory ratification of a previously made secret decision of Defendant PBCSB. These actions of Defendants Kowal, Torcivia, and PBCSB were direct violations of the letter and the spirit of Florida's Sunshine law. Such statements concerning these actions to Plaintiff resulted in Plaintiff having no effective choice as to whether the proposed Settlement Agreement was in his best interests, and constituted extreme

*Complaint*
*Johnson v. Kowal, et al*
*Page 38*

and irrefutable duress upon Plaintiff.  Further, Plaintiff was never afforded the opportunity to publicly

contest these illegal actions of Defendants Kowal, Torcivia and  PBCSB which violated the Sunshine

Laws, and resulted in his termination and/or forced resignation.


87.    Further, Defendants Kowal, Torcivia, and PBCSB failed to ever present evidence or

other factual findings of any sort that the Tytler Incident had  an adverse effect upon any individual

student, group of students, the faculty or the school as a whole, which would or did constitute

reasonable grounds upon which to base any action against Plaintiff, including Plaintiff's termination

and/or forced resignation.


88.    The State of Florida and Defendant PBCSB has established grievance and termination

procedures for permanent employees, entitling such employees to certain procedural due process

rights with regard to disciplinary actions, demotions and/or terminations.  Through the adoption of

these procedures, Plaintiff had a reasonable and legitimate expectation to both continued employment

and due process.   In derogation of his rights, in  violation of law, and in the course of Defendants'

unlawful conspiracy, Plaintiff was wrongfully denied both such pre-termination and post-termination

due process rights as have been established by the State of Florida and Defendant PBCSB.


89.    Plaintiff was terminated without Defendants ever establishing just cause for such

termination.

*Complaint*
*Johnson v. Kowal, et al*
*Page 39*

90.     The motive, purpose, effect and intent of Plaintiff's constructive discharge was, among
other things, to rid Defendant Kowal of a School District employee whom she viewed as a threat to
her continued tenure as Superintendent, and to detract attention from her own poor job performance,
her ineptitude, and her inability to be a strong, resourceful and effective leader. Due to the fact that
Plaintiff had proved himself to be a strong, resourceful and effective leader, Defendant Kowal and
her co-conspirators felt threatened, which motivated them in their actions against Plaintiff.

91.     In addition, Defendant Kowal's actions against Plaintiff were motivated, in part, by
her want and desire to appear strong for the media, and were not based upon her desire to protect
the rights of the students of Palm Beach County, or to cause justice to be had.[15]

92.     Upon information, Defendants Kowal, Torcivia and PBCSB may have also coerced
other highly qualified employees, into resignation by threatening them with discharge, or multiple
level demotions and significant pay reductions, following years of high level performance, if they
refused to resign.

93.     But for the actions of Defendants, Plaintiff would have refused to resign his position,
or accept a substantial demotion in pay status and tenure. Only after being illegally coerced and
pressured by Defendants to resign, under the extreme financial and psychological duress, pressure and

---

[15] The *Palm Beach Post* through a Freedom of Information Act request was able to retrieve Defendant Kowal's
"list of goals" as Superintendent. First on Defendant Kowal's list was "Neutralize the Media"; sixth on her list of goals
as Superintendent was "Improve Education." See Plaintiff's Exhibit 4.

*Complaint*
*Johnson v. Kowal, et al*
*Page 40*

coercion, caused by Defendants, individually, jointly and as co-conspirators, did Plaintiff conclude

he was left with no choice but to resign.

94.    In addition, Plaintiff did not voluntarily resign; rather, he was in fact terminated by

Defendant PBCSB, after effectively revoking and rescinding the Settlement Agreement only a week

after the alleged "formal" Board approval thereof, which had occurred  in contravention of the

Sunshine Laws.

95.    Defendants Kowal and PBCSB have established, and in terminating Plaintiff, have

implemented employment policies and practices which are illegal, arbitrary, capricious, discriminatory

and have no rational purpose other than to enhance Defendant Kowal's power base, and thereby that

of Defendants Kaiser, Torcivia and Pino, and to cause irreparable damage to Plaintiff's career,

reputation, and person.

96.    Defendants have subjected Plaintiff to unlawful employment policies and practices in

a manner depriving Plaintiff of rights and privileges secured by the Unites States Constitution, The

Constitution of the State of Florida, the Administrative Procedures Act, and the policies of Defendant

PBCSB and the Palm Beach County School District.

97.    But for Defendant PBCSB's constructive discharge of Plaintiff, Plaintiff would have

continued in his employment with Defendant PBCSB. Plaintiff was happy and successful in his

*Complaint*
*Johnson v. Kowal, et al*
*Page 41*

position as Area Two Executive Director, and but for the Defendants' conduct which resulted in Plaintiff's termination and/or forced resignation, would have, within a reasonable degree of probability, continued to serve the students of Palm Beach County in an effective and positive manner.

98.    Except as otherwise noted, all of the Defendants' conduct described herein was committed intentionally, willfully, maliciously, recklessly, and with gross disregard for Plaintiff's rights.

99.    All of the conduct complained of herein was committed with gross indifference to Plaintiff's rights, motivated by the desire to further the Defendants' influence and power base and to further the careers of the Defendants individually and as co-conspirators.

100.    As a direct and proximate result of Defendants' conduct, Plaintiff has been and is presently suffering serious mental and emotional distress, anxiety, ridicule, humiliation, indignity, loss of esteem, embarrassment, loss of civil and constitutional rights, loss of wages and benefits, and loss of future employment prospects.

101.    As a direct and proximate result of Defendants' actions in publicizing Plaintiff's discharge, Plaintiff's employment prospects have been permanently and irreparably damaged.

*Complaint*
*Johnson v. Kowal, et al*
*Page 42*

102. As a direct and proximate result of Defendants' actions in publicizing Plaintiff's discharge, Plaintiff's liberty interests have been permanently and irreparably damaged.

103. Plaintiff has no remedy at law sufficient to redress all of the deprivations of his previously mentioned rights, and the continued deprivation thereof. Plaintiff will suffer irreparable harm unless Defendants are enjoined by this Court from the ongoing conduct in derogation of his rights. The deprivation of Plaintiff's rights is ongoing and can be redressed only by the granting of temporary and permanent injunctive relief hereinafter prayed for.

*Complaint*
*Johnson v. Kowal, et al*
*Page 43*

## COUNT I
## VIOLATION OF DUE PROCESS/ PROCEDURE:
## TERMINATION OF PLAINTIFF'S EMPLOYMENT CONTRACT

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 1, 16-19, 21-22, and 24-103 as if specifically alleged herein.

104.    Plaintiff was employed by Defendant PBCSB as the Area Two Executive Director, pursuant to contract, which had a duration of 3 years. A copy of this contract is attached hereto as Plaintiff's Exhibit 3.

105.    As a result of Defendants Kowal, Torcivia, and PBCSB's action, which violated Florida Statutes §286.011 (Sunshine Law) and PBCSB's own internal procedures, on or about July 16, 1997, Plaintiff was fraudulently induced, coerced, placed under duress, and otherwise forced to sign the purported Settlement Agreement, effectively terminating his employment contract with Defendant PBCSB.

106.    Due to the invalid, illegal, and otherwise unconscionable text and nature of this purported Settlement Agreement , the agreement was and is void or voidable.

107.    On or about August 7, 1997, Plaintiff formally withdrew, rescinded, or otherwise voided the purported Settlement Agreement, by providing Defendant PBCSB, through Defendant

*Complaint*
*Johnson v. Kowal, et al*
*Page 44*

Kowal, with written notice of such rescission.  A copy of this notice is attached hereto as Plaintiff's

Exhibit 16.


108.    On or about August 8, 1997, Plaintiff reported for work pursuant to his employment

contract with Defendant PBCSB, in his capacity as Area Two Executive Director, an administrative

position.


109.    On or about August 8, 1997, Defendant Kowal wrote a letter to Plaintiff, wherein she

informed Plaintiff that his rescission of the purported Settlement Agreement was not accepted by

Defendant PBCSB, and enclosed Plaintiff's check for the settlement amount of $135,656.43, which

Plaintiff had sent to PBCSB with his rescission.  A copy of this letter is attached hereto as Plaintiff's

Exhibit 14.


110.    On or about August 11, 1997, Plaintiff was informed, through his personal

representative Dr. Orr, by Nancy Courtney, an employee of Defendant PBCSB's Personnel

Department, that he was "considered retired," and therefore should not report further employment

assignment.


111.    The August 11, 1997 actions of Defendant PBCSB constituted dismissal of the

Plaintiff from his employment, or he had previously been improperly dismissed, and/or terminated

prior to that date.

*Complaint*
*Johnson v. Kowal, et al*
*Page 45*

112.   Pursuant to Florida Statute §231.29, Personnel of School Systems, Assessment

Procedures and Criteria:

(1) the superintendent shall establish procedures for assessing the performance of duties and responsibilities of all instructional, administrative, and supervisory personnel employed in his or her district.

(2) The assessment procedure shall comply with, but shall not be limited to, the following requirements:

(a) An assessment relating to the criteria specified in subsection (3) shall be conducted for each employee at least once a year.  Such assessment shall be based upon sound educational principles and contemporary research in effective educational practices.

(b) All personnel shall be fully informed of the criteria and procedures associated with the assessment process before the assessment takes place.

(c) A written report of each assessment shall be made and a copy thereof shall be given to the employee no later than 10 days after the assessment takes place.  The written report of assessment shall be discussed with the employee by the person responsible for preparing the report.  The employee shall have the right to initiate a written response to the assessment, and the response shall become a permanent attachment to his or her personnel file.

(d) In the event that an employee is not performing his or her duties in a satisfactory manner, **the evaluator shall notify the employee in writing of such determination and describe such unsatisfactory performance.  The evaluator shall thereafter confer with the employee, make recommendations with respect to specific areas of unsatisfactory performance, and provide assistance in helping to correct such deficiencies within a reasonable, prescribed period of time.**

113.   Pursuant to Florida Statute §231.291, Personnel of School Systems, Personnel Files,

public school system employee personnel files shall be maintained according to the following

provisions:

(2)(a) Materials relating to work performance, discipline, suspension, or dismissal

must be reduced to writing and signed by a person competent to know the facts or make the judgment.

(b) 1. No such materials may be placed in a personnel file unless they have been reduced to writing within 45 days, exclusive of the summer vacation period, of the school system administration becoming aware of the facts reflected in the materials.

2. Additional information related to such written materials previously placed in the file may be appended to such materials to clarify or amplify them as needed.

(c) A copy of such materials to be added to an employee's personnel file shall be provided to the employee either:

1. By certified mail, return receipt requested, to his or her address of record; or

2. By personal delivery. The employee's signature on a copy of the materials to be filed shall be proof that such materials were given to the employee, with the understanding that such signature merely signifies receipt and does not necessarily indicate agreement with its contents.

(d) An employee has the right to answer in writing any such materials in a personnel file on July 1, 1983, as well as any such materials filed thereafter, and the answer shall be attached to the file copy. An employee has the right to request that the superintendent or the superintendent's designee make an informal inquiry regarding material in the employee's personnel file which the employee believes to be false. **The official who makes the inquiry shall append to the material a written report of his or her findings.**

(4) The term "personnel file," as used in this section, means all records, information, data, or materials maintained by a public school system, in any form or retrieval system whatsoever, with respect to any of its employees, which is uniquely applicable to that employee whether maintained in one or more locations.

114.    Florida Statue § 231.36, Personnel of School Systems, Contracts with Instructional Staff, Supervisors, and Principals, guides school districts in their relationships with employees, including dismissal of employees. The relevant portions of §231.36 are set forth below:

(1)(b) A supervisor or principal shall be properly certified and shall receive a written contract as specified in chapter 230. Such contract may be for an initial period not to exceed 3 years, subject to annual review and renewal. After the first 3 years, the contract may be renewed for a period not to exceed 3 years and shall contain provisions for dismissal during the term of the contract only for just cause, in addition to such other provisions as are prescribed by the school board.

(4)(a) An employee who has continuing contract status prior to July 1, 1984, shall be entitled to retain such contract and all rights arising therefrom in accordance with existing laws, rules of the State Board of Education, or any laws repealed by this act, unless the employee voluntarily relinquishes his or her continuing contract.

(4)(b) Any member of the district administrative or supervisory staff and any member of the instructional staff, including any principal, who is under continuing contract may be dismissed or may be returned to annual contract status for another 3 years in the discretion of the school board, at the end of the school year, when a recommendation to that effect is submitted in writing to the school board on or before April 1 of any school year, giving good and sufficient reasons therefor, by the superintendent, by the principal if his or her contract is not under consideration, or by a majority of the school board. The employee whose contract is under consideration shall be duly notified in writing by the party or parties preferring the charges at least 5 days prior to the filing of the written recommendation with the school board, and such notice shall include a copy of the charges and the recommendation to the school board. The school board shall proceed to take appropriate action. Any decision adverse to the employee shall be made by a majority vote of the full membership of the school board. Any such decision adverse to the employee may be appealed by the employee pursuant to s. 120.68.

(4)(c) Any member of the district administrative or supervisory staff and any member of the instructional staff, including any principal, who is under continuing contract may be suspended or dismissed at any time during the school year; however, the charges against him or her must be based on immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, drunkenness, or conviction of a crime involving moral turpitude. Whenever such charges are made against any such employee of the school board, the school board may suspend such person without pay; but, if the charges are not sustained, he or she shall be immediately reinstated, and his or her back salary shall be paid. In cases of suspension by the school board or by the superintendent, the school board shall determine upon the evidence submitted whether the charges have been sustained and, if the charges are sustained, shall determine either to dismiss the employee or fix the terms under which he or she may be reinstated. If such charges are sustained by a majority vote of the full membership of the school board and such employee is discharged, his or her

contract of employment shall be thereby canceled. Any such decision adverse to the employee may be appealed by the employee pursuant to s. 120.68, provided such appeal is filed within 30 days after the decision of the school board.

(6)(b) Any member of the district administrative or supervisory staff, including any principal but excluding an employee specified in subsection (4), may be suspended or dismissed at any time during the term of the contract; however, the charges against him or her must be based on immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, drunkenness, or conviction of any crime involving moral turpitude. Whenever such charges are made against any such employee of the school board, the school board may suspend the employee without pay; but, if the charges are not sustained, he or she shall be immediately reinstated, and his or her back salary shall be paid. In cases of suspension by the school board or by the superintendent, the school board shall determine upon the evidence submitted whether the charges have been sustained and, if the charges are sustained, shall determine either to dismiss the employee or fix the terms under which he or she may be reinstated. If such charges are sustained by a majority vote of the full membership of the school board and such employee is discharged, his or her contract of employment shall be thereby canceled. Any such decision adverse to the employee may be appealed by him or her pursuant to s. 120.68, provided such appeal is filed within 30 days after the decision of the school board.

115.   In addition to the rules prescribed by Florida Statutes, Defendant PBCSB has also promulgated regulations regarding Suspension and Dismissal of Employees (Policy 3.27), pursuant to Florida Statute §231.001. The relevant portions of this policy is set forth below:

(2)   Upon a finding of probable cause by the Superintendent sufficient to warrant a recommendation to the School Board for suspension without pay and dismissal, the Superintendent shall communicate in writing to the employee:

(a)   A concise statement of the Superintendent's recommendation(s) to the School Board affecting the employee's employment status.

(b)   A statement of the date, time, and place where the School Board shall meet in consider the Superintendent's actions and recommendation(s).

(c)   A statement of the legal authority for the Superintendent's actions and recommendation(s).

*Complaint*
*Johnson v. Kowal, et al*
*Page 49*

(d)    A short and plain statement of the changes made by the Superintendent against the employee.

(e)    A statement of the time limit for requesting a hearing before the School Board.

(3)    All employees recommended for suspension without pay and dismissal shall have the right to request a hearing provided such a request is made in writing to the School Board within 15 days of the receipt of the Superintendent's written notice.

(4)    Any person who receives written notice from the Superintendent of a recommendation(s) for suspension without pay and dismissal and who fails to request a hearing within 15 days, shall have waived the right to request a hearing on such matters and the allegations and charges as contained in the notice shall be deemed by the School Board to be true for the purpose of entering a final order on the Superintendent's recommendation(s).

(5) & (6) Hearing Procedures

(7)    A majority vote of the membership of the School Board shall be required to sustain the Superintendent's recommendation.  A final order shall be entered ninety (90) days after the last date of the hearing or receipt of the hearing transcript, whichever is later.

(8)    The determination of the School Board shall be final as to the sufficiency or insufficiency of the grounds for termination of employment.

116.    Defendant PBCSB violated Plaintiff's rights under Fla. Stat §231.29 in the following manners:

a.    Failing to inform Plaintiff of the criteria and procedures associated with the assessment process before the assessment takes place. (2)(b)

b.    Failing to give Plaintiff his assessment report within 10 days, which thereby eviscerated

*Complaint*
*Johnson v. Kowal, et al*
*Page 50*

his opportunity to respond if such report was unfavorable. (2)(c)

    c.    Failing to provide Plaintiff with recommendations on how to improve. (2)(d)

    117.    Defendant PBCSB violated Plaintiff's rights under Fla. Stat §231.291 in the following manners:

    a.    Failing to provide Plaintiff with all evaluations or other assessments that would become part of his employment file, thereby eviscerating his rights under §231.291(2)(d). (2)(c)

    b.    Providing Plaintiff with the opportunity to request a formal inquiry into any alleged wrongdoing of Plaintiff. (2)(d)

    118.    Defendant PBCSB violated Plaintiff's rights under Fla. Stat §231.36 in the following manners:

    a.    Failing to dismiss Plaintiff for just cause.(1)(b)

    b.    Failing to follow procedures for timely presentation of notices, and for presentation of notices in general.  (4)(b)

    c.    Failing to charge Plaintiff with any violations which would allow for immediate dismissal.  (6)(b)

    119.    Defendant PBCSB violated Plaintiff's rights under PBCSB Policy 3.27 in the

*Complaint*
*Johnson v. Kowal, et al*
*Page 51*

following manners:

    a.    Failing to provide a formal finding of probable cause . (2)

    b.    Failing to provide Plaintiff recommendations for improvement.(2)

    c.    Failing to provide Plaintiff with notice of his rights to an administrative hearing, or requirements for requesting such hearing. (3)

    d.    Failing to gather the necessary majority vote of Defendant PBCSB for dismissal of Plaintiff. (7)

    120.    Plaintiff has sustained injury due to Defendants Kowal, Kaiser and PBCSB's action in the form of lost earnings, impairment of future employment prospects, emotional damage, and damage to his reputation, and loss of the value of the contract.

    **WHEREFORE** Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter judgement against Defendant **JOAN KOWAL, JOANNE KAISER,** and **PALM BEACH COUNTY SCHOOL BOARD**, for any and all damages to the Plaintiff that resulted from the violation of his Procedural Due Process rights, reinstatement of his employment, rescission of the purported Settlement Agreement, and whatever other relief this Court deems proper.

*Complaint*
*Johnson v. Kowal, et al*
*Page 52*

## COUNT II
## VIOLATION OF DUE PROCESS/ PROPERTY

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 2, 16-19, 21-22, and 24-103 as if specifically alleged herein.

121.   Plaintiff was employed by Defendant PBCSB as the Area Two Executive Director, pursuant to contract, which had a duration of three (3) years. A copy of this contract is attached hereto as Plaintiff's Exhibit 3.

122.   Plaintiff was reappointment as either Principal or Area Two Executive Director under this contract on an annual basis, by way of written notifications, examples of which are also attached hereto as Plaintiff's Exhibits 5, and 7. The annual reappointment would usually occur in May or June, and be effective for one year.

123.   On or about June 10, 1997, Plaintiff received a written notification from Defendant Kaiser on behalf of Defendant PBCSB that he would be reappointed as Area Two Executive Director for the 1997-1998 school year (Plaintiff's Exhibit 7.)

124.   This written notification created in Plaintiff a property interest in his employment with Defendant PBCSB until the end of fiscal year 1998, until on or about June 30, 1998.

*Complaint*
*Johnson v. Kowal, et al*
*Page 53*

125.   Following Plaintiff's reappointment, Defendants Kowal, Torcivia, and PBCSB, began a course of actions intended to result in the termination or demotion of Plaintiff. Defendants' action included violation of Florida's Sunshine Law, by meeting, discussing, polling, agreeing, and/or otherwise orchestrating Plaintiff's termination outside of public view, violation of Florida Statutes §§231.29, 231.291, 231.36, 231.001 and PBCSB Policy 3.27, and violation of Plaintiff's due process rights prior to his termination from his employment.

126.   As a result of the actions of Defendants Kowal, Torcivia, and PBCSB, on July 16, 1997, Plaintiff was coerced into signing the purported Settlement Agreement (Plaintiff's Exhibit 12), which allegedly constituted Plaintiff's resignation from his employment with Defendant PBCSB. This agreement was "approved" by Defendant PBCSB on or about July 30, 1997, without any prior public hearing.

127.   At no time prior to Plaintiff's signing of the purported Settlement Agreement was he provided with written notice of Defendants intentions to terminate and/or demote Plaintiff.

128.   At no time prior to Plaintiff's signing of the purported Settlement Agreement was Plaintiff provided with an opportunity to present evidence, witnesses, or otherwise refute the allegations levied against him by Defendants, whether at a meeting or hearing before School District officials or members of Defendant PBCSB, or otherwise.

*Complaint*
*Johnson v. Kowal, et al*
*Page 54*

129.   At no time prior to Plaintiff's signing the purported Settlement Agreement was there ever a formal or informal finding of guilt, culpability, or responsibility on the part of Plaintiff of any wrongdoing with regard to the Tytler Incident or any other facet of his employment with Defendant PBCSB, or an admission thereof by Plaintiff.

130.   Although the purported Settlement Agreement was void and/or voidable upon inception, Plaintiff formally rescinded said agreement on August 7, 1997, by way of a letter to Defendant Kowal. On August 8, 1997, Plaintiff reported to his job as Area Two Executive Director.

131.   On or about August 8, 1997, Defendant Kowal wrote a letter to Plaintiff, wherein she informed Plaintiff that his August 7, 1997 rescission of the purported Settlement Agreement was not accepted by Defendant PBCSB, and returned Plaintiff's check for $135,656.43, which Plaintiff had sent to PBCSB with his rescission. A copy of this letter and check are attached hereto as Plaintiff's Exhibit 14.

132.   On or about August 11, 1997, Plaintiff was informed by Defendant PBCSB that he was no longer be employed pursuant to his employment contract.

133.   Therefore, at all material times hereto, Plaintiff was terminated from his employment by Defendant PBCSB without the benefit of his procedural due process rights. As a result of this termination, Defendants violated Plaintiff's property right in his employment.

*Complaint*
*Johnson v. Kowal, et al*
*Page 55*

134.    Due to the fact that Plaintiff's employment constitutes a property right, his employment is afforded the due process protection under the Fourteenth Amendment to the United States Constitution, and the corresponding rights in The Constitution of The State of Florida, Article 1, Section 9.  Due process when terminating a contracted employee of Defendant PBCSB must include written notices provided to the employee with regard to the allegations that form the basis for his termination, as well as a hearing prior to termination at which time the employee is given an opportunity to address the allegations against him. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Spiegel v. University of South Florida, 555 So.2d 428 (Fla. 2nd DCA 1989).

135.    Defendant PBCSB has violated the 4th and 14th Amendments to the United States Constitution, as well as Article One, Section Nine of the Constitution of the State of Florida by failing to provide Plaintiff with all required due process procedures before depriving him of his property.

136.    Plaintiff was damaged by this deprivation of his procedural and substantive due process rights, in that he lost his proprietary rights to employment.

WHEREFORE, the Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter judgment for damages against Defendants **JOAN KOWAL, GLEN TORCIVIA, JOANNE KAISER**, and **PALM BEACH COUNTY SCHOOL BOARD**, for violation of his due process rights under the Fourth and  Fourteenth Amendments to the United States constitution and Article

*Complaint*
*Johnson v. Kowal, et al*
*Page 56*

One Section 9 of the Constitution of the State of Florida, and whatever other relief this Court deems

just and proper.

## COUNT III
## VIOLATION OF DUE PROCESS/ LIBERTY

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained

in Paragraphs 2, 16-19, 21-22, and 24-103 as if specifically alleged herein.

137.    Plaintiff was employed by Defendant PBCSB, as the Area Two Executive Director,

pursuant to contract, which had a duration of 3 years.  A copy of this contract is attached hereto as

Plaintiff's Exhibit 3.                                                                    ı

138.    Plaintiff received reappointment under this contract on an annual basis, by way of

written notifications, examples of which are also attached hereto as Plaintiff's Exhibits 5, and 7.  The

annual reappointment would usually occur in May or June, and be effective for one year.

139.    On or about June 10, 1997, Plaintiff received a written notification from Defendant

Kaiser on behalf of Defendant PBCSB that he would be reappointed as Area Two Executive Director

for the 1997-1998 school year (Plaintiff's Exhibit 7.)

140.    This written notification created in Plaintiff a property interest in his  employment with

*Complaint*
*Johnson v. Kowal, et al*
*Page 57*

Defendant PBCSB until the end of fiscal year 1998.

141.    Following Plaintiff's reappointment, Defendants Kowal, Torcivia, and PBCSB, began a course of actions intended to result in the termination or demotion of Plaintiff. Defendants' action included violation of Florida's Sunshine Law, by meeting, discussing, polling, agreeing, and/or otherwise orchestrating Plaintiff's termination outside of public view, violation of Florida Statutes §§231.29, 231.291, 231.36, 231.001 and PBCSB Policy 3.27, and violation of Plaintiff's due process rights prior to his termination from his employment.

142.    As a result of the actions of Defendants Kowal, Torcivia, and PBCSB, on July 16, 1997, Plaintiff was coerced into signing the purported Settlement Agreement (Plaintiff's Exhibit 12), which allegedly constituted Plaintiff's resignation from his employment with Defendant PBCSB. This Settlement Agreement was "approved" by Defendant PBCSB on or about July 30, 1997, without any prior public hearing.

143.    At no time prior to Plaintiff's signing of the purported Settlement Agreement was he provided with written notice of Defendants intentions to terminate and/or demote Plaintiff.

144.    At no time prior to Plaintiff's signing of the purported Settlement Agreement was Plaintiff provided with an opportunity to present evidence, witnesses, or otherwise refute the allegations levied against him by Defendants, whether at a meeting or hearing before School District

*Complaint*
*Johnson v. Kowal, et al*
*Page 58*

officials or members of Defendant PBCSB, or otherwise.

145.   At no time prior to Plaintiff's signing the purported Settlement Agreement was there ever a formal or informal finding of guilt, culpability, or responsibility on the part of Plaintiff of any wrongdoing with regard to the Tytler Incident, or any other facet of his employment with Defendant PBCSB.

146.   Although the purported Settlement Agreement was void and/or voidable upon inception, Plaintiff formally rescinded said agreement on August 7, 1997, by way of a letter to Defendant Kowal. On August 8, 1997, Plaintiff reported to his job as Area Two Executive Director.

147.   On or about August 8, 1997, Defendant Kowal wrote a letter to Plaintiff, wherein she informed Plaintiff that his August 7, 1997 rescission of the purported Settlement Agreement was not accepted by Defendant PBCSB, and returned Plaintiff's check for $135,656.43, which Plaintiff had sent to PBCSB with his rescission. A copy of this letter and check are attached hereto as Plaintiff's Exhibit 14.

148.   On or about August 11, 1997, Plaintiff was informed by Defendant PBCSB that he would no longer be employed pursuant to his employment contract.

149.   Therefore, prior to, on or about August 11, 1997, Plaintiff was terminated from his

*Complaint*
*Johnson v. Kowal, et al*
*Page 59*

employment by Defendant PBCSB without the benefit of his procedural due process rights. As a result of this termination, Defendants violated Plaintiff's property right in his employment.

150.   Following Plaintiff's signing of the purported settlement agreement, Defendants Kowal, Torcivia, and/or PBCSB (by and through its agents and employees,) made disparaging remarks concerning Plaintiff and about Plaintiff's performance with regard to his employment with Defendant PBCSB, which were false, unsupported by evidence, and extremely harmful to Plaintiff's personal and professional reputation.

151.   As a result of these remarks, Plaintiff continues to suffer the loss of his reputation and prestige in the community, in conjunction with the loss of his employment.

152.   Defendants' remarks were presented in such a manner as to imply that Plaintiff admitted wrongdoing with regard to the Tytler Incident.

153.   At no time following Plaintiff's coerced resignation and/or termination from his employment, was Plaintiff provided with an opportunity to answer and challenge the allegations levied against him by the Defendants. Therefore, Plaintiff was never provided due process by which to prevent the deprivation of his constitutionally protected right to liberty, which was violated by Defendants' post-termination remarks.

*Complaint*
*Johnson v. Kowal, et al*
*Page 60*

154. The actions of Defendants have resulted in the violation of Plaintiff's right to liberty as guaranteed the Fourth and Fourteenth Amendment, to the United States Constitution.

155. This violation occurred due to the fact that Defendant PBCSB deprived Plaintiff of this right to liberty without affording him any due process, specifically a post-termination hearing in which Plaintiff would be given the opportunity to exonerate himself.

156. The United States Supreme Court has held that a liberty interest will be impaired when the reasons for an employee's discharge from employment are disclosed to the general public. *Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2974, 48 L.Ed. 684 (1976).* Thus, even though an employee may not be entitled to due process protections because he has no property interest in his employment, he might still be entitled to procedural protections "for the narrow purpose of vindicating his reputation." *Robinson v. Wichita Falls and North Texas Community Action Corp., 507 F.2d 245, 252 (5th Cir. 1975).* Crews v. Ellis, 531 So.2d 1372 (Fla. 1 DCA 1988).

**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this court enter judgement for damages against Defendants **JOAN KOWAL, JOANNE KAISER**, and **PALM BEACH COUNTY SCHOOL BOARD**, for violation of this right to liberty without due process, and whatever other relief this Court deems just and proper.

*Complaint*
*Johnson v. Kowal, et al*
*Page 61*

## COUNT IV
## VIOLATION OF FLORIDA STATUTE 286.011
## "GOVERNMENT IN THE SUNSHINE"

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in

Paragraphs 3, 16-21, and 24-103 as if specifically alleged herein.

157.    The citizens of the State of Florida enjoy the right to have all public meetings and

records available for their perusal.  This right is commonly know as "The Sunshine Law."  This law

can be found at Florida Statutes §286.011, Public Meetings and Records; Public Inspection; Criminal

and Civil Penalties.  Relevant portions of this law are set forth below:

> (1) All meetings of any board or commission of any state agency or authority or of
> any agency or authority of any county, municipal corporation, or political subdivision,
> except as otherwise provided in the Constitution, <u>at which official acts are to be taken</u>
> <u>are declared to be public meetings open to the public at all times, and no resolution,</u>
> <u>rule, or formal action shall be considered binding except as taken or made at such</u>
> <u>meeting. The board or commission must provide reasonable notice of all such</u>
> <u>meetings.</u>

> (2) The minutes of a meeting of any such board or commission of any such state
> agency or authority shall be promptly recorded, and such records shall be open to
> public inspection.  The circuit courts of this state shall have jurisdiction to issue
> injunctions to enforce the purposes of this section upon application by any citizen of
> this state.

> (3)(a) Any public officer who violates any provision of this section is guilty of a
> noncriminal infraction, punishable by fine not exceeding $500.

> (b) Any person who is a member of a board or commission or of any state
> agency or authority of any county, municipal corporation, or political subdivision who
> knowingly violates the provisions of this section by attending a meeting not held in

accordance with the provisions hereof is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

(c) Conduct which occurs outside the state which would constitute a knowing violation of this section is a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

(4) Whenever an action has been filed against any board or commission of any state agency or authority or any agency or authority of any county, municipal corporation, or political subdivision to enforce the provisions of this section or to invalidate the actions of any such board, commission, agency, or authority, which action was taken in violation of this section, and the court determines that the defendant or defendants to such action acted in violation of this section, the court shall assess a reasonable attorney's fee against such agency, and may assess a reasonable attorney's fee against the individual filing such an action if the court finds it was filed in bad faith or was frivolous. Any fees so assessed may be assessed against the individual member or members of such board or commission; provided, that in any case where the board or commission seeks the advice of its attorney and such advice is followed, no such fees shall be assessed against the individual member or members of the board or commission. However, this subsection shall not apply to a state attorney or his or her duly authorized assistants or any officer charged with enforcing the provisions of this section.

(5) Whenever any board or commission of any state agency or authority or any agency or authority of any county, municipal corporation, or political subdivision appeals any court order which has found said board, commission, agency, or authority to have violated this section, and such order is affirmed, the court shall assess a reasonable attorney's fee for the appeal against such board, commission, agency, or authority. Any fees so assessed may be assessed against the individual member or members of such board or commission; provided, that in any case where the board or commission seeks the advice of its attorney and such advice is followed, no such fees shall be assessed against the individual member or members of the board or commission.

158.    Defendant PBCSB is considered a "board" within the meaning of Fla. Stat. §286.011. Therefore, any of its actions must be taken in full view of the public. This includes debates and discussions regarding personnel matters, especially if such matters are never later discussed by Defendant PBCSB in a public forum, and are ratified solely based upon "back room," political debate.

*Complaint*
*Johnson v. Kowal, et al*
*Page 63*

159.   Plaintiff was informed by Defendants Kowal and Torcivia, both employees and/or agents of Defendant PBCSB, that they had met and/or spoken with all of the members of Defendant PBCSB privately to plan the termination of Plaintiff's employment.   Plaintiff was informed that his dismissal was considered a "done deal" by Defendant PBCSB as a result of their secret polling, that Defendants Kowal and Torcivia had the required votes to terminate Plaintiff's employment, and that his "only option" was to avoid termination, and/or an unacceptable diminution in title, authority, prestige and salary,  and the effects both personally and professionally thereof, was to accept the purported Settlement Agreement.

160.   The purportedly valid vote of Defendant PBCSB on the approval of Plaintiff's termination and/or purported Settlement Agreement occurred on July 30, 1997.   This vote constituted merely a perfunctory ratification of the previously made, secret decision, which was, *inter alia,* a violation of the Sunshine Law.

161.   By conferring about government matters in private, Defendants Kowal, Torcivia, Kaiser, Pino, and PBCSB, by and through its members, are in direct violation of the Sunshine Law, specifically holding a meeting at which official acts are to be taken, and failing to take minutes of those meetings. Even though the Sunshine Law itself only references meetings between two or more board members, by holding secret meetings with each board member privately concerning the same matter of public importance, a *de facto* meeting of Defendant PBCSB was in fact held, and it was eminently foreseeable that the subject of such meetings would be the subject of "formal" PBCSB

*Complaint*
*Johnson v. Kowal, et al*
*Page 64*

action, and/or consideration.

162.   Alternatively, Defendants Kowal and/or Torcivia were designated, approved of and used by Defendant PBCSB itself, and/or its members, either intentionally or unintentionally, as its agents or intermediaries, to circulate, collect and/or convey information and thoughts of each member or members of Defendant PBCSB in order to circumvent or evade the Sunshine Law.

163.   Alternatively, meetings and discussions between Defendants Kowal and/or Torcivia and each member or members of Defendant PBCSB to discuss the Tytler Incident and/or termination of Plaintiff, constituted a *de facto* meeting or meetings of two or more members of Defendant PBCSB at which a final governmental action was taken, in violation of the Sunshine Law.

164.   As a matter of law, discussions between Defendant PBCSB members and a school district attorney are not protected attorney/client conversations and are not privileged for the purposes of Sunshine Law violations, with the very narrow exception, not applicable in this case, of certain discussions concerning pending litigation against such an entity. Due to the fact that no litigation with regard to Plaintiff was pending, or even contemplated at that time, no privilege exists which would protect any of the meetings between Defendants Kowal and PBCSB with Defendant Torcivia. Defendant Torcivia was hired by Defendants PBCSB and/or Kowal for the sole purpose of investigating the Tytler Incident. A copy of his report is attached hereto as Plaintiff's Exhibit 15.

*Complaint*
*Johnson v. Kowal, et al*
*Page 65*

165.    A meeting or meetings of two or more members of Defendant PBCSB as to the termination of Plaintiff in fact occurred, both actually and constructively, constituting a *de facto* meeting or meetings of Defendant PBCSB.


166.    As a result of the numerous Sunshine Law violations set forth above, Plaintiff suffered damages, including loss of employment, and injury to his public and professional reputation.


**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this court enter judgement for damages against Defendants, **JOAN KOWAL, GLEN TORCIVIA,** and **PALM BEACH COUNTY SCHOOL BOARD**, for violation of Florida Statutes §286.011, and in addition, Plaintiff requests that this Court hold that any action taken as a result of these meetings, including the resignation agreement of Plaintiff, be held invalid, void or voidable, resulting in rescission of any action taken with regard thereto or as a result thereof, attorney fees, costs and whatever other relief the Court deems proper.

## COUNT V
## CIVIL CONSPIRACY


Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 4, 16-20, and 22-103 as if specifically alleged herein.


167.    Defendants Kowal, Torcivia, Kaiser, and Pino acted in concert to deprive Plaintiff of

*Complaint*
*Johnson v. Kowal, et al*
*Page 66*

his constitutional right to property,  his constitutional right to liberty, his constitutional right to procedural due process, to force Plaintiff to resign from his employment, to interfere with Plaintiff's employment contract, to defame Plaintiff, and to cause other harm to Plaintiff.

168.    Defendants' unlawful objectives were conducted with malice, due to the fact that they acted knowing that their actions were calculated to harm Plaintiff, for personal gain,  in violation of the laws of the State of Florida and the United States of America, and knowing that their public statements were false, not based upon sound reasoning, not based upon any established facts, and/or not based upon any legitimate evidentiary basis.

169.    Defendants had an agreement or understanding with regard to these objectives and the manner in which they were to be achieved. Defendants were also conscious and knowing of their participation in, and the goals of, their conspiracy, having reached an agreement with respect to their objectives, tacit or otherwise.

170.    Defendants committed unlawful, overt acts in furtherance of their conspiracy, including violation of Florida's Sunshine Law, interfering with Plaintiff's employment, defaming Plaintiff, depriving Plaintiff of his constitutional rights, and other damaging actions.   Defendants' actions were undertaken in furtherance of the conspiracy, for  the goal of committing these torts and wrongful acts, and such actions were done or taken outside the scope of their employment with Defendant PBCSB or any other body, branch, division or subdivision of the State of Florida.

*Complaint*
*Johnson v. Kowal, et al*
*Page 67*

171.    In addition, the Defendants' conspired to breach Plaintiff's employment contract by their violation of their legal duties under the contract, and the laws of the State of Florida, specifically, Plaintiff's due process rights, which were independent of the contract itself and resulted from circumstances extraneous to the contract.

172.    Plaintiff was injured as a result of these overt acts of Defendants, and their acts were the proximate cause of his injuries.

**WHEREFORE**Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this court enter judgement against Defendants, **JOAN KOWAL, GLEN TORCIVIA, JOANNE KAISER**, and **CYNTHIA PINO** for civil conspiracy, plus interest, costs, fees, and whatever other relief this Court deems just and proper.

## COUNT VI
## AIDING & ABETTING IN THE
## COMMISSION OF A TORTIOUS ACT

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 5, 16-18, 20, and 22-103 as if specifically alleged herein.

173.    Defendants Kaiser, Torcivia and Pino committed tortious or unlawful acts against Plaintiff as further outlined above.

*Complaint*
*Johnson v. Kowal, et al*
*Page 68*

174.    The Defendants had actual knowledge of both the wrongful conduct and their role in

furthering it.


175.    Defendants, individually and collectively provided substantial assistance in the

commission of the unlawful conduct.


176.    Plaintiff was damaged by the Defendants' actions.


**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter

judgment for damages against Defendants, **GLEN TORCIVIA**, **JOANNE KAISER**, and

**CYNTHIA PINO**, for Aiding and Abetting in the commission of tortious and other unlawful acts

against Plaintiff with malicious intent, costs, attorneys' fees, and whatever other relief this Court

deems proper.


## COUNT VII
## DEFAMATION


Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in

Paragraphs 6, 16-20, and 24-103 as if specifically alleged herein.


177.    Defendants Kowal and Torcivia made numerous defamatory statements concerning

Plaintiff and his role in the Tytler incident immediately following Plaintiff's signing of the purported

*Complaint*
*Johnson v. Kowal, et al*
*Page 69*

Settlement Agreement, which were damaging to Plaintiff both personally and  professionally.


178.    The statements made by Defendants Kowal and Torcivia were published in several local publications, and the alleged wrongdoing by the Plaintiff was the subject of the press conference of July 16, 1997, called by Defendants Kowal and/or Torcivia.


179.    The statements made by Defendants Kowal and Torcivia about the Plaintiff were false.


180.    Defendants Kowal and Torcivia acted with negligence *per se*.


181.    Defendants Kowal and Torcivia also acted with actual malice, by knowingly making the false statements, and/or acting with reckless disregard of whether her statements were false or not.


**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter judgment for damages against Defendants, **JOAN KOWAL**, and **GLEN TORCIVIA**, fees, costs and whatever other relief this Court deems proper.

*Complaint*
*Johnson v. Kowal, et al*
*Page 70*

## COUNT VIII
## BREACH OF SETTLEMENT AGREEMENT

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 7, 16-18, 21, and 24-103 as if specifically alleged herein.

182.     Plaintiff and Defendant PBCSB entered into a purported Settlement Agreement on July 16, 1997.  A copy of said purported Settlement Agreement is attached hereto as Plaintiff's Exhibit 12, and incorporated fully herein.

183.     The purpose of this purported Settlement Agreement was allegedly to have Plaintiff resign his employment without any damage to his professional or public reputation caused by Defendant PBCSB.

184.     Plaintiff's professional and public reputation was immediately violated by Defendant PBCSB, when Defendant Kowal held a press conference in which she made false, unsubstantiated, and/or malicious comments about Plaintiff, in direct contravention of the terms and intent of the purported Settlement Agreement.

185.     Prior to Defendant Kowal's statements, there was never any fact finding investigation or other  proceeding in which wrongdoing on the part of Plaintiff was established, based upon any competent evidence, facts or statements based in fact.

*Complaint*
*Johnson v. Kowal, et al*
*Page 71*

186.   Defendants Kowal and Torcivia were acting as agents, employees and/or representatives of Defendant PBCSB when making said statements for which Defendant PBCSB is vicariously liable.

187.   Further, the purported Settlement Agreement itself purports to acknowledge no wrong doing on the part of the Plaintiff, and when such agreement was presented, Plaintiff was shown no evidence of his guilt, and made no statement to the effect that he was guilty.[16] Thus Defendant Kowal's actions were a breach of both the letter and the spirit of the purported Settlement Agreement, and the actual and implied terms thereof.

188.   Plaintiff was damaged by this breach in the precise manner that the purported Settlement Agreement was intended to prevent.

**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter judgment for damages against Defendant, **PALM BEACH COUNTY SCHOOL BOARD**, for breach of the above-referenced purported Settlement Agreement, attorneys' fees, costs, and whatever other relief this Court deems proper .

---

[16] Paragraph 4: It is understood and agreed by the parties that this agreement does not constitute any admission by the School District or by Dr. Johnson of any violation of any applicable laws, rules or policies.
   Paragraph 9: The School District agrees to release, hold harmless, and defend Dr. Johnson in any claim, litigation, or any administrative proceedings related to, or in conjunction with, his employment with the School District.

*Complaint*
*Johnson v. Kowal, et al*
*Page 72*

## COUNT IX
## BREACH OF CONTRACT

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 8, 16-18, 21, and 24-103 as if specifically alleged herein.

189.    Pursuant to the attached Employment contract, Defendant PBCSB was obligated to employ Plaintiff between July, 1995 and June, 1998.

190.    Defendant PBCSB breached this contract by failing to allow Plaintiff to continue his employment on or about August 11, 1997, and thereafter continued to fail to allow Plaintiff to continue his employment.

191.    Plaintiff was damaged by this breach.

192.    Defendant PBCSB currently owes Plaintiff an amount in excess of $85,000.00, pursuant to the terms and conditions of said contract. Such amount does not include benefits and supplements to which Plaintiff is entitled to, or damages to which he is or may be entitled in law and/or equity.

193.    As a result of this breach, Plaintiff was required to hire the law firm of Osherow & Schwartz, P.A., and is required to pay said firm reasonable attorneys' fees.

*Complaint*
*Johnson v. Kowal, et al*
*Page 73*

**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter judgment for damages against Defendant, **PALM BEACH COUNTY SCHOOL BOARD**, for breach of contract, attorneys' fees, costs, and whatever other relief this Court deems proper.

## COUNT X
## INJUNCTION

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 9, 16-21, and 24-103 as if specifically alleged herein.

194.    Plaintiff is and has been throughout his career, a distinguished and well respected member of the Boca Raton community.

195.    On or about July 16, 1997, and thereafter, Defendants Kowal and Torcivia, individually and in conspiratorial collusion, did cause Plaintiff to be defamed in public.

196.    Defendants Kowal and Torcivia continue to defame Plaintiff.

197.    Such defamation has been and is injurious to Plaintiff's reputation in the community.

198.    Defendants Kowal and Torcivia's continued conduct unless and until enjoined by order of this Court, will cause irreparable injury to Plaintiff in that, as a direct and proximate result of

*Complaint*
*Johnson v. Kowal, et al*
*Page 74*

Defendants Kowal and Torcivia's conduct, Plaintiff's public and professional reputation has been and will continue to be damaged.

199.    Entry of a temporary and/or permanent injunction is not adverse to the Public's interest.

200.    For the harm and damage done to Plaintiff's reputation, and for the harm and damage that will continue unless and until Defendants Kowal, Torcivia, or any member or agent of Defendant PBCSB is enjoined from continuing to publicly comment on Plaintiff in a defamatory manner, or in connection with his constructive termination, or alleged resignation from his employment with Defendant PBCSB, Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, respectfully requests equitable relief against Defendants, **JOAN KOWAL, GLEN TORCIVIA** and **PALM BEACH COUNTY SCHOOL BOARD** as follows:

1.    For a temporary injunction until Plaintiff's right to a permanent injunction is determined, due to immediate and irreparable harm to Plaintiff, until further determination herein.

2.    For a permanent injunction on final trial of the above-entitled cause enjoining Defendants Kowal, Torcivia and PBCSB, and Defendants' agents, servants, employees, and attorneys,

*Complaint*
*Johnson v. Kowal, et al*
*Page 75*

and any persons in active concert or participation with Defendants Kowal, Torcivia and PBCSB from

defaming Plaintiff or otherwise publicly commenting on Plaintiff's termination or alleged resignation

from his employment with the Palm Beach County School District.


   3.      For costs of suit incurred in this action.


   4.      For such other and further relief as the Court may deem just and proper.


## COUNT XI
## SPECIFIC PERFORMANCE


Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in

Paragraphs 10, 16-18, 21, and 24-103 as if specifically alleged herein.


   201.    This is an action for specific performance of a contract for employment.


   202.    On or about June, 1995, Plaintiff and Defendant PBCSB entered into a contract for

employment of Plaintiff by Defendant PBCSB. A copy of this contract is attached to this complaint

as Plaintiff's Exhibit 3 and incorporated herein by reference.


   203.    During the term of the contract, Plaintiff fulfilled all of his obligations under the

contract.

204.    On or about August 8, 1997, Defendant Kowal wrote a letter to Plaintiff, wherein she informed Plaintiff that his rescission of the purported Settlement Agreement was not accepted, and returned the check for $135,656.43 which Plaintiff had sent to PBCSB with his rescission. A copy of this letter is attached hereto as Plaintiff's Exhibit 14.

205.    On or about August 11, 1997, Defendant PBCSB refused to accept further performance of the contract by Plaintiff, effectively breaching the contract.

206.    Plaintiff continues to be willing to perform his obligations under the contract.

207.    All contractual conditions precedent of Plaintiff to Defendant PBCSB's obligations under the contract have been performed or have occurred, or have been waived.

208.    As a proximate result of Defendant's failure and refusal to allow Plaintiff to continue his employment contract, Plaintiff has been deprived of the fair value of his property interest in the contract, including wages and benefits thereunder.

209.    If specific performance is denied, Plaintiff will have incurred damages as a proximate result of Defendant PBCSB's failure to perform the contract in that Plaintiff has been effectively terminated from his employment without due process, will be unemployed thus suffering from a financial hardship, and he will continue to have his professional reputation damaged thereby impeding

*Complaint*
*Johnson v. Kowal, et al*
*Page 77*

his ability to obtain new employment.

210.   Defendant PBCSB has or will certainly soon have a person who will be placed in

Plaintiff's employment position, thereby impeding his ability to be reinstated.

211.   Plaintiff has retained the firm of Osherow & Schwartz, P.A. to represent him in this

action and has agreed to pay the firm  reasonable attorneys' fees.

**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, demands judgment against Defendant,

**PALM BEACH COUNTY SCHOOL BOARD**, as follows:

1.    Directing Defendant PBCSB to immediately reinstate Plaintiff in his employment

position pursuant to contract, pending final resolution herein.

2.    Awarding Plaintiff a fair and reasonable sum as damages as a result of his loss of

employment.

3.    If specific performance is not granted, awarding Plaintiff a fair and reasonable sum as

damages to compensate Plaintiff for loss of employment.

4.    For costs of suit incurred in this action.

*Complaint*
*Johnson v. Kowal, et al*
*Page 78*

5.    For attorneys' fees.


6.    For such other and further relief as the court may deem proper.


# COUNT XII
## ABUSE OF POWER


Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 11, 16-19, and 24-103 as if specifically alleged herein.


212.    At all times relevant hereto, Defendant Kowal was the superintendent of Palm Beach County School District.  As such, she possessed certain enumerated powers as set for in Florida Statutes §230.32 General Powers of Superintendents.  The relevant portions of this statute are set forth below:


The superintendent shall have the authority, and when necessary for the more efficient and adequate operation of the district school system, the superintendent shall exercise the following powers:

(1) GENERAL OVERSIGHT.—Exercise general oversight over the district school system in order to determine problems and needs, and recommend improvements.

(2) ADVISE, COUNSEL, AND RECOMMEND TO SCHOOL BOARD.— **Advise and counsel with the school board on all educational matters and recommend to the school board for action such matters as should be acted upon.**

*Complaint*
*Johnson v. Kowal, et al*
*Page 79*

(3) RECOMMEND POLICIES.—Recommend to the school board for adoption such policies pertaining to the district school system as the superintendent may consider necessary for its more efficient operation.

(4) RECOMMEND AND EXECUTE RULES AND REGULATIONS.—Prepare and organize by subjects and submit to the school board for adoption such rules and regulations to supplement those adopted by the state board as, in the superintendent's opinion, will contribute to the efficient operation of any aspect of education in the district. When rules and regulations have been adopted, the superintendent shall see that they are executed.

(5) RECOMMEND AND EXECUTE MINIMUM STANDARDS.—From time to time to prepare, organize by subjects, and submit to the school board for adoption such minimum standards relating to the operation of any phase of the district school system as are needed to supplement those adopted by the state board and as will contribute to the efficient operation of any aspect of education in the district; to see that minimum standards adopted by the school board are observed.

(6) PERFORM DUTIES AND EXERCISE RESPONSIBILITIES.— **Perform such duties and exercise such responsibilities as are assigned to the superintendent by law and by regulations of the state board.**

213.   Defendant Kowal's actions in forcing Plaintiff from his position as Area Two Executive Director were outside the scope of Defendant Kowal's enumerated or implied powers, and for her own personal gain, with malicious purpose or an intentional reckless disregard for the rights of Plaintiff.

214.   Defendant Kowal's actions in forcing Plaintiff from his position as Area Two Executive Director were clearly an abuse of Defendant Kowal's position as Superintendent.

215.   Plaintiff was damaged by Defendant Kowal's abuse of power.

*Complaint*
*Johnson v. Kowal, et al*
*Page 80*

**WHEREFORE** , Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter judgment for damages against Defendant, **JOAN KOWAL**, for all damages he sustained as a result of her abuse of power as Superintendent of the Palm Beach County School District, attorneys' fees, costs, and whatever other relief this Court deems just and proper.

## COUNT XIII
## TORTIOUS INTERFERENCE WITH CONTRACT

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 12,16-20, and 24-103  as if specifically alleged herein.

216.    On or about July, 1983, Plaintiff commenced a business relationship with Defendant PBCSB, which contemplated Plaintiff's long term employment with Defendant PBCSB as a Principal. Later, Plaintiff continued his employment with Defendant PBCSB as an Area Executive Director, a higher level supervisory position.

217.    At all times relevant, Defendant Kowal was the Superintendent of the Palm Beach County School District.

218.    At all times relevant, Defendant Torcivia was an attorney employed by Defendants Kowal and/or PBCSB.

219.    During the time in which Plaintiff was serving as Area Executive Director, Defendant Kowal and Torcivia, with the assistance of Defendants Kaiser and Pino, in connection with the business relationship described above, began a course of conduct consisting of forcing Plaintiff from his employment and defaming him in public, which was intended to disrupt Plaintiff's relationship with Defendant PBCSB, and which in fact did disrupt that relationship.

220.    In engaging in the conduct described above, Defendants Kowal and Torcivia, acting outside the scope of their employment, intended to impair or destroy Plaintiff's business relationship with Defendant PBCSB, thereby destroying Plaintiff's expectancy of economic gain. Defendants Kowal and Torcivia engaged in the interfering conduct with malice toward Plaintiff and a desire to injure Plaintiff economically, and with wantonness and disregard of Plaintiff's rights. Defendants Kowal and Torcivia's conduct was improper, unlawful, and unfair, in that it was defamatory, and a violation of the Plaintiff' due process rights.

221.    The conduct engaged in by Defendants Kowal and Torcivia described above was the proximate cause of the loss of Plaintiff's business relationship with Defendant PBCSB, which resulted in the Plaintiff' loss of the expectancy of economic gain.

222.    As a result of the impairment or loss of Plaintiff's business relationship with Defendant PBCSB, Plaintiff suffered a loss of economic expectancy arising from the relationship, including damages in the form of loss of employment.

*Complaint*
*Johnson v. Kowal, et al*
*Page 82*

223.    Defendants Kowal and Torcivia were not justified or privileged to engage in the conduct described above, which resulted in the loss of Plaintiff's business relationship with Defendant PBCSB.

WHEREFORE Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter judgement for damages against Defendants **JOAN KOWAL** and **GLEN TORCIVIA**, attorneys' fees, costs, and whatever other relief this Court deems proper.

## COUNT XIV
## TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATION

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 13, 16-20, and 24-103 as if specifically alleged herein.

224.    Plaintiff was employed by Defendant PBCSB under a contract which did not terminate until June, 1998.

225.    Defendants Kowal and Torcivia had knowledge of this relationship, and had a duty not to interfere in such relationship.

226.    Defendants Kowal and Torcivia breached this duty by intentionally and with malice causing Plaintiff to resign from his employment.

*Complaint*
*Johnson v. Kowal, et al*
*Page 83*

227.   The actions of Defendants Kowal and Torcivia are the actual and proximate cause of Plaintiff's coerced resignation of his employment.

228.   Defendants Kowal and Torcivia were not acting within the scope of their employment with Defendant PBCSB, and were not justified or privileged to engage in the conduct described above, which resulted in the loss of Plaintiff's employment with Defendant PBCSB.

229.   Further, Defendants Kowal and Torcivia acted with actual malice.

230.   Plaintiff has been damaged by the actions of Defendants Kowal and Torcivia, in that he has lost his employment position and such corresponding wages and benefits engendered therein, and  had his reputation injured in the community.

**WHEREFORE**Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter judgement for damages against Defendants **JOAN KOWAL** and **GLEN TORCIVIA**, attorneys' fees, costs, and whatever other relief this Court deems proper.

*Complaint*
*Johnson v. Kowal, et al*
*Page 84*

## COUNT XV
## RESCISSION OF SETTLEMENT AGREEMENT

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 14, 16-18, 21, and 24-103 as if specifically alleged herein.

231.   This is an action for rescission of a purported Settlement Agreement between Plaintiff and Defendant PBCSB.

232.   Defendant PBCSB was the employer of Plaintiff, who had been told by agents of Defendant PBCSB, namely Defendants Kowal and Torcivia, either within or outside the scope of employment, that Plaintiff's employment was definitely to be terminated by Defendant PBCSB if he did not cooperate and execute the purported Settlement Agreement. Defendants Kowal and Torcivia claimed to have gathered this information based on a series of secret meetings with members of Defendant PBCSB, outside of the public eye, in violation of Florida's Sunshine Law.

233.   Defendants Kowal and Torcivia intentionally made false representations regarding Plaintiff's employment to Plaintiff with the intent that Plaintiff would rely on such representations, thereby inducing him into the purported Settlement Agreement. Defendants Kowal and Torcivia represented and stated to Plaintiff that his contract of employment would be terminated or he would, among other "punishments," be demoted to the position of Assistant Principal with a significant reduction in salary if he did not accept their terms. Defendant's agents' representations were false in

*Complaint*
*Johnson v. Kowal, et al*
*Page 85*

that no action of Defendant PBCSB such as described by Defendants Kowal and Torcivia could have

been binding on Plaintiff because a public hearing and vote would be required for such action, and/or

such action would be invalidated due to the fact that it was in violation of Florida Statute §286.011,

the Sunshine Law (see Count IV, *supra*.)

234.    Plaintiff reasonably relied on Defendants Kowal and Torcivia's misrepresentations

although he did not know or have reasonable means of knowing the fallacious nature of Defendants

Kowal and Torcivia's misrepresentations.  A copy of the purported Settlement Agreement is attached

as Plaintiff's Exhibit 12.

235.    Plaintiff's execution and acknowledgment of the attached purported Settlement

Agreement was accomplished under coercion, duress, and was an act contrary to Plaintiff's will.

Plaintiff executed such agreement only because he was in fear for his livelihood, reputation and

career, achieved over many years of hard work and devoted service, as a result of Defendant's

wrongful conduct described herein.

236.    At the time Plaintiff executed the purported Settlement Agreement, Plaintiff did not

have knowledge of the fact that no such decision to terminate or demote Plaintiff either existed or

could be enforced, due to the actions undertaken by the culpable parties. Plaintiff mistakenly believed

that such termination or demotion was imminent, and had in fact occurred prior to execution of the

purported Settlement Agreement.

*Complaint*
*Johnson v. Kowal, et al*
*Page 86*

237.   On July 16, 1997, Plaintiff delivered to Defendant the signed purported Settlement Agreement, thereby resigning his position as Area Two Executive Director; in return, Plaintiff was given a check in the sum of $135,656.43, $104,000.00 of which constituted monies Plaintiff was otherwise entitled to as accrued sick leave, vacation, and other leave pay, over his many years of service. The remaining $31,000.00 constituted his "settlement."

238.   Upon Dr. Orr's, Plaintiff's personal representative's, return from his month-long vacation in Australia, Plaintiff had the opportunity to confer with Dr. Orr regarding the events which lead up to and followed his coerced resignation.    Thereafter, Plaintiff realized the extent of Defendants Kowal and Torcivia's misrepresentations and action which induced him to enter into the purported Settlement Agreement, the extent of his mistake upon which he based his decision to execute the purported Settlement Agreement, and the extent to which he had been placed under duress and coerced to execute the purported Settlement Agreement, the extent of the Sunshine Law violation, and the failure of Defendants Kowal and Torcivia to allow for informed, prepared, and competent representation.

239.   On or about August 7, 1997, Plaintiff notified Defendant in writing of Plaintiff's intent to rescind and void the purported Settlement Agreement described above, and returned to Defendant PBCSB the check for $135,656.43. This rescission was hand delivered by Plaintiff's representative, Dr. Orr. Plaintiff demanded that Defendant reinstate Plaintiff as Area Two Executive Director. A

copy of Plaintiff's notice of rescission is attached as Exhibit 16.

240.    On or about August 8, 1997, Defendant Kowal wrote a letter to Plaintiff, wherein she informed Plaintiff that his rescission of the purported Settlement Agreement was not accepted, and returned the check for $135,656.43 which Plaintiff had sent to PBCSB with his rescission.  A copy of this letter is attached hereto as Plaintiff's Exhibit 14.  Defendant Kowal stated in the letter that "The District's position is that your resignation, once accepted by the Board, is binding."

241.    Defendant PBCSB has refused and still refuses to restore or otherwise act to return Plaintiff to his previous employment, specifically turning down such a request on August 11, 1997, in a call from Plaintiff's representative, Dr. Orr, to Defendant PBCSB representative Nancy Courtney.

242.    Plaintiff has no adequate remedy at law for the reasons indicated above.

243.    As a direct and proximate result of Defendant's misrepresentations, Plaintiff has become unemployed and had his reputation in the professional community, and the Palm Beach County community as a whole, damaged.

244.    Plaintiff has retained the firm of Osherow & Schwartz, P.A. to represent Plaintiff in this action and has agreed to pay the firm a reasonable attorneys' fee.

*Complaint*
*Johnson v. Kowal, et al*
*Page 88*

**WHEREFORE,** Plaintiff , **ARTHUR JOHNSON**, demands judgment against Defendant,

**PALM BEACH COUNTY SCHOOL BOARD**, as follows:

1.    For a judgment declaring that the purported Settlement Agreement attached to this

complaint as Exhibit 12 be rescinded.

2.    For an order directing Defendant PBCSB to reinstate Plaintiff to his former position

as Area Two Executive Director.

3.    For damages in an amount exceeding Eighty Five Thousand Dollars ($85,000.00), for

lost wages and benefits.

4.    For costs of suit and attorneys' fees incurred in this action.

5.    For such other and further relief as the court may deem proper.

*Complaint*
*Johnson v. Kowal, et al*
*Page 89*

## COUNT XVI
## DEPRIVATION TO PLAINTIFF, PARENTS, STUDENTS AND COMMUNITY OF ADEQUATE AND UNIFORM EDUCATION UNDER ARTICLE 9, SECTION 1 OF THE FLORIDA CONSTITUTION

Plaintiff, **ARTHUR JOHNSON**, hereby realleges and reaffirms the allegations contained in Paragraphs 15, 16-19, 21, and 24-103 as if specifically alleged herein.

245.    Plaintiff has standing to challenge violations of Article 9, Section 1, by virtue, *inter alia,* of the following:

a.    As a tax payer of the State of Florida, and a resident of Palm Beach County; and

b.    As a member of the community, he is injured by such diminution of the education system therein.

246.    Article 9, Section 1 of the Florida Constitution provides:

System of Public Education.--Adequate provision shall be made by law for a uniform system of free public schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require.

247.    Plaintiff has had a long and distinguished career as an educator in the State of Florida. Among Plaintiff's accomplishments, more fully noted above, are:

a.    Distinguished Educator, University of Florida Commencement Exercises Honor,

*Complaint*
*Johnson v. Kowal, et al*
*Page 90*

December, 1991.

      b.     Principal of the Year, Southern Interscholastic Press Association, March, 1990.

      c.     Exemplary Principal Award, U.S. Department of Education, November, 1987.

      d.     Educator of the Year, Boca Raton Rotary, November, 1987.

      e.     Bronze Leadership Award, Junior Achievement, 1987.

     248.    Plaintiff has also been the focus of countless newspaper and magazine articles, as well as featured on local television stations. A sampling of articles are the attached hereto as Plaintiff's Composite Exhibit 4. Plaintiff also wrote numerous articles on education which were published in education publications throughout the State, as well as in local newspapers and magazines.

     249.    By virtue of his well documented achievements both in his position as Principal of Spanish River High School, and then in his more influential position as Area Two Executive Director, Plaintiff provided the community of Palm Beach County, and in particular the Teachers, Students and Parents thereof, with an unparalleled level of achievement and dedication, a superior level of educational excellence, and the motivation and initiative to implement programs for the betterment of the School District in the future. By terminating Plaintiff outside the public eye, Defendant PBCSB was violating its obligations under Article 9, Section 1, for private gain, and to the detriment of the community.

250.    On or about July 16, 1997, July 30, 1997, and August 11, 1997, Defendants Kowal and PBCSB, in violation of Florida's Sunshine Law, effectively terminated Plaintiff, without providing him, or the community, a real and meaningful opportunity to protest or otherwise object to such termination, and to act in opposition thereto.

251.    Defendant Kowal's actions were designed to further her interest in protecting her image with the media, and eviscerate her competition, without proper consideration of the relevant factors and issues under Article 9, Section 1 of the Florida Constitution, and for other illegal, self-serving and improper purposes.

252.    By such termination actions, Defendants Kowal and PBCSB, failed to maintain and operate the Palm Beach County School District in accordance with the requirements of Article 9, Section 1, by allowing Plaintiff to be removed from his position within the School District without public debate and for their private gain.

**WHEREFORE**, Plaintiff, **ARTHUR JOHNSON**, respectfully requests that this Court enter Declaratory Judgment, holding that Defendant **JOAN KOWAL**, and **PALM BEACH COUNTY SCHOOL BOARD**, have failed to provide the students they are obligated to serve, with their fundamental rights to adequate education by failing to retain Plaintiff, in his position as Area Two Executive Director, thereby failing to maintain and operate the institutions of public education which Defendant PBCSB operates in a manner that adequately meets the needs of the people and

*Complaint*
*Johnson v. Kowal, et al*
*Page 92*

community of Palm Beach County.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief as to all counts herein, in furtherance of that specifically herein listed above, and where applicable:

(1)     granting Plaintiff compensatory damages in an amount to be established, in excess of the jurisdictional limit of this court and believed totaling in excess of $200,000;

(2)     granting Plaintiff a declaratory judgment adjudging that Defendants' conduct as described in the complaint to constitute a violation of the Fourteenth Amendment to the United States Constitution, Article 1, Section 9 and Article 9, Section 1 of the Florida Constitution; and Florida Statutes;

(3)     issuing a permanent injunction enjoining Defendants, their co-conspirators, officers, agents, successors, employees and any others acting in concert with any of them from:

(a)     maintaining arbitrary, capricious, discriminatory, or otherwise unlawful employment policies and practices;

*Complaint*
*Johnson v. Kowal, et al*
*Page 93*

        (b)     requiring Defendants to adopt and implement employment policies and practices designed to eliminate the effects of the discriminatory, hostile, conspiratorial, and unjust practices resulting in the infliction of unjust and unlawful conduct upon Plaintiff;

        (c)     committing or conspiring to commit any other unlawful conduct against Plaintiff.

    (4)     awarding punitive damages against one or more of the Defendants, pursuant to the proper showing under the Florida Statutes, and based upon the conduct of the Defendant's set forth herein;

    (5)     reinstating Plaintiff to his position as Area Two Executive Director with an award of back pay, with interest, and all other lost employment benefits such as pension and leave. In the event the Court finds reinstatement is not feasible, Plaintiff prays for an award of front pay and other damages occasioned by Defendants' wrongful conduct;

    (6)     awarding Plaintiff reasonable attorney's fees, costs and disbursements of this action;

    (7)     retaining jurisdiction of this action to ensure full compliance with the law; and

    (8)     awarding Plaintiff and granting such other and further relief that the court deems just

*Complaint*
*Johnson v. Kowal, et al*
*Page 94*

and proper.

## DEMAND FOR JURY TRIAL

The Plaintiff demands that a trial by jury be had on all issues so triable before this Court.

Respectfully Submitted,

**OSHEROW & SCHWARTZ, P.A.**
Attorneys for the Plaintiff, Dr. Arthur C. Johnson
Sanctuary Center
4800 North Federal Highway
Suite 105, Building B
Boca Raton, FL 33431
(561) 447-7080 (telephone)
(561) 447-7166 (facsimile)
E-mail: oshwartz@aol.com
Web: http://www.oshwartzlaw.com

By: _____
**MARK R. OSHEROW**
Florida Bar No.997013

By: _____
**KENNETH J. SCHWARTZ**
Florida Bar No. 939277

By: _____
**LAURA P. RIDDLE**
Florida Bar No.0098183

*Complaint*
*Johnson v. Kowal, et al*
*Page 95*

## VERIFICATION

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, **ARTHUR JOHNSON**, being duly sworn, say:

I am the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents of the complaint. The contents of this complaint are true to the best of my knowledge.

ARTHUR JOHNSON

SUBSCRIBED AND SWORN TO BEFORE ME by Arthur Johnson, who is personally known to me, on October 14, 1997, to certify which witness my hand and official seal.

Notary Public

My commission expires:

KENNETH J SCHWARTZ
My Commission CC379722
Expires Jun. 06, 1998
Bonded by HAI
800-422-1555

# JOHNSON V KOWAL, <u>ET AL</u>

# PLAINTIFF'S EXHIBIT

# 1

ANNUAL CONTRACT OF EMPLOYMENT FOR
INSTRUCTIONAL PERSONNEL OF THE PUBLIC SCHOOLS

Plaintiff's Exhibit
One

STATE OF FLORIDA; COUNTY OF PALM BEACH

THIS CONTRACT, entered into between The School Board of Palm Beach County, Florida, the Party of the First Part, hereinafter called the School Board, and

| | |
|---|---|
| NAME **ARTHUR C JOHNSON** | SCHOOL YEAR 19**83-1984** |
| POSITION **PRINCIPAL** **BOCA RATON HIGH** | BASE SALARY $ **42233** 00 |

TEACHER'S CERTIFICATE:

| TYPE | RANK | NUMBER | |
|---|---|---|---|
| **01** | 1 | **227527** | VALID TO 19**96** |

FOR A PERIOD OF **12.0** MONTHS OR _____ DAYS    BEGINNING DATE **08/02/83**

**SEMI-**    ENDING DATE **06/29/84**

CONTRACT SALARY **$42,233.67**   NO. MONTHLY INSTALLMENTS **24**   DAY RATE _____

The Party of the Second Part, hereinafter called the Teacher.

WITNESSETH:

WHEREAS, Section 230.23 (5) (e), Florida Statutes, requires the School Board to enter into written contracts with all members of the instructional staff of each district who are qualified as provided by law, and

WHEREAS, the Teacher has been duly appointed as provided by law,

NOW THEREFORE, for and in consideration of the mutual agreements, covenants, terms, and conditions herein contained, it is expressly stipulated, understood, agreed, covenanted by and between the parties hereto as follows:

1. The School Board agrees to employ the Teacher as specified above regarding position, period of time designated by beginning and ending date of contract, for service rendered, annual salary in monthly installments, or as otherwise specified above provided, however, that the parties hereto mutually agree that the salary schedule upon which the aforementioned payment is based may be amended through collective bargaining after this contract is executed and both parties hereto mutually agree that the aforementioned salary payment shall be subject to accord with the salary schedule as so amended.

2. The services to be performed hereunder shall begin on the day and in the position as aforementioned and in a school as designated by the School Board.

3. The Teacher agrees to teach the full period of service for which this contract is made, in no event to be absent from duty without leave or to leave his position without first obtaining written consent from this contract by the School Board, to observe and to enforce faithfully the laws, rules, regulations, and policies lawfully prescribed by legally constituted school authorities insofar as the laws, rules, regulations, and policies are applicable to the position held by him. The Teacher agrees that the last month's salary may be withheld upon proper notice to the Teacher for reasons for said withholding if all duties and regulations of the School Board and the State Board of Education have not been met.

4. This contract is conditioned and based on the assertion by the Teacher:

   (1) That he is legally qualified to teach in the State of Florida, as evidenced by a valid Florida Teacher's Certificate (information as shown above) which is warranted by the Teacher to be unrevoked and valid, or

   (2) That the Teacher has completed the requirements and will be legally qualified to teach in the State of Florida upon issuance of a Florida Teacher's Certificate which will not be lower than a rank III for which application has been duly made as evidenced by the official receipt and acknowledgment recorded in the office of the Superintendent, the Department of Education file no. as shown above.

The Teacher agrees further to file with the School Board a Florida Teacher's Certificate of a rank not lower than rank III by not later than ninety (90) days from the date of this agreement, provided that failure to obtain and file such certificate shall relieve the School Board of all obligations under this contract. The Teacher agrees that if he fails to obtain and file such a certificate, this contract is null and void and of no further force or effect.

5. The Superintendent or School Board may suspend and the School Board may remove the Teacher for cause as provided by law. The Teacher agrees that he may not be entitled to receive any salary from and after the date of such suspension or removal by the School Board unless such suspension is revoked and in no event shall the Teacher be entitled to any compensation subsequent to the cancellation of this contract.

6. The School Board agrees to make available to the Teacher in the library or other accessible place at each school a copy of its rules, regulations, policies, and when applicable collective bargaining agreement for which the Teacher and the School Board will be held accountable and subject to under the terms of this contract.

7. The Teacher agrees:

   (1) The cost of all physical and psychiatric tests, or examinations taken by the Teacher at the request or order of the School Board or its designee, except those examinations or tests which are prerequisites of initial employment, shall be borne by the Board.

   (2) At all times the choice from among states licensed physicians and psychiatrists shall be made by the Teacher from a list provided by the School Board. No Teacher shall be compelled to submit to any test or examination without a written statement of the need for such examination from the School Board.

   (3) A Teacher shall have the right to seek an additional opinion or judgment from among states licensed physicians or psychiatrists of the Teacher's choosing. This cost shall be borne by the Teacher and shall be completed without undue or unreasonable delay, but in no event later than twenty-one (21) days after the receipt of the report by the Teacher of the School Board requested examination. When this option is exercised, the additional opinion shall be attached to any other medical opinions under consideration with respect to disciplinary action against the Teacher.

   (4) The report(s) of the examination(s) completed pursuant to this contract shall be placed in the Teacher's personnel file.

8. This contract shall not operate to prevent discontinuance of a position as provided by law.

9. It is expressly understood and agreed by and between the parties hereto that neither the Teacher nor the School Board owes any further contractual obligation to the other after the ending date shown above. The Teacher understands that unless and until he/she shall receive a continuing contract under and by virtue of the provisions of Section 231.36, Florida Statutes, he/she shall have probationary status and no legal cause shall be required of the School Board in the event that the Teacher is not reemployed by the School Board after the ending date shown above.

10. This contract shall at all times be subject to any and all laws, and all lawful rules, regulations, or policies of the State Board of Education or the School Board now existing or hereafter enacted.

11. Failure of either party to fulfill the obligations under this contract, and to carry out the lawful provisions hereof, unless prevented from so doing by reason of personal illness of the Teacher, or as otherwise provided by law, shall constitute sufficient grounds for the termination of this contract by the other party, provided, however, no termination shall be effective without reasonable notice.

12. This contract may be changed or modified only by an amendment in writing executed in the same fashion as the original, or by actions taken pursuant to the provisions of Florida Statute 447.00. No person, officer or employee may modify the provisions of this agreement or make any other contract with the Teacher for and on behalf of the School Board without express ratification by the School Board. Provided, however, that in accordance with paragraph one hereof both parties agree that this contract shall be modified by the adoption of a subsequent salary schedule as provided in paragraph one and that adoption of such amended salary schedule by the School Board shall constitute expressed ratification.



APPROVED 4-20-76
BY STATE BOARD OF EDUCATION

THE SCHOOL BOARD
FLORIDA
PALM BEACH COUNTY

THIS CONTRACT MUST BE SIGNED AND RE-TURNED TO THE SCHOOL BOARD WITH-IN 10 DAYS FROM THIS DATE.

GIVEN UNDER OUR HANDS AND SEALS IN WEST PALM BEACH, FLORIDA

Party of the second part                          DATE EXECUTED

Party of the first part   THE SCHOOL BOARD OF PALM BEACH COUNTY, FLORIDA

BY _____   CHAIRMAN

ATTEST: _Thomas J. Mills_   SUPERINTENDENT SCHOOLS

| DATE | | | |
|---|---|---|---|
| MONTH | DAY | YEAR | AUTH. |
| FEB 15 | | 84 | |

EMPLOYEE'S COPY



# THE SCHOOL BOARD
## OF PALM BEACH COUNTY, FLORIDA

3323 BELVEDERE ROAD
WEST PALM BEACH, FLORIDA 33402

TELEPHONE 684-5000
**February 15, 1984**

THOMAS J. MILLS
SUPERINTENDENT
OF SCHOOLS

GEORGE H. BA
SUSAN R. PE
LOUIS J. EAS
ROBERT S. HOV
SAMUEL S. LO
HUGH MacMILLA
PAULA F. NESS

EMPLOYEE  ARTHUR      C JOHNSON
POSITION  PRINCIPAL
LOCATION  BOCA RATON HIGH
RANK       1    NO OF DUTY DAYS    236

SALARY FOR 1983-84 SCH YR    $44345.35

## RIDER TO BE ATTACHED TO YOUR CONTRACT FOR THE 1983-84 SCHOOL YEAR.

[✓] The Contract (or Continuing Contract Advice) that you have received
for the 1983-84 school year is hereby amended.  Your current Annual
Salary is quoted above.

[✓] The year-round supplements listed below are INCLUDED in the above
Annual Salary.  You receive 1/24th of each supplement amount in each
semi-monthly paycheck.

### ADVICE OF SALARY SUPPLEMENTS

EMPLOYEE  ARTHUR      C JOHNSON
LOCATION  BOCA RATON HIGH
CODE:       N     AMOUNT:   2111.68

SUPPLEMENT CODES:

| | | |
|---|---|---|
| M. | Athletic Director; Asst. Athletic Director; or Athletic Trainer | T. Newspaper Sponsor |
| N. | Intramural Coordinator | U. Band Director |
| O. | Choral Director | V. Department Head |
| P. | Cheerleading Sponsor | W. (Reserve) |
| Q. | Drama Coach | X. Glades Resident Supplement |
| R. | Year-Book Sponsor | Y. Vocational Agriculture Teacher |
| S. | Forensic and Debate Sponsor | Z. Student Govt Sponsor; Jr. Class Sponsor; or Senior Class Sponsor |

Please acknowledge receipt of this Rider to your Contract by signing and returning one
copy to the Division of Personnel Relations and keep one copy for your files.

TJM:JKS:HMB:mo

Chairman of the Board

*Thomas J. Mills*
Superintendent of Schools

I ACKNOWLEDGE RECEIPT OF THIS RIDER
Date_____

Teacher's Signature_____

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 2

Plaintiff's Exhibit Two

CC   CT OF EMPLOYMENT FOR SUPERVISORS   ADMINISTRATORS

STATE OF FLORIDA, COUNTY OF PALM BEACH
THIS CONTRACT, entered into between the School Board of Palm Beach County, hereinafter referred to as the Board, and

Name _____ ARTHUR JOHNSON _____ holding a Florida Teacher's Certificate, _____ 227527 96

| | TYPE | RANK | CTF. NO. | EXP. DATE |
|---|---|---|---|---|

hereinafter referred to as the Employee. WITNESSETH:

WHEREAS, Section 231.36(1), Florida Statutes, requires the Board to enter into written contracts with supervisors and principals of each district school system and further provides for contracts for periods not to exceed three (3) years for persons who are qualified as provided by law, and
WHEREAS, the Employee has been duly appointed as provided by law,
NOW THEREFORE, for and in consideration of the mutual agreements, covenants, terms, and conditions herein contained, it is expressly stipulated, understood, agreed, and convenanted by and between the parties hereunto as follows:

1. The Board agrees to employ the Employee in the position of PRINCIPAL SR   3 _____ for _____ school fiscal year(s) as defined by law beginning on 070 95 _____ and pay the Employee for services rendered an annual salary of $ 53217 35 _____ or such salary as may be prescribed by the Board in the Administrators' and Supervisors' Salary Schedule as adopted by the Board from time to time. The salary may be adjusted according to said salary schedule and shall be governed by the Salary Administration Policies for Administrators and Supervisors as adopted by the Board in its annual budget. Said Employee shall render services for a period not less than 12 0 months during each school fiscal year unless such period of time of service is increased or decreased by Board action with a corresponding increase or decrease in salary.

2. The services to be performed hereunder shall begin on the day and in the position as aforementioned and in a school as designated by the Board. The Board may, upon recommendation of the Superintendent transfer and assign the Employee to a similar position in any other school of the district, provided that the duties shall be similar to the duties originally assigned, and the salary shall be as heretofore set forth.

3. The Employee agrees to perform the obligations attaching to the position for which employeed as prescribed by the Board for the full period of service for which this contract is made, in no event to be absent from duty without leave or to leave his position without first being released from this contract by the Board, to observe and to enforce faithfully the laws, rules, regulations, and policies lawfully prescribed by legally constituted school authorities insofar as such laws, rules, regulations, and policies are applicable to the position held by him. The Employee agrees that the last month's salary in each year shall not be paid until all reports required by the Board have been satisfactorily made and all duties have been performed as required by law and regulations of the Board and the State Board of Education.

4. This contract is based on the assertion by the Employee:
   (1) That said Employee is legally qualified to be a supervisor/administrator in the State of Florida, as evidenced by a Florida Teacher's Certificate, type, rank, number, and expiration date shown above, which is warranted by the Employee to be unrevoked and valid, or
   (2) That the Employee will be legally qualified to be a supervisor/administrator in the State of Florida upon issuance of a Florida Teacher's Certificate for which application has been duly made as evidenced by the official receipt and acknowledgement recorded in the Office of the Superintendent, being Department of Education File No. shown above.
       The Employee agrees further to file with the Board a valid Florida Teacher's Certificate of a rank not lower than the rank shown above by not later than ninety (90) days from the date of this agreement, provided that failure to obtain and file such certificate shall relieve the Board of all obligations under this contract. The Employee agrees that if he fails to obtain and file such a certificate or if the Employee ceases to hold a valid Florida Teacher's Certificate, this contract is null and void and of no further force and effect.

5. The Board may suspend or remove the Employee for just cause. The Employee shall not be entitled to receive any salary from and after the date of such suspension or removal unless such suspension is revoked and in no event shall the Employee be entitled to any compensation subsequent to the cancellation of this contract.

6. The Board agrees to make available to the Employee in the library or other accessible place at each school a copy of its rules, regulations, and policies for which the Employee will be held accountable and subject to under the terms of this contract.

7. The Employee, at his expense, agrees to submit to the Board, if required, prior to the effective date of this contract written evidence of good health based on a medical examination including a negative report of a Tuberculosis (TB-Tubercle Bacillus) X-ray examination with such examination to have been made within sixty (60) days prior to the effective date of this contract. The Employee, at the expense of the Board, further agrees, upon the request of the Board at any time during the school term, to submit to a physical or psychiatric examination by a qualified physician or physicians to be selected by the Employee from a list consisting of not less than three (3) names approved by the Board. The Employee further agrees to allow the report of the physician or physicians to be submitted to the Board with a copy being forwarded to the Employee.

8. This contract shall not operate to prevent discontinuance of a position as provided by law.

9. It is expressly understood and agreed by and between the parties hereto that neither the Employee nor the Board owes any further contractual obligation to the other after termination of this contract, and that no expectancy of re-employment may be derived from the execution or performance of this agreement. The Employee understands that unless and until his/her contract is renewed by the Board, or he/she receives a continuing contract under and by virtue of the provisions of Section 231.36(3)(h), Florida Statutes, or a multi-year contract under and by virtue of the provisions of Section 231.36(1), Florida Statutes, he/she shall have probationary status and no legal cause shall be required of the Board to re-employ the Employee after the termination of this contract.

10. This contract shall at all times be subject to any and all laws, and all lawful rules, regulations or policies now existing or hereafter enacted.

11. Failure of either party to fulfill the obligations under this contract, and to carry out the lawful provisions, hereof, unless prevented from so doing by reason of personal illness of the Employee, or as otherwise provided by law, shall constitute sufficient grounds for the termination of this contract the other party, provided, however, no termination shall be effective without reasonable notice.

GIVEN UNDER OUR HANDS AND SEALS _____ AT WEST PALM BEACH, FLORIDA

_____ (L.S.)
Employee

THE SCHOOL BOARD OF PALM BEACH COUNTY

By: _____
Chairman

Attest: _____
Superintendent of Schools

THIS CONTRACT MUST BE SIGNED AND RETURNED TO THE SCHOOL BOARD WITHIN 10 DAYS FROM THIS DATE

| Date | | |
|---|---|---|
| Mo. | Day | Yr. |
| 2 2 | 26 | 8 7 |

This contract form is to be executed in duplicate immediately on appointment of the Employee by the School Board. After being duly signed by the Employee, one copy is to be retained by the Board and one by the Employee.

Prescribed by the Commissioner of Education as Authorized by Section 6A—1.64, Regulations of the State Board of Education, July 25, 1974.

WHITE-PERSONNEL   YELLOW-EMPLOYEE   PINK-CONTROL

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 3

STATE OF FLORIDA, COUNTY OF PALM BEACH

THIS CONTRACT, entered into between the School Board of Palm Beach County, hereinafter referred to as the Board, and

Name **ARTHUR JOHNSON** _____ holding a Florida Teacher's Certificate, ____ 01 __ 1 __ 227527 __ 1996

|  | TYPE | RANK | CTF. NO. | EXP. DATE |

hereinafter referred to as the Employee WITNESSETH:

WHEREAS, Section 231.36(1), Florida Statutes, requires the Board to enter into written contracts with supervisors and principals of each district school system and further provides for contracts for periods not to exceed three (3) years for persons who are qualified as provided by law, and

WHEREAS, the Employee has been duly appointed as provided by law.

NOW THEREFORE, for and in consideration of the mutual agreements, covenants, terms, and conditions herein contained, it is expressly stipulated, understood, agreed, and convenanted by and between the parties hereunto as follows:

1. The Board agrees to employ the Employee in the position of ____ **PRINCIPAL HS/VC** _____ for _____ 3 _____ school fiscal year(s) as defined by law beginning on ____ 07/03/95 _____ and pay the Employee for services rendered an annual salary of $ ____ 73,802.57 ____ or such salary as may be prescribed by the Board in the Administrators' and Supervisors' Salary Schedule as adopted by the Board from time to time. The salary may be adjusted according to said salary schedule and shall be governed by the Salary Administration Policies for Administrators and Supervisors as adopted by the Board in its annual budget. Said Employee shall render services for a period not less than ____ 12 ____ months during each school fiscal year unless such period of time of service is increased or decreased by Board action with a corresponding increase or decrease in salary.

2. The services to be performed hereunder shall begin on the day and in the position as aforementioned and in a school as designated by the Board. The Board may, upon recommendation of the Superintendent transfer and assign the Employee to a similar position in any other school of the district, provided that the duties shall be similar to the duties originally assigned, and the salary shall be as heretofore set forth.

3. The Employee agrees to perform the obligations attaching to the position for which employed as prescribed by the Board for the full period of service for which this contract is made, in no event to be absent from duty without leave or to leave his position without first being released from this contract by the Board, to observe and to enforce faithfully the laws, rules, regulations, and policies lawfully prescribed by legally constituted school authorities insofar as such laws, rules, regulations, and policies are applicable to the position held by him. The Employee agrees that the last month's salary in each year shall not be paid until all reports required by the Board have been satisfactorily made and all duties have been performed as required by law and regulations of the Board and the State Board of Education.

4. This contract is based on the assertion by the Employee

(1) That said Employee is legally qualified to be a supervisor/administrator in the State of Florida, as evidenced by a Florida Teacher's Certificate, type, rank, number, and expiration date shown above, which is warranted by the Employee to be unrevoked and valid, or

(2) That the Employee will be legally qualified to be a supervisor/administrator in the State of Florida upon issuance of a Florida Teacher's Certificate for which application has been duly made as evidenced by the official receipt and acknowledgement recorded in the Office of the Superintendent, being Department of Education File No. shown above.

The Employee agrees to file with the Board a valid Florida Teacher's Certificate of a rank not lower than the rank shown above by not later than ninety (90) days from the date of this agreement, provided that failure to obtain and file such certificate shall relieve the Board of all obligations under this contract. The Employee agrees that if he fails to obtain and file such a certificate or if the Employee ceases to hold a valid Florida Teacher's Certificate, this contract is null and void and of no further force and effect.

5. The Board may suspend or remove the Employee for just cause. The Employee shall not be entitled to receive any salary from and after the date of such suspension or removal unless such suspension is revoked and in no event shall the Employee be entitled to any compensation subsequent to the cancellation of this contract.

6. The Board agrees to make available to the Employee in the library or other accessible place at each school a copy of its rules, regulations, and policies for which the Employee will be held accountable and subject to under the terms of this contract.

7. The Employee, at his expense, agrees to submit to the Board, if required, prior to the effective date of this contract written evidence of good health based on a medical examination including a negative report of a Tuberculosis (TB-Tubercle Bacillus) X-ray examination with such examination to have been made within sixty (60) days prior to the effective date of this contract. The Employee, at the expense of the Board, further agrees, upon the request of the Board at any time during the school term, to submit to a physical or psychiatric examination by a qualified physician or physicians to be selected by the Employee from a list consisting of not less than three (3) names approved by the Board. The Employee further agrees to allow the report of the physician or physicians to be submitted to the Board with a copy being forwarded to the Employee.

8. This contract shall not operate to prevent discontinuance of a position as provided by law.

9. It is expressly understood and agreed by and between the parties hereto that neither the Employee nor the Board owes any further contractual obligation to the other after termination of this contract, and that no expectancy of re-employment may be derived from the execution or performance of this agreement. The Employee understands that unless and until his/her contract is renewed by the Board, or he/she receives a continuing contract under and by virtue of the provisions of Section 231.36(3)(h), Florida Statutes, a multi-year contract under and by virtue of the provisions of Section 231.36(1), Florida Statutes, he/she shall have probationary status and no legal cause shall be required of the Board to re-employ the Employee after the termination of this contract.

10. This contract shall at all times be subject to any and all laws, and all lawful rules, regulations or policies now existing or hereafter enacted.

11. Failure of either party to fulfill the obligations under this contract, and to carry out the lawful provisions, hereof, unless prevented from so doing by reason of personal illness of the Employee, or as otherwise provided by law, shall constitute sufficient grounds for the termination of this contract the other party, provided, however, no termination shall be effective without reasonable notice.

GIVEN UNDER OUR HANDS AND SEALS _____ AT WEST PALM BEACH, FLORIDA

_____ (L.S.)
Employee

SPANISH RIVER HIGH
SSN: 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

THE SCHOOL BOARD OF PALM BEACH COUNTY

By: _____
Chairman

| | Date | | |
|---|---|---|---|
| | Mo. | Day | Yr. |
| | 02 | 12 | 96 |

THIS CONTRACT MUST BE SIGNED AND RETURNED TO THE SCHOOL BOARD WITHIN 10 DAYS FROM THIS DATE

Attest: _____
Superintendent of Schools

This contract form is to be executed in duplicate immediately on appointment of the Employee by the School Board. After being duly signed by the Employee, one copy is to be retained by the Board and one by the Employee.

Prescribed by the Commissioner of Education as Authorized by Section 6A—1.64, Regulations of the State Board of Education, July 25, 1974.

WHITE-PERSONNEL     YELLOW-EMPLOYEE     PINK-CONTROL

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 4

Plaintiff's Composite
Exhibit Four

▶ CLASSROOM CONTROVERSY

# Johnson's forced retirement a shock to many

*Parents, teachers and students saddened to hear of his removal for not taking action on offensive art*

By JASON ZACHER
SPECIAL TO BOCA RATON NEWS

The news of Art Johnson's forced retirement from the Palm Beach County School District came as a shock to teachers, parents and students who were at Spanish River High School during his tenure there.

"Johnson, former principal at Spanish River, and teacher Jeffrey Tyler were forced out Wednesday, while acting principal Barbara Porcher was demoted after Tyler hung inappropriate drawings in his classroom and made students sit in a "slacker's box."

Boca Raton City Councilwoman Susan Whelchel was both a teacher and a parent at Spanish River under Johnson's leadership.

"Dr. Johnson was one of the finest principals I have ever known," said Whelchel. "I am thrilled that all of my children were lucky enough to go through school under him."

Her sentiments were echoed by Boca Raton Community High School social studies teacher David Robbe. Johnson was principal at Boca High from 1983 to 1986.

"Art Johnson was the best administrator and principal I have ever had the pleasure of serving with in 20 years in three states," Robbe said.

Students at Spanish River were as stunned as teachers at the news.

"It's sad to hear. He was always on top of the problems, some of them racial, and he always handled them the right way," senior Frank Monzo said of Johnson. "It's shocking. I thought he would be the superintendent someday."

Johnson finished his career as an area executive director, a post to which he was named in October 1996 after serving as principal of Spanish River.

**Probe led to teacher's firing**

During a school district investigation, Johnson said he did not know about the slacker's box or the offensive drawings. The pictures, which were found in the in-school suspension room, were hung by Tyler.

Tyler, the in-school suspension teacher, will no longer teach in Palm Beach County public schools.

Tyler told investigators that he had created the box about two years ago as an alternative to sending students home. He estimated that about 200 students had been placed in the box since its creation, the

school's investigation revealed.

District Superintendent Joan Kowal's statement Wednesday that she expects principals to know everything that is going on in their school surprised some teachers.

**A tough job**

"Having taught high school for 17 years, there is a lot of stuff a principal doesn't know about," Whelchel said. "I think Kowal should follow her words. If she thinks every principal should know every single minute detail I hope she knows every single detail of what goes on in the district."

Johnson's nearly 30-year career in the school district ended with his forced retirement, which is effective July 31. He was considered a valued member of the school community.

"The Art Johnson I have come to know called upon teachers to go beyond their limits," Robbe said. "This man is a leader that teachers respect, students understand and the community can benefit from."

Some feel that the public is not being told the entire story of why a long-time and long-loved school administrator would be fired.

"I would imagine that people are extremely curious that one principal would be fired for the actions of a teacher who he is not even there with, when other principals have changed grades and such and only received a slap on the wrist," Whelchel said. "Somewhere, there is something we don't know."

16A Boca Raton News, Sunday, July 20, ...

## SOME ANSWERS, PLEASE

# We have the right to more facts on Johnson's dismiss...



**Ellen Birkman**

*I am not comfortable with Kowal's defensive comment that principals should know everything that goes on in their schools.*

I had to respond regarding Art Johnson's forced retirement. I would agree with the comment from Boca Raton City Council member Susan Whelchel that the public clearly is not hearing the entire story. Since my source is limited to the information reported in this newspaper I have the following questions:

If this is an attempt to clean house and demote or fire administrators who were in office while "the box" was being used, why is it not a clean sweep? Why are some administrators' positions secure when other positions are jeopardized? Spanish River High School is a big school with a large administrative team. Why is culpability limited to the former principal and the replacement principal? One would have to assume that if one member of that team knew about conditions in the classroom, the entire team would know. So, I am not impressed with Superintendent Joan Kowal's "clean sweep for allowing something deplorable."

There has been no mention of parental complaints. Is the community to assume that about 200 students were placed in the box without any parents complaining or questioning this action? I personally find it more alarming that 200 students did not tell their parents or that their parents decided the action did not warrant a phone call, than the fact that the box existed.

I am not comfortable with Kowal's defensive comment that principals should know everything that goes on in their schools. As an informed Boca resident and parent, I am aware that a Boca principal changed an athlete's grade and remained in office. I am also aware that another Boca principal had several years when he was not physically on campus. He could not possibly have known what was going on because he was not on the school grounds. Another Boca principal allowed a prominent textbook author to practically live on campus during the two years prior to elementary textbook adoption for the county. This conflict of interest and the other examples of misconduct were alarming, but somehow positions were protected. How

does the superintendent pick wi... offenses merit the boot?

Art Johnson is an effective, ta... ed administrator and his forced retirement is alarming and puzzling. I am sure that Kowal has heard only praise and commend... tions for this individual since a... ing and I would guess she finds tiresome. He sought the position superintendent and, locally, he w... her strongest competition for ... appointment.

School systems are known f... churning out unimpressive, un... spired, uncreative, limited lea... ers. They emerge from the tea... ing ranks and enter school administration. They comfort... maintain status quo until they qualify for sweet retirement packages. Art Johnson broke ... pattern with his inspiring, enthusiastic, creative leadership. He ran SRHS with a ferocity and energy that I have never observed in my 20 years of teaching in other schools.

School systems have never been comfortable with truly excellent teachers and with superior administrators. Excellent teachers make the other teachers look inferior and inadequate and superior administrators are usually viewed negatively from insecure superiors.

Without more facts, the community is left to draw its own conclusions. We know and trust Art Johnson's track record. I urge the superintendent to give us the story so we can support – or disagre... with your decision. To do otherwise is to leave us i... the dark with our suspicions and questions.

This superintendent and School Board have star... ed a tradition of quietly sending, moving or demot... ing people without the public getting the substanti... ation for the action. I would like to suggest more candor. This is an intelligent, informed community and you serve us.

Your actions are beginning to make me feel like I am in "The Box." □

■ *Ellen Birkman of Boca Raton is a public school teacher in Broward County.*

**16A** Boca Raton News, Thursday, July 24, 1997

READER VIEWS

# Incident robbed community of fine educator

■ A teacher was inappropriate in a classroom and is being held accountable.

This should be the end of the story.

Instead, our community is losing two of its greatest contributors to education with the forced retirement of Dr. Art Johnson and and the demotion of Barbara Porcher.

It is rare to find truly dynamic principals – ones who embody school spirit, receive respect from students and teachers, and continually reach for high academic standards. We found that in both Johnson and Porcher – yet now after years of building a reputable school in our community, one incident robs our community of these leaders' future contributions.

Was this drastic action to remove Johnson and Porcher appropriate? I find it peculiar one former principal is forced to retire (and another demoted) for an incident they weren't directly involved in, yet other principals have unethically changed grades and received little disciplinary action. Politics should not cost our community two of its greatest assets.

To Barbara Porcher and Dr. Johnson – thank you for years of dedicated service and a constant pursuit for success in our schools. Those you have touched remember you with honor and hope you continue to make a positive difference in your new pathways of life.

**Candace Bertotti**
*Spanish River Graduate*

**12A**   Boca Raton News  Wednesday, July 23, 1997

OUR VIEWS

# Cut through smoke in the Johnson affair

**The issue:**
*Churning at Spanish River.*
**We suggest:**
*Less smoke, more truth.*

As the Johnson affair heats up, we spy smoke. It is time school administrators stop shuffling both bodies and the truth and come clean.



## YOU HAVE THE POWER

■ School Superintendent Joan Kowal must clear the smoke surrounding the retirement of Art Johnson and demotion of Barbara Porcher.

**WRITE/CALL**
Joan Kowal
School Superintendent
3340 Forest Hill Blvd.
Suite C-316
West Palm Beach, FL 33406
(561) 434-8200
(561) 434-8571 – FAX

To recap: Last week Arthur Johnson, one-time principal of Spanish River High School and promoted last year to the post of area executive director, was forced into "voluntary" retirement over the alleged misconduct of a Spanish River teacher. In addition, then-acting principal of Spanish River, Barbara Porcher, was demoted to assistant principal. The teacher of the in-school suspension class, Jeffrey Tytler, was not rehired. This week Porcher moved from administration into a personnel office slot.

In another move, Elizabeth Decker, long-time Area 1 superintendent, has been moved to Area 2, comprising the segment of the county from Boynton Beach north to West Palm Beach and its suburbs.

And Jake Sello, well-respected for his role as first principal of Olympic Heights High School, has been shuffled from his position as magnet programs director to take over from Decker as Area 1 superintendent.

Nice and neat? Perhaps not. It appears there may be just a few mirrors to go along with that smoke.

This churning of the South County educational structure came about because of Jeffrey Tytler. A macho kind of guy, he apparently determined the way to deal with the kids in in-school suspension is to get in their faces. This teacher also laced his classes with inappropriate references to his ex-wife, some of which manifested themselves in gory and graphic drawings.

Much of this occurred during Johnson's watch. Some of it during Porcher's tenure. If they knew of such repellent behavior and did nothing about it, each of them is responsible and culpable.

Still it appears the insecurities of Schools Superintendent Joan Kowal have a role in this morality play. Johnson says he felt he responded appropriately to initial reports to him about Tytler's conduct, and ordered the drawings removed.

Porcher, as acting principal, ordered Tytler removed from the classroom. And here is where things get smoky: News reports indicate that after "a school district evaluation," Porcher was told to reinstate Tytler.

Who conducted that evaluation? Who ordered Tytler put back into the classroom *after* the principal put him out? If, as Kowal suggests, forcing Johnson into retirement and knocking Porcher down indicates a clean sweep in answer to egregious violations of School District policies, who else is being swept? Is this why Elizabeth Decker, who spent most of her administrative career in South County, is heading north? Surely, if Kowal wants to sweep things clean, there are others who should shoulder some of the blame. If, in the superintendent's opinion, each principal should know what is going on in every classroom in her or his school, those directing the principals should know likewise.

And how about the superintendent? □

Boca Raton News

Boca Raton News · August 5, 1997

## READER VIEWS

# Residents should fight for Arthur Johnson

■ A great wrong has been done to Dr. Arthur Johnson. Here is a man who was loved by his students and respected by parents and his fellow educators.

Now because of filthy politics he has been forced to retire after 30 outstanding years of service to our community.

Do we just sit back and let this happen? Do we live in America or in some country like North Korea?

Think of what the students at Spanish River High School must think of the Palm Beach County School Board. Do they respect it?

Dr. Johnson is a decent human being who deserved better. Residents of Boca Raton, let's stand up and fight.

**Stewart J. Tauscher**
*Boca Raton*

**COMMENTARY**

Boca Raton News  Sunday July 27, 1997  **15A**

**SEAMLESS SCHEMING**

# The community gains nothing from Spanish River dismissals

It is a familiar metaphor; a pebble is dropped in a pond creating a ripple effect that is eventually felt across the entire pond. Superintendent of Schools Joan Kowal, her lieutenants, and her legal representation justify the recent events at Spanish River High School by presenting Jeffrey Tytler and the decor in his classroom as the pebble that initiated the ripples undermining the career paths of both Arthur Johnson and Barbara Porcher. In fact, Tytler's situation merely offered Dr. Kowal an opportunity to drop a much larger stone resulting in repercussive waves across this community, the lives of our students and the faculty of Spanish River High School. .



Brett
**Burkey**

Dr. Johnson is highly regarded as an educator and community leader in Boca Raton.



He effectively served as principal at both Boca Raton and Spanish River high schools, with innovative discipline techniques and elevated test scores as his legacy. He continues to be widely respected in this community and enjoys a broad base of support. He also is ambitious, and it is no secret that he has aspirations to be the superintendent of schools. In the year and a half since Dr. Kowal arrived, the Kowal-Johnson divorce has been imminent.

The description of Art Johnson also would fit the community from which he came. Boca Raton can be intimidating, a powerful and vocal group positioned on the fringe of the realm; the disproportionate contributor to the school system's coffer demanding an equally disproportionate amount of independence from the central authority. A challenge to a power-driven individual trying to cement her supremacy.

Through a contrived and convenient series of events, Dr. Kowal has effectively killed two birds with one stone. But because of her blind ambition, she has irrevocably damaged her relationship with the community, thwarted the careers of two dedicated individuals, tightened the restrictive reins on academic freedom in our schools and ultimately undermined the opportunities of the young people she was hired to protect.

In a classic case of divide and conquer, Dr. Johnson was promoted to area superintendent of the communities north of South County, pulling him away from his base of support and propping him up unprotected. He was replaced by Porcher, a

dedicated part of the Spanish River family, and an advocate of much that Dr. Johnson had brought to the school. The Tytler situation offered a unique situation to eradicate the now-relatively defenseless Dr. Johnson and Porcher, who had aspirations of becoming the permanent principal with the full support of the community and faculty.

Tytler was suspended March 4 and reinstated, with the school system's personnel division's approval, May 1. Dr. Kowal didn't officially initiate her investigation until June, and School Board members didn't view the evidence until after school was out and while the Spanish River principal search was in its final stages.

The "outrage and horror" of the in-school suspension classroom didn't seem to materialize until it became a convenient means to a self-serving end. The fallout from the well-timed release of sensationalized evidence has been well-documented.

The opportunity to shore up her authority in Boca Raton, because of additional factors, has been flawless. The sudden resignation of Norm Shearin from Boca Raton High School, the large thumb that Principal Fran Giblin at Olympic Heights High School finds himself under and the repositioning of South County Area Superintendent Elizabeth Decker out of this region has given the superintendent the chance to put all of her own pieces in place.

The effective removal of Dr. Johnson was felt across the pond. In addition to the removal of the community's overwhelming choice for the principal's position, the sense of paranoia among other educators has been greatly enhanced. The feeling is that if the administration can bring down two respected and dedicated people like Dr. Johnson and Porcher, then all could be targets.

What of the community's role in determining the outcome of its students' education? At no point in this affair have the community's opinions been considered. The students at Spanish River have now lost two great role models in an era where they are a rare commodity. This is a large pond so the ripples are numerous. Normally the ripples in nature don't leave an indelible mark on the water's surface. None of what has happened in the last week is the least bit natural.

■ *Brett Burkey is a social studies teacher at Spanish River High School and served as a member of the school's Principal Selection Committee.*

Boca Raton News · July 27, 1997

## KOWAL MISFIRED

# Early retirement the wrong answer for Art Johnson



Ellen **Birkman**

When Art Johnson was recruited from Spanish River High School to serve as an area executive director, I misread the intentions of Superintendent of Schools Joan Kowal and gave her undeserved credit. I assumed she recognized tremendous talent and wanted him in a more visible role where he could impact more people. I gave her credit for a wise move, although as a parent I hated to see him leave SRHS.

In retrospect I read Dr. Kowal's moves differently. Art Johnson was lifted out of his school and moved to north county to distance him from his following and destroy his power base. It is very apparent that Dr. Johnson's popularity and unmatched talent threatened Dr. Kowal. It is the only spin I can put on the story that has unfolded recently.

What explanation can anyone give for creating and publicizing a problem that did not exist? Yes, there was a small room with objectionable pictures; and, yes, there was an unfit teacher. What was missing? A complaint! There was not one complaint from a parent or student or fellow faculty member. Regardless, the district pressed forward with an investigation.

Although the teacher seldom met with students in the room, the investigation uncovered great evidence that could be printed up in packets for media consumption. Imagine ... releasing packets to verify how bad it really was! The district issued a press release to justify and explain their handling of the situation. They followed that up by offering counseling to the alleged "victims." I am expecting the School Board to print a list of local attorneys who will handle the cases that are being invited by their encouraging disclosures.

At the Monday night meeting, the investigating attorney, Glen Torcivia, claimed that Barbara Porcher was not being punished and that Dr. Johnson chose retirement. The way I see it, Porcher lost her status at a school where she was beloved and Dr. Johnson chose the only honorable option that would convey his innocence to the people he served.

Let's look at the losses:

■ Locally, teachers and administrators have a heightened sense of no job security. Principals feel that if this could happen to Dr. Johnson, it could happen to anyone. Principals will need to consult with attorneys before following future district discipline policies.

■ A great educator is precluded from staying in education. Could this have been Dr. Kowal's grand goal?

■ An administrator who was doing a beautiful job of maintaining Dr. Johnson's leadership tradition departs from the school. The irony is that she had just been selected by the appointed committee as the best candidate for principal.

■ A community is left seething at what is being seen as a vendetta, knowing they are powerless to reverse a "done deal."

■ Boca Raton will enter the 1997-98 school year with a new area superintendent and new principals and administrators at two of the three high schools. A core group of individuals with knowledge of this community and great respect and fine standing in this community have been removed from the area.

Another result is a complete loss of faith in a leader. Dr. Kowal might have pulled this off another school year, but this was a tumultuous year for Palm Beach County high schools. There were countless litigious and contentious situations. It is too inconsistent and inexplicable that this one situation was singled out as the landmark case to show Dr. Kowal's resolute strength as a leader. She claimed Dr. Johnson and Porcher should have known what was going on in their schools. Let's apply that dictate to Dr. Kowal's relationship with her Personnel Office. They conducted an investigation and returned the unfit teacher to the classroom. Then Dr. Kowal hired a private attorney to conduct a reinvestigation.

A situation that should have been handled internally is broadcast in an attempt to embarrass a community and create a perception of a school out of control. The potential fallout from Dr. Kowal's handling of this situation is far more damaging than the damage caused in that classroom.

The hearing on Dr. Johnson's settlement will take place at the July 30 School Board meeting, at which time the board should reject the settlement and reinstate Arthur Johnson. A strong, fine leader admits mistakes, retracts judgments and weighs the infraction against the individual's merit. Those are the only actions that can save this community's perception of Dr. Kowal.



■ Ellen Birkman of Boca Raton is a public school teacher in Broward County and a member of the Boca Raton Education Advisory Board

Boca Raton News · July 28, 1997

**THANKS, DR. JOHNSON**

# No matter what they say, Johnson did a great job



David
**Thomas**

During the last several days allegations regarding Spanish River High School and its faculty have been widely circulated. I cannot argue their validity because I never witnessed the events first hand, nor have I heard from anyone who has. All I can comment on is how our principal, Art Johnson, treated his students while I was enrolled at Spanish River.

For four years I attended the school and had several meetings with him throughout my senior year when I was editor-in-chief of the school's newspaper, The Galleon. I want to inform those who do not know the man about his true nature. Every time I talked with Dr. Johnson he treated me, and any other students with me, with a respect that is uncommon among most public school faculty.

He never would talk down to students, or raise his voice. While this may seem inconsequential it meant a lot to me at the time. When you sit down with this man who shouts into bullhorns and patrols the school yard like a watchdog you quickly understand that all of that is for the benefit of the students. At no time in the four years I went to that school did I feel unsafe or uncomfortable in the classroom or outside it.

Coming from a middle school that was rife with fights and other violence, I expected Spanish River to have even more of the same. Instead I found a tranquil campus that, while looking like a prison from the nearby road, was anything but one. I sincerely believe that without Dr. Johnson the students at Spanish River would not have been able to feel so secure. And that insured the most important aspect of schools everywhere – education.

Personally Dr. Johnson impressed me often, but not always due to his work inside the school. At every after school function or football game I attended so did the principal, almost always accompanied by his family. A year ago I was home for spring break and was having dinner with friends at Mizner Park. I looked up from my meal to see Dr. Johnson with his wife waiting for a table. Two years had passed since the last time I had seen him the stage in FAU's gymnasium to receive my diploma. I did not think he would remember me in the least, with overseeing more than 1,000 new students in that two-year period.

After I mentioned my name, he introduced me to his wife and informed her that I was one of his former students and former editor of the newspaper. Then he surprised me even more as he asked how I was doing at Indiana University. At



**LOCAL VIEW**

this point I was stunned that he could possibly remember the minute facts of one student's life, but for Dr. Johnson they were not minute because he truly does care about every kid that walks through the halls of Spanish River. It is this one fact that makes me question all these allegations. If he had known the extent of problems being reported now in his own school he would have dealt with them quickly and professionally, as he did any other hazard to the school. Why would he intentionally ignore them?

I just want people reading all the stories to understand that this isn't about school boards and administrators, it is about the students and one person who always cared about them. This fact seems to elude the headlines, and it should be sal somewhere.

If Dr. Johnson is reading this I would like to thank him for the job he did and for the good it achieved for so many of his students and myself. □

■ *David Thomas is a senior majoring in journalism at Indiana University. He is currently an editor at the Indiana Daily Student and correspondent for MTV Online. He graduated from Spanish River High School in 1994.*

Boca Raton News: July 25, 1997

**KIDS LOSE – AGAIN**

# Dr. Johnson a rarity: He cared

As a teacher from Spanish River High School since its inaugural year, I would like to express my support for my former principal, Dr. Art Johnson. Since I began my teaching career in Palm Beach County almost 20 years ago, I have never seen conditions so deplorable as they are today.



Administrators literally steal money from our children's education. Taxpayers repeatedly deny the funding, which is so badly needed.

The School Board consistently balances its budget on the backs of the teachers by increasing class sizes. Is anyone really surprised by the fact that our students can't pass even the simplest of tests?

Yet there was a diamond among us – Dr. Art Johnson. Dr. Johnson was the ultimate



Ken
**Weemhoff**

motivator, making himself accessible to every person on campus. He demanded the best from his administration, faculty, and student body. His no-nonsense approach to education – summarized by him as "teachers will teach and students will learn" – earned him tremendous respect from the faculty, staff, students, and community, and consistently resulted in the highest test scores in the county.

His departure in October from Spanish River was met by all

with mixed emotions. We were sad because we all knew that the golden age of Spanish River had come to an end, yet we were happy, for we knew that the school system as a whole would benefit from Dr. Johnson's outstanding leadership.

Has everyone forgotten the educational accomplishments and service to the community that this man has made? Maybe Dr. Johnson made an error in judgment, but is forcing his retirement an appropriate punishment? Are the needs of the schools and the children of Palm Beach County really being served by the elimination of one of the county's best administrators?

Once again, the students lose! □

---

■ *Ken Weemhoff is a science instructor at Spanish River Community High School.*

PB    Sun-Sentinel, Thursday, July 31, 1997   3B

# LOCAL

# School Board lets Johnson retire, despite outcry

**By BERENICE D. CHAUVET**
Education Writer

Despite the passionate pleas of about 30 Spanish River High School parents, the Palm Beach County School Board on Wednesday approved the retirement of area executive director Arthur Johnson, effective on Friday.

Johnson agreed to retire after a district investigation concluded that he should have known about the militaristic practices of a Spanish River detention teacher. Johnson was principal at the Boca Raton school until his promotion last fall.

Parent Charles Jaffe said Johnson's departure was "a great tragedy for children" in Palm Beach County."

Parent Ellen Kessler said Johnson "was the man on his way up, not on his way out."

> **Parent Charles Jaffe said [Arthur] Johnson's departure was "a great tragedy for children."**

Johnson will receive $31,000 to cover two months' severance pay and benefits. That extension of benefits will allow Johnson to collect full pension for 30 years of service, though he will leave just shy of the 30-year mark. He also will collect $115,344 for unused vacation and sick days.

Also on Wednesday, the School Board:

■ Agreed to pay $20,000 in legal fees

to settle a lawsuit filed by Boca Raton High School 10th-grader Peter Riera, who sued because he was prohibited to attend school wearing a beaded Cuban flag necklace. School officials said it was gang attire; Riera said it was not.

■ Agreed to pay one-third of the $255,747 cost of additional repairs at district headquarters. The rest will be split between the builder and the architect. The district paid $19 million to build the building, which opened in 1992. The cost of the unanticipated repairs required has now topped $1 million.

■ Approved a literacy program that will allow teachers to better track the progress of elementary school students in reading. The program, to be piloted at a few schools, will give teachers uniform guidelines for assessing students' progress.

# Sun-Sentinel

SOUTH FLORIDA • **THURSDAY** • JULY 17, 1997

## Kowal: Decision was toughest she has made

### Johnson popular with Boca parents, teachers, students

By STEVE NICHOL
Staff Writer

Art Johnson lived by the book at Spanish River High School. It was a 50-page book on class behavior, dress code, tardiness and absenteeism.

And the bullhorn was one of his favorite tools of law and order.

"You've got 30 seconds," Johnson would blare to students straggling to class. And for his no-nonsense ways, he was widely admired during his 10 years at the Boca Raton high school of 3,000 students.

But on Wednesday, those who came in contact with the educator, 52, were astonished to learn that he was being forced to retire, subject to School Board approval.

Documents released by the School Board on Wednesday suggest Johnson turned a blind eye to an in-school suspension class where drawings were posted that were deemed to be glorifying of violence, demeaning to women, and possibly racist.

"He loved Spanish River," said Lorraine Testani, a former school advisory board member who had two children graduate under Johnson, including his final class in 1996. "I think he's [probably] totally crushed."

Johnson had no comment, said his attorney, Carey Haughwout.

"This incident is not the only reason he decided to retire. He has been considering retirement for some time," Haughwout said. "Was he a scapegoat? Was he wrongly fired? He has not commented, nor will he."

Johnson obtained his doctorate degree in education from Florida State University in 1968 and started teaching in Sarasota.

He came to Palm Beach County in 1983, when he became principal of Boca Raton High School. In 1986, he moved across town to become principal at Spanish River High, at Yamato and Jog roads.

During the years, he was widely admired in the community, even by those who had no children at the school.

Teachers said Johnson was tireless on campus and made everyone feel involved and important, from parents to students to fellow educators.

"He was truly involved. He knew almost every kid on campus," said Carolann Brockman, a math and science teacher who worked with Johnson for five years.

On two occasions at Spanish River, Johnson submitted his name to be considered superintendent of the school system. The School Board chose others, first Monica Uhlhorn and, most recently, Joan Kowal.

Kowal said the decision to end Johnson's career in Palm Beach County was the toughest she has ever made.

The School Board is scheduled on July 30 to take up the settlement agreement under which he would retire.

*Staff Writer Kellie Patrick contributed to this report.*

## NEWS DIGEST

### Art Johnson forced into early retirement by school district



Johnson

The former Spanish River High School principal ignored an in-school suspension class that investigators say was run like a military camp and glorified violence. The teacher was fired and the acting principal was demoted. **LOCAL, 1B**

AUGUST 1996
*DAILY RECORD OF EVENTS*

**23** FRIDAY
236th Day  130 Left  Week 34

- Commitments Exchanged
- Journal Entry
- Thoughts & Ideas
- Agendas (telephone, meetings)
- Conversations

*Goals:*

1) Neutralize Media
2) Find New Outlets
3) Stabilize Staff
4) Create + Drumbeat (Outcome)
   (can't do it alone)
5) Build Consensus
   Common VISION
   Common GOALS
6) Improved Education

*Palm Beach Post. May 8, 1997*

# Kowal's goal: 'Neutralizing the media'

*The following are excerpts from a Palm Beach Post Editorial Board meeting, attended by Palm Beach County Schools Superintendent Joan Kowal and Post education reporter Mary Warejcka, among others.*

**Mary Warejcka:** I wanted to ask something that's related to media. This (a memo, reproduced above, retrieved by *The Post* through a Freedom of Information Act request) came out of your calendar, Dr. Kowal. I just wanted to find out what that was all about.

**Dr. Kowal:** This is probably, OK, from a meeting with David Voss, where what we were looking at is how do we work more effectively with the media to get a positive . . . I mean, if our goal is to successfully pass a referendum this fall, um, we have been talking with people about how do we do that. Uh, and this is, uh, um, I mean

. . . Again, you're in a position to help us do that, um, as much as you choose to, so, um, obviously in talking about what the goal's for, um, and that's the training that David was involved in talking about — how do we more effectively work with you, neutralizing, what are ways that . . . fine, if there's negative print what are some of the other ways we have to work to get our story out . . . um, by using new outlets. I mean that's, those are notes that I took in the conversation with David — that's it.

**Mary Warejcka:** So is that the advice you plan to follow, or how does that . . . ?

**Dr. Kowal:** This is a set of casual notes. He gave us a plan, you've already seen the plan . . . I don't recall those words being in the plan. That's what we were looking at that day, in a conversation.

## David Voss

David Voss, a public relations consultant from the St. Petersburg area, was communications director for Florida Education Commissioner Betty Castor from 1986 to 1990.

Since August 1996, Palm Beach County Schools Superintendent Joan Kowal authorized payment of more than $10,000, through several contracts, to develop a 'strategic communication plan' for the district.

On Jan. 22, Mr. Voss turned down a $25,000 contract, saying more work would interfere with his full-time job as marketing director for Apple Computer. Bob Douglas, former business editor at *The Palm Beach Post*, was hired instead.

# Dr. Johnson... the man who made Spanish River

**By Tova Sacks and Beth Kaufman**
**In-Depth Editors**

"If I had stayed at Spanish River until I retired, I would have retired a happy man," said Dr. Arthur Charles Johnson Jr.

Often seen poking his head in classrooms, dressing up in extravagant costumes during pep rallies, and monitoring the hallways with his bullhorn, Johnson is gone and leaves behind 10 years of memories.

With his personable manner and ability to interact with the students and faculty of Spanish River, he acquired the name "Dr. J." His motto "Work hard, play hard," was directly portrayed through his serious and responsible actions regarding order at Spanish River. Johnson's job went farther than its original description, for he took his job as principal to a higher level.

"Compared to other principals, he is by far the best. There are certain ingredients for a recipe. Dr. J was consistently fair, firm, and honest with the students and faculty, with empathy and compassion," said Mrs. Bonnie Plucinski, Acting Assistant Principal for Curriculum.

When Johnson attended the University of South Florida, his expectations of becoming a principal were remote. He began school as a music major, and then later changed majors to physical education. He furthered his education at Florida State University, where he eventually earned his Masters and Doctorate, and then went on to become a physical education teacher for elementary school students.

Johnson became the principal of Williston High School when he was 26 and then moved to Boca Raton High School for three years before coming to Spanish River High School in 1986. In his 10 year reign at Spanish River, he made an impact not only on the students and faculty, but to the school as a whole.

"He was so aggressive as principal. He wanted the worst job so his best job could make more of an impact," said Derrick Manning, Assistant Principal for Discipline, who is among the faculty members who came over to Spanish River with Johnson. "He could reprimand you or inspire you in the same tone. He never yelled or demoralized you," Manning said.

One of Johnson's passions was working closely with the student body. He always took part in preparation for the pep rallies, and supported student council. "Being involved with student council I have had the opportunity to work with Dr. J. He was easy to work with, and was supportive of student council's endeavors," said Marli Guzzetta, Student Council President.

Johnson's influence and leverage as principal leaves a lasting impression. "He was so organized. Nothing skipped by Dr. J. His goals were to teach every student to play hard when you play, and to be fair. He was able to show both sides of education," said Coach Larry Osborne, teacher and dean.

As Johnson's feats and accomplishments are admired and respected, his leaving has caused a mixture of emotions. "It's like losing a best friend. There simply is no comparison. On a scale of one to 10, he is 50," said Mr. Douglas Markwardt, dean.

"You could mentor yourself after him, following examples and taking care of responsibilities," said Barbara Porcher, Interim Principal. Her interests are not to try to change Spanish River, but to continue to carry on Johnson's leadership skills and involvement.

The day Johnson announced his departure, students had mixed feeling towards his decision. Some students felt that the school would suffer, while others felt Spanish River would remain on top. Even though he has left the class of 1997 without a permanent principal, Johnson has promised to attend graduation and as many pep rallies as he can. "He was extremely supportive, and if help was needed he was the man to go to," said Steven Bell, Mr. Spanish River.

"The most important thing we do in education is contribute to the betterment of mankind," said Johnson. As he moves on to be Executive Director of the South-Central area in Palm Beach County, he will not only be able to share his skills as a leader with Spanish River High School, but with the 26 schools in his district. "He is a strong promoter of positive self-esteem, constantly striving to achieve success for all," said Plucinski.

Johnson realized that he had to take this new job opportunity because he could not become superintendent directly from his status as principal in a large county. "This is just a stepping stone for him," said Manning. By taking this job opportunity, he will now come closer to meeting his ultimate goal as superintendent. He did have hesitations regarding leaving behind his personal faculty and close interactions with the students. Johnson said, "I miss the River."

"Spanish River has such a solid reputation that we will have to withstand his departure. I think we will survive, but when a principal leaves, there is always a degree of insecurity and anxiety regarding who will succeed and what their particular policies and emphasis should be. Without question a principal sets the tone for the school," said Mary Murley, Student Council Advisor.

Johnson's time at Spanish River High School is now in the past, but will not soon be forgotten. As the basis for the achievements and the title as the number one school in Palm Beach County, credit is given where credit should be received. At his farewell meeting to the senior class Johnson said, "The nature of education is that we all move through, graduate, and go on to better things in life. That is basically what I want you to look at in terms of my departure."



Boca Raton News

Florida's Best Community Newspaper

Tuesday, November 17, 1987

25 cents



**Staff photo by Tracey Trumbull**

Spanish River High principal Art Johnson will be recognized by the U.S. Department of Education as a role model for other principals

# Everful principal deemed role model

By Michelle Busher
Staff Writer

When students at Spanish River High School heard that Art Johnson would be their new principal last year, they shuddered to think of the changes that would take place.

"We heard rumors from Boca Raton High School (where Johnson was principal from 1983-86) that he hides in closets during classes and that he'd lock the doors while we were in school," said Brad Gardin, a student council senator.

Johnson admits that last year there was a lot of anxiety and expectation at first.

"The kids had heard I was really tough and strict and they didn't like that," Johnson said. "Their fears were confirmed when I fenced in the parking lot and began a new tardy policy," Johnson said.

Yet tonight Johnson will be recognized at a county School Board meeting by the U.S. Department of Education as a role model for other principals.

Turn to Principal page 3A

# Principal

**From page 1A**

He was the only principal chosen out of thousands of high schools in eight states for his "no-nonsense approach" and ability to "get out of the office and into the action," said Lee McCormick, who is Education Secretary William Bennett's regional representative in Atlanta.

McCormick, who will present the award, chose Johnson after visiting high schools throughout his region and getting feedback from teachers and students.

Student Body President Tarita Virtue said Johnson deserves it.

"He works really hard and every year things get better and better," she said.

"Before we had a principal that was never accessible and when Johnson came - boom - boom - things got done," agreed Rachel Cohen, student vice president.

Although he's an intimidating figure with a short muscular build, walking around the halls between classes with a bull horn, senior Devin Archer said "Dr. J goes out of his way to let people know he cares.

"He's really strict, but everyone knows exactly where he's coming from and exactly what he wants and why," Archer said.

Each week Johnson holds a forum so students can ask whatever is on their minds or make suggestions on school improvements.

He spends 12 hours a day at school, and then works out in the weight room with students and faculty.

"I've been practicing management by wandering around for a long time," Johnson said. "That's the only way you can make sure nothing escapes your eye."

To students, that can be scary, admitted Virtue. "It's almost like he's a student in class. He even catches fliers that get passed around for parties and has been known to bust them," she said.

She said some students felt Johnson overstepped his bounds last year when he appeared at the front door of a student's home before a party with several police officers.

"Some students were furious, but I guess if he sees a flier for a party in the school he feels it's his responsibility," Virtue said.

Though he is commended for his strict discipline and emphasis on high academic standards, "I recognize also that it is important for kids to enjoy being here," Johnson said.

Pep rallies and intramurals are two events Johnson promotes to ensure fun doesn't disappear from school.

But he said, "The most important thing is to make sure the students are in the classrooms and the teachers are teaching."

# Principal knows formula for successful school



## Wayne Ezell

**OPINION**

Herewith some thoughts on the matter of Dr. Art Johnson, the principal at Boca Raton High School, where some remarkable changes have come about, and his transfer to Spanish River High School, where some changes are said to be needed:

A few days ago I was among several people who interviewed 10 outstanding students at Boca High to help select Mr. and Ms. Boca High for next year. In the course of those questions, I asked each of the finalists to tell me one of the best things they could about Boca Raton High School.

"Dr. J," said one.

"Our principal," said another.

"Dr. Johnson," said two others.

Now can you imagine asking 10 students an open-ended question such as that one and have four of the 10 name the principal?

Later in the interview I asked each to describe for me the drug situation among students at Boca High. In summary, the consensus was that they don't have a drug problem at Boca High. Some students may have a problem at home or after school, but drugs are not a problem on this campus during school hours. That, of course, was not the case a few years ago.

"Our school," one student said proudly, "is the only high school in the county that doesn't have the drug-sniffing dogs that have become a regular fixture at Palm

Beach County's middle and high schools don't ever visit Boca High. The implication is that they aren't needed there.

The reason seems to be Art Johnson.

He doesn't look like a principal. A coach maybe, but not a principal. At 41, he is a short, muscular man who was state weight-lifting champion six times. He is immensely confident, some would say cocky.

After working 14 years as principal — in such small Florida towns at Wakulla, Wachulla and Williston before coming to Boca — he seems to harbor no secrets about how to run a high school.

His priorities are simple: student discipline and effective teaching.

Now there are some frills in education these days. Johnson learned about those on his way to getting a doctorate at Florida State University and as he was doing post-doctoral work at Boston University and at Harvard.

But there aren't many frills in his approach, which some might say is a bit radical.

He visits every classroom at Boca High every day. Every classroom every day.

"You can tell in just a few seconds what's going on," he said. In other words, whether the teacher is teaching and the students are paying attention.

He also puts a lot of premium on being available to students, which is why he is out on the grounds in the mornings when students arrive.

That also is why he spends his lunch hour among the students and staff. Every day.

Most schools allow a student to be tardy up to three times to each of his or her seven classes before the dean's office gets involved. That can amount to a lot of tardiness.

At Boca High, every tardiness gets attention.

"Being on time, behaving and paying attention are not negotiable," he said.

The results of Johnson's approach are easily measured. Student scores on the Scholastic Aptitude Test and other tests have gone up in each of the three years he has been there. The problems of truancy and on-campus drug activity have diminished.

Finally, the students appear to love him; school morale is definitely up and he gets much of the credit, according to the finalists for Mr. and Ms. Boca High. The school newspaper noted recently that the man who

once was called "the enemy of the people" when he arrived not only improved tests scores, he even made pep rallies more fun.

Interesting that pep rallies should be mentioned. When I talked to a group of finalists for Mr. and Ms. Spanish River High a few weeks ago, several students volunteered that their pep rallies needed a little more pep.

Maybe that will change when Johnson gets to Spanish River next year. He loves a good pep rally, Johnson, who talks about working hard and playing hard, came up with an assistant principal to do a Blue-White routine at one pep rally.

But pep rallies probably aren't the only thing that will change at Spanish River next year.

One morning a few days ago, with less than a week to go before school was out, Johnson approached a line of Boca High. The parking lots were full. He raised his left hand to his right and toward the main building, surveying the campus. Not a soul was in sight, nothing stirred. It was almost eerie. The principal smiled and swaggered just a little as he marched toward the office door.

"The students are in class," he explained proudly "and the teachers are teaching."

*Wayne Ezell is the editor of The News.*

▶ SCHOLASTIC APTITUDE TESTS

# Local SAT scores beat national average

*Most district scores*
*unchanged in 5 years*

BY DANA YVETTE GEORGE
STAFF WRITER

Although Scholastic Aptitude Test math scores pushed Palm Beach County public schools over the national average by one point, most of the district's 1991-1992 math and verbal scores are about the same as, or even lower than five years ago.

Spanish River High School is the only public school in the county with SAT math averages over 500 for the 1991-1992 academic year. However, even Spanish River's scores lag way behind area private schools. And the district's SAT scores were well below the average scores of recently admitted freshmen in Florida colleges.

While the district's combined math and verbal SAT average was 894, Florida Atlantic University's fall of '92 class had a combined SAT average of 1002, according to Brian Levin-Stankevich, FAU director of admissions.

According to the 1991 edition of American University and Colleges, the freshmen at Florida State University had mean SAT scores of 513 verbal, 578 math. The University of Florida's freshman class had SAT scores in the mid-range of 470-570 for verbal and 560-650 for math.

## Scores and choices

"It doesn't mean they're not going to get into a state university, it just may not be the school of their choice," said Levin-Stankevic.

Several of the state's univer-

## SAT scores for the past 5 years

| Fiscal year | verbal | | | | | math | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 88 | 89 | 90 | 91 | 92 | 88 | 89 | 90 | 91 | 92 |
| **South County Schools:** | | | | | | | | | | |
| Atlantic | 429 | 399 | 392 | 402 | 416 | 467 | 447 | 446 | 439 | 467 |
| Boca Raton | 445 | 444 | 443 | 428 | 428 | 493 | 491 | 497 | 483 | 489 |
| Santaluces | 419 | 395 | 414 | 405 | 389 | 488 | 457 | 472 | 466 | 440 |
| ⟶Spanish River | 429 | 434 | 437 | 433 | 435 | 482 | 493 | 490 | 495 | 505 |
| **Select Schools:** | | | | | | | | | | |
| Lake Worth | 423 | 418 | 405 | 405 | 387 | 474 | 468 | 451 | 457 | 457 |
| P.B. Gardens | 437 | 438 | 423 | 424 | 426 | 493 | 508 | 498 | 496 | 495 |
| Pahokee | 286 | 273 | 319 | 336 | 340 | 349 | 359 | 368 | 377 | 390 |
| Deerfield | 425 | 394 | 362 | 380 | 391 | 508 | 470 | 468 | 454 | 484 |
| District | 424 | 414 | 413 | 418 | 417 | 474 | 472 | 470 | 473 | 477 |
| State | 422 | 420 | 418 | 416 | 416 | 468 | 467 | 466 | 466 | 468 |
| Nation | 428 | 427 | 424 | 422 | 423 | 476 | 476 | 476 | 474 | 476 |
| **Select Private Schools:** | | | | | | | | | | |
| St. Andrews | 544 | 541 | 529* | 510* | 500 -540** | 580 | 575 | 560 | 570 | 550- 590** |
| Pine Crest | 560 | 570 | 560 | 570 | 510 -620** | 630 | 610 | 620 | 630 | 570- 680** |

\* Does not include students whose second language is English
\*\* Median range. Reflects a change in the method of reporting Olympic Heights' first graduating class is this year
Sources: Palm Beach County School District; individual private schools

DONNA BONN, THE NEWS

sities, including FAU, use a sliding scale for admission, which allows students with low SAT scores to be accepted into college, he said.

The scale lists students with a 3.0 GPA, as needing a minimum SAT score of 340 verbal 400 math. Students with a 2.5 GPA need 900 combined SAT score and students with a 2.0 GPA need a 1050 combined SAT score.

"But it's very rare that someone with a 2.0 GPA would have 1050 (combined SAT score)," Levin-Stankevic said.

Half of the high school se-

niors in the country, or 2,665, took the SAT last year, the district reports. This was a slight increase from 1990-1991, said Marc Baron, district coordinator of research. These scores will be used as a benchmark for improving academic performance.

When schools increase the numbers of students taking the test, the scores often decrease because new test takers are not as well prepared, said Murray Harris, school district spokesman.

"We want to encourage students to consider the possibility of going to college," Harris said.□

# Playful principal strikes a blow for school spirit

By DEBBIE CENZIPER
Education Writer

His motto is "Work Hard, Play Hard."

And Spanish River High School Principal Arthur Johnson really means it.

He pushes students at the Boca Raton school to excel in academics, but when it's playtime, the principal known as "Dr. J." lets loose.

He becomes a wacky stuntman.

At a rowdy pep rally on Friday afternoon to gear up for a football game, Johnson ran into the gym in front of more than 1,000 cheering students wearing a toga and wielding a sledgehammer.

He called over the class presidents in each grade level, armed them with sheets of plastic to shield themselves and then proceeded to smash watermelons, chocolate milk, red grapes, fruit punch, eggs and orange juice all over them.

And himself.

"If you demand as much as I do from them in terms of academic achievement, then there's got to be a

> "He [Principal Arthur Johnson] likes school spirit. He makes the school more exciting."
> — Allison Wean

healthy outlet," he said after the show, arms dripping with fruit juice. "Now, I've got to go take a shower."

At school pep rallies in the past, Johnson has bungee jumped in the gym, jumped off a two-story tower to land in a kiddie pool and shot himself out of a rocket ship. Students expect his circuslike stunts each year.

"It's pretty cool," said sophomore Allison Wean. "He likes school spirit. He makes the school more exciting."

Test scores show Spanish River ranks near or at the top of the pack among Palm Beach County schools.

On last year's Scholastic Aptitude Test, Spanish River students scored highest in the county in math and second in verbal abilities.

By ANDY NEY
Staff Writer

BOCA RATON — Emblazoned across the school roof in 12-foot high letters, a sign proclaims: *Spanish River Community High School — Center of Excellence.*

It's a credo the school has taken to heart this year.

"We take a lot of pride here and set high expectations in all aspects of the school population," Spanish River Principal Art Johnson said. "First and foremost we demand excellence from the academic program, but we also expect the same high excellence in the athletic program."

After the finest athletic year in school history, Spanish River can claim that excellence.

With an overall record of 225-88-3 (.718), Spanish River toppled four-time champion Cardinal Newman to win the *Sun-Sentinel* All-Sports trophy, which is awarded annually to a Palm Beach County high school for athletic supremacy. "We've been waiting five years for this," Spanish River Athletic Director Bill Massey said. The school opened in the fall of 1983, but had no seniors until the following year.

Cardinal Newman, which fielded teams in 18 of 19 varsity sports, was second with .690. Palm Beach Gardens was third.

"The key here is balance," Johnson said. "When you strive to achieve, you do it in all areas. It doesn't matter if it is in the classroom, or the athletic field. If you are going to do something, do it all the way. That's what we try to stress here."

Spanish River, with an enrollment of about 2,800 in grades 9-12, is the largest school in the county. It has finished second in the All-Sports competition the past two years.

"Being the largest school in the county is helpful, I'm not going to deny that," Massey said. "We have been very competitive with the other public schools for years. But you have to be supportive of the whole program to make them competitive. You can have all the kids in the world and if the athletic program is not up to scale you won't get the bodies out."

The Sharks won state championships in boys' and girls' tennis.

The swimming teams also had outstanding years, the boys finishing 14-0 and the girls 12-2. Each won the district. The volleyball team was 33-6 and a state finalist. The cross country and track teams also finished with winning records.

"We have always been competitive in the minor sports," Massey said. "This year, however, we also did well in the other sports and that was the big difference."

Spanish River had school bests in both boys' and girls' basketball. The boys' finished 21-9 and reached the district semifinals. The girls were 15-8, the third-best record in the county, and played in the district final for the first time.

The football team finished 8-2.

"We have tried to emphasize all of our sports every school year," Massey said. "The thing we stress is to keep all our programs first class. That's been our philosophy since we opened."

Said Johnson: "Everything gets equal treatment here. We have pep rallies not only for football and basketball, but also for tennis, golf, swimming and even non-sports get the same recognition. We had a state championship assembly last month where we honored the state championship tennis team and also the FBLA [Future Business Leaders of America] and debate teams, which also won state competitions."

# Art Johnson is mad. He wants change in the schools and he wants it now.

Art Johnson may have a career death wish. He thinks "the last thing we need in education is another stupid committee." The difference is he says it out loud. To anybody.

Johnson is the 50-year-old short guy with big muscles in charge of Spanish River High School in West Boca Raton, whose mission in life is first, his students, and second, making waves for the beleaguered Palm Beach County School System. According to Johnson, education reformers keep getting in his way. They tinker with the curriculum. They crush teachers with paperwork. They convene pointless, irrelevant meetings that former Delray Beach teacher Owen Murphy called "absolutely deadening to the soul and spirit." And they dispense a gutless, ineffective brand of classroom discipline.

If a school reform does not enhance what Johnson calls "quality instruction" or discipline, he doesn't want to hear about it.

Roaming his school between classes and whenever the urge hits him, Johnson slings a bullhorn over his shoulder in the manner of bat-wielding New Jersey principal Joe Clark in the '80s. Johnson seems more humane than the legendary Clark. But his bottom line demand is obedience from students. Parents crave that discipline in their schools, as they have passionately told their school board at countless meetings and public hearings. Couple that with Johnson's growing impatience with the Palm Beach County School Board and district administrators, which is also perfectly in sync with parents' frustrations, and you have the makings of a hero.

He can be a hero to students, too. Part of it is his presence. Johnson rolls through the halls and classrooms of Spanish River High School with an athlete's gait. He doesn't quite swagger but he absolutely owns the space around him. When he speaks, it is usually after a pause that causes the listener to notice his absolute concentration on the issue at hand.

"You have entered a zone over which I have complete and appropriate control," his expression seems to say, "and in a moment I will prove that to you in no uncertain terms. So get ready."

Vocal inflections betray a life lived in the South, but with the benefit of considerable education. The voice, propelled by a drill sergeant's diaphragm, is clear and forceful.

The overall effect, however, is not intimidating and those who know Johnson are eager to describe his flexibility and knack for compromise.

Assistant principal Barbara Porcher recalls Johnson assembling students after they walked out of the school cafeteria en masse to protest the quality of food. The result: cafeteria personnel were fired and menus were improved. And the guy can be fun. At pep rallies he'll don a tuxedo and leap, bristling with school patriotism, into a kiddie pool filled with water.

The aggressive physical posture, insistence on discipline, volcanic impatience with administrators who philosophize about education while the school board fiddles and a theatrical sense of humor — these qualities apply not only to Johnson and teachers in Boca ...

Scratch an Art Johnson supporter and you'll likely find someone who wishes Johnson were the county's superintendent. Johnson has more ... about a desire to sit in the hot seat here or in some other district. ...

**By Phil Scruton  /Photos: Robert Brantley**

support is. huge. Parents who gather at public meetings, rallies and invade school board meetings have made it clear they are mad as hell at the county's public school system and Superintendent Monica Uhlhorn.

who gathered from her earli-ncements that, stingy legisla-, she would find a way to pay more money and reduce their burden perwork, felt betrayed. Parents who eir children's schools are unsafe and funded are at their wits' end. nistrators like Johnson and many s who sense that they are ted to be the last bastions der in a district whose l office staff is cut off from reality and contemptuous of teachers feel they are losing the battle to perform their jobs.

"There is an uproar because Monica Uhlhorn does not have the confidence of the parents," says Spanish River parent and School Advisory Committee member Suzanne Kalman. "I think Tallahassee wants parents to be involved in their schools, but the communication is not there in this county. It seems as if edicts are always being handed down from the superintendent."

"I was one of the Superintendent's (Monica Uhlhorn) biggest supporters when she began because of her emphasis on student achievement. When she kept stepping into new problems, it made me wonder how effective she could be. When any superintendent embroils themselves in as many controversies as Dr. Uhlhorn has, she will lose the support of teachers and without that she cannot be successful," Kalman says.

Uhlhorn rode into the county three years ago on a media-painted white horse, promising reform and a new emphasis on success in the classroom. South County parents swooned with joy—for about six months.

Then teacher unrest, a sharp increase in gang activity and incidents of violence at their children's schools turned joy to despair and anger.

As for the teachers, the specific problems grappled with in the recent contract

talks were money (the teachers wanted a 4 percent raise; the administration balked at 3 percent); a reduction in teacher's health insurance benefits; differences in positions regarding putting caps on class sizes and a number of other issues. According to a *Palm Beach Post* article this summer, 94 percent of 5,400 teachers in a union-sponsored vote said they had lost confidence in Uhlhorn.

And, aside from union differences, there have been allegations by the NAACP that Uhlhorn has made racist comments and there were charges leveled



by three of her top administrators around mismanagement and "neglect of duty," among other things. Uhlhorn has vehemently denied all charges and the controversy continues.

Uhlhorn's expression, beneath a dangerous shock of perfectly coifed red hair can shift from maternal to steely in a second. When she says she's determined to weather the current discontent, she means it.

Johnson's expression, beneath close-

cropped hair, atop a bull's neck, is equally determined. He is a career principal who's seen every culturally sensitive reform come down the pike in the last 20 years and found no value in any of them but technology.

Beyond stubbornness, the personal styles of Johnson and Uhlhorn could not be more different. Uhlhorn does not have an ability to charm large groups. "In larger settings, she can appear inflexible, like a Margaret Thatcher," admits School Board member and staunch Uhlhorn supporter Jodi Gleason. "One-on-one she really shines."

In contrast, Johnson possesses the broad sense of humor, flair for dramatic oratory and wrestling coach's vocal cords that can work a crowd like everyone's favorite coach. He also epitomizes right-thinking, for many in Boca Raton, in an era of misplaced academic priorities and ineffective discipline.

One of the contributing factors to school discipline problems may be classroom size. The union asked the district to "pledge its continuing commitment to reduce class sizes to keep the student-teacher ratio at no more than 30," an issue some board members termed "non-negotiable" from their standpoint. It's widely believed that teachers could live with smaller salary increases if the district reduced class sizes or bought enough classroom supplies so that teachers wouldn't have to buy them.

Either way, classroom and in-school discipline comes up again and again as a serious and ongoing problem in Palm Beach County schools.

"What needs to be done? The leadership has to let students know very clearly what is expected and what will not be tolerated," says Johnson. "There have to be consequences. If you say to students by your actions 'If you commit a crime we're just going to transfer you somewhere else,' that is not a consequence. Education is a right, but I believe you can lose that right, through severe and inappropriate behavior. Until the youngsters out there, hard core, high risk, incorrigible youngsters, see the

things you can't do, they're going to continue to do them," he says.

[text obscured] line is not a standard Art Johnson [text obscured] erday. Lakeshore Middle [text obscured] Richard Ramsey, who [text obscured] cipal at Boca Raton High [text obscured] nson was hired for the [text obscured] in 1983, remembers his [text obscured] nson's commitment. [text obscured] it. We got word some [text obscured] the fence and gone [text obscured] and I got in his blue truck [text obscured] them. We started going up [text obscured] (Glades Road) and looked over and there were the kids on the opposite side of I-95. Rather than get tied up with doing a proper U-turn, we ended up going the wrong way on Glades Road. Art was pounding his horn and I was very frightened. I said 'Art, you've lost your mind.' He was smiling and said 'Man, this is fun.' We chased those kids for about 45 minutes, but we got 'em.

If only truancy were the worst transgressions principals had to battle. According to figures released by the Palm Beach County School Board, school crimes involving weapons have increased 60 percent in the last four years to a grand and mind-boggling total of 329 during the 1992-93 school year. (1994 figures have not been released.)

And just because a kid isn't packing a gun doesn't mean he or she is no threat. A recent incident at Spanish River was nearly as chilling as a gunshot: Physical education teacher Lori Eaton was severely beaten by a female student she had told to quit smoking on school property. Angelique Marchione, 15, was subsequently tried as an adult, expelled and may do time.

Johnson agrees with the court's uncharacteristically harsh decision. "We have operated in the last couple of years in Palm Beach County under what was essentially a no-consequence philosophy," he says,

"and as a result of that the kids said 'Hey, I can do anything I want to do.' Then, all of a sudden, parents and the media rose up and said 'enough is enough,' so our system made a 180 degree turn in its approach to discipline, especially with these very difficult youngsters. Do you want to make an example out of Angel? That's not the issue. But if you don't discipline her, what sort of example do you set for all other students who follow and put themselves in that same situation?"

A lot of people assume that Johnson's passion for plain speaking and plain discipline is either the result of a military background (everybody's heard he was a Marine) or a dark fatherly shadow lurking in the back of his psychological closet.

Neither is true.

Johnson has never served in the military. And his father, who was a career soldier, [text obscured] sound remotely like the Great Santini.

"My father was and is an extraordinar[text obscured] man. He never really [text obscured] because my parents were so [text obscured] the discipline I learned from them wa[text obscured] their teaching and not through[text obscured] punitive action."

Tough or not, Johnson is not universally revered. Jodi Gleason is a parent and a school board member who's more of the politician in Johnson than[text obscured] er. While agreeing that Johnson's style is charismatic and good for school spirit, she believes he plays shamelessly to affluent parents in South Palm Beach County and lacks the courage to exercise his tough-discipline agenda in a school that could really use it.

"If you want only to work with successful students, his philosophy works great. If you look at the profile of kids who succeed under his philosophy, who are they? For the most part, white male students. Outside those parameters, life can be tough," Gleason says.

EDUCATION:
Ph.D. - Florida State University; M.S. Florida State University; B.A. University of South Florida.
OTHER:
Superintendent's Academy 1990; Harvard Law School Summer 1988; Boston State University Summer 1985; Boston State College Summer 1980; Harvard University Postdoctoral summer fellowship, 1977; NASSP Institute on Discipline, summer [text obscured]
PROFESSIONAL OBJECTIVE:
Superintendentship
(excerpted from Art Johnson's most recent resume)

Art Johnson, graduation address, 1994:
Are you tired of all the problems in our school system and are you tired of the endless school reforms that never seem to make any difference?
So are we. Why? Because our mission is to provide a progressive, high quality, equitable, drug-free, safe neighborhood school equipped with the latest technology, staffed by caring, well-remunerated professionals, working in constant with parents and business leaders on a school advisory council utilizing a multi-sensory, algorithm-based, data-driven program for the 109 cultures represented in South County to produce kids to become internationally competitive, self-fulfilled, independent and productive citizens as described by the school improvement plan under school accountability -all for just $9.99."

# MONICA UHLHORN:
# AT THE EYE OF THE STORM

Dissatisfaction with education in Palm Beach County did not begin when Dr. Monica Uhlhorn became superintendent of schools. Yet her predecessor, Tom Mills, always found a way to convince the majority of parents and teachers that he shared their dissatisfaction and was doing all in his power to turn things around.

Ironically, just three short years ago South Palm Beach County parents and teachers went crazy with optimism when Dr. Monica Uhlhorn of Prince George's County, Maryland, took the reins from previous superintendent Tom Mills. Paving the way were press descriptions of the other candidates suggesting they were slick. Uhlhorn alone spoke and carried herself like a genuine educator.

That perception has shifted. Uhlhorn, soft spoken and earnest in interviews, points out that she should be given credit for presiding over gains in county students' test scores. She notes that more students are taking advanced courses, that graduation rates have risen above the state average and that more students now elect to take the PSAT. She believes her decision to replace the principal at troubled Omni Middle school in West Boca Raton would demonstrate to parents that she is an effective problem solver.

However, like every other superintendent in the state, Uhlhorn has not succeeded in bringing more money to the district. Her handling of ethics charges brought against school board employees was widely criticized. Toss in vague allegations of racist comments, the continued threat of violence in many schools and a teaching corps whose morale is less-than-zero and you have a beleaguered superintendent.

"Asking people to do things differently gives them a feeling of insecurity. Change and the questions it raises really bring on a tense situation. We're asking teachers to change at a time when their class sizes have grown."

She does not apologize for her determined demeanor at school board meetings. "What has happened here is when you're working with change anything that looks like someone is asking you to do something differently is interpreted as inflexibility. People think you are making demands rather than asking them to do something."

Uhlhorn declines to identify South Palm Beach County as a hotbed of discontent, but says pleasing everyone in a district the size of Palm Beach County is impossible. "It becomes difficult in an extremely large county when people elect to go into different camps based on an image (of the superintendent) the media and a few individuals are willing to portray. When (a community) flexes its muscle, so to speak, I have to have the responsibility of looking over the entire county and do what is best for all of the children."

Rumors among school staffs that Uhlhorn discouraged suspension of violent students was a case of misinterpretation, she says.

"In fact, more children have been put out of the classroom each year. Many of those children have been placed on alternative programs, whether home school or one of the alternate schools. We will not tolerate violence in our schools, although with few adults on campuses and campuses too large, we have some serious difficulties."

Uhlhorn is cautious in her comments on Art Johnson. They are entwined, after all, in a formal employer-employee relationship.

"My meetings with Dr. Johnson have always been rather positive," she says. "We certainly respect one another and I think he respects the skills I have."

As for accusations from parents that she attempted to wrest Johnson from his supporters at Spanish River High School, Uhlhorn says, "John I. Leonard High School is a school that had a great deal of technology, which Dr. Johnson probably is best equipped to handle, plus a student population that I felt Dr. Johnson could work well with. I am disappointed that he did not take the position."

Anyone who speaks with Uhlhorn face-to-face realizes that the acid comments of critics and the district's problems pain her. Job pressure also took its toll on Mills whose resignation was a surprise only to those who did not know him well. Many say it will be difficult for Uhlhorn to last more than a year or so.

Sometimes she sounds very much like the teachers who have become her most enthusiastic detractors. Both seem disillusioned by their working conditions and about to run out of fortitude.

"I can very much relate to a teacher who has a very difficult situation," she says in a low voice, although she insists she is not "burned out."

"I very much want to see people understand where I'm coming from so they can feel better about trust and moving ahead."

Gleason lives in Lake Worth, where the two public high schools have large minority populations from poor neighborhoods. The level of misbehavior and crime in those schools is much higher than in Spanish River. When Uhlhorn recently proposed transferring Johnson to one of the two Lake Worth high schools, Gleason says Johnson, backed by howling Spanish River parents, refused to go. While Johnson declines to talk about the proposal in detail, his supporters say that it was a bald attempt by Uhlhorn to silence Johnson by removing him from his "political base."

Gleason and Uhlhorn say it was an effort to place a troubled school in the hands of someone with a successful track record and a reputation for toughness.

"I have never seen (Uhlhorn) move anyone for the purpose of getting even with them," says Gleason. "Apparently, Johnson didn't want the challenge."

Which brings up the question of Johnson's agenda, in general. Is he a fervent educator, a defender of the faith? Or is he the man who would be King, or at least, superintendent?

Sixteen-year School Board veteran Susan Pell says she is in sync with Art Johnson's philosophy. She respects his ability to keep order in his school, his success in mediating conflicts and the support he has received from parents in south Palm Beach County. She also describes him as the district's "guru of classroom technology."

Anyone who has spent a few moments in Johnson's Spanish River office senses his fascination with computers. Information not on the top of his tongue is rapidly retrieved from his deskside computer after a few rapid-fire strokes on the keyboard. Ask him for his resume and he summons it with a flourish and a smile from his printer. The sight is somewhat incongruous, since Johnson bears no resemblance to the archetypal computer nerd. Pell has heard Johnson plead many times for greater use of the latest hardware and software to enhance classroom teaching.

But she's not sure he's ready for the superintendent's position. Uhlhorn, after all, was an associate superintendent before coming to Palm Beach County. "The assumption is that he's got all the ingredients to master a school system," says Pell, but the leap from principal to superintendent is too broad. "A lot of people that have moved from the schools into district administration are shocked at how differently it works."

Don't tell Frank Brogan that the principal-to-superintendent transition is impossible

*Continued on page 123*

**Art Johnson**

*Continued from page 76*

Brogan, a candidate for state Commissioner of Education, was elected to the top spot in Martin County in 1988 and left a principal's position to take the job. He was re-elected in 1992. "I personally believe people do not have to be an area superintendent to be successful," says Brogan. "You've got to have a good business mind, be a great mediator and you have to be a visionary."

Johnson, Brogan says, fills the bill on all counts.

Carol Brockman, a math teacher at Spanish River, is among teachers who agree with Brogan. Their endorsement is based on his tireless support for teachers' three main concerns in Palm Beach County: Money, paper work, and morale.

"Is it any wonder this year that our teachers talk to the contract as a symbol of their frustration?" asked Johnson at this year's commencement.

"She (Uhlhorn) won't pay us," Brockman says bluntly. Although starting salaries in the county are inching into the mid 20's, no amount of experience will take a teacher past the $50,000 mark, a situation out of step with other white-collar professions. This year's raise was paltry: from one to 2.99 percent, with a doubling of the medical coverage deductible. Says Johnson, "The average teacher's salary in the county is $35,000. Take an average home in Boca Raton which is $150,000 and there is no mortgage ratio that is going to allow you to live in Boca Raton. I think that totally negates the argument that teachers are paid on a professional level."

"Here in Florida, you know, the still-not-quite-as-dumb-as-Mississippi-state, we have a plan code named Blueprint 2000, loaded with the vaguest, most bloated, mind-numbing language possible, requiring every school to write an improvement plan to meet the stated goals of Florida. Listen to this: 'Students will apply problem solving strategy to decode visual materials as they work independently in group learning activities.' Why can't we just say 'We're going to teach kids to read?' "—Art Johnson, graduation address, 1994.

Page 8A — THE NEWS — Friday, March 30, 1990

# Boca Raton News

### Established 1955

# School drug stings worth the effort

Police tried an undercover drug sting at Spanish River High School last week and lo and behold, the cops were stymied.

Mostly because Spanish River is fairly clean, which is a tribute to the school and its students.

Meanwhile, 10 Palm Beach County students at other schools were arrested as a result of undercover work by youthful-looking police officers who try to make connections for drug buys.

While these cops were apparently successful at other schools around the county, they couldn't seem to find a Boca Raton student who'd say yes.

Spanish River Principal Art Johnson attributed this to running "a tight ship."

"I could not say there are no drug problems," Johnson said, but he said that drugs are not rampant at Spanish River.

Which is good to hear, and students and faculty there are to be applauded for keeping clean.

At the same time, the undercover cops are also due for some applause for their work. They are backed by a new state law that makes sell-

## OUR VIEW

ing drugs within 1,000 feet of a schoolyard — a drug-free zone — punishable by three years in the slammer, with no probation.

That's three years behind bars. A lot of time to waste, sitting in a cell. It's also a ruination of one's life. It's not worth the profits of a drug sale.

Kids who are planning to enter the business world at age 16 by selling drugs ought to think about that before they start disbursing packets from their car.

There is, of course, a privacy issue in these police activities. Obviously cops are going to learn a thing or two they didn't expect to find out about the teenagers they inspect. Like what the teens think of their parents or their principal. Or that a girl may be dating a boy of whom her parents disapprove.

None of which are criminal matters. It's nobody's business, really.

However, as long as the police stick to rooting out crime and drug dealing from the county's schools, more power to them. Maybe this kind of police work will teach kids the most valuable lesson of all: Stay away from drugs.

Boca Raton News · Aug 8, 1993

# Two Boca Raton high schools recognized for 'drug-free' goals

**By MARIAN KING**
Staff Writer

Boca Raton High School and Spanish River High School have something outstanding in common.

Both recently were recognized as national winners in the 1992-93 Drug-Free School Recognition Program and both have implemented comprehensive "safe school" programs for five years or more.

And the administrations at both schools want to be sure everyone knows "drug-free" is both a misnomer and an ultimate goal.

"We should be called a safe school, not a drug-free school," said Spanish River High principal Arthur Johnson. "Drug-free is a misnomer. It's definitely something we would like to achieve, however."

The schools were two of 59 schools in the nation recognized by the U.S. Dept. of Education for possessing "comprehensive plans to become or remain drug-free." They also must show that they have reduced disruptive behavior and acts of violence.

The program recognizes schools that have made "outstanding progress toward meeting the sixth national education goal, which states that by the year 2000 every school in America will be free of drugs and violence and offer a disciplined environment conducive to learning."

Schools with comprehensive drug-free programs will be honored at a ceremony in Washington, D.C., in September and will receive a plaque and a flag of recognition from U.S. Education Secretary Richard Riley.

Receiving the designation was the result of a lot of hard work by Spanish River and Boca Raton Community High, administrators said. "When I first came here eight years ago, half of the expulsions in the district were from Spanish River High School, and all of them were drug-related," said Johnson. "Last year, we had the lowest suspension rate of any high schools in the district, which is excellent for a 2,300-student school."

Johnson believes the school's overall approach to discipline and promotion of achievement in education is winning out over violence and drugs. He said the day he arrived, the word was spread that drugs and alcohol in school would not be tolerated.

"I was asked to come here because this school was an expansion school with a lot of growing pains," Johnson said. "We immediately set up expectations of a well-behaved student body. You can't wish it or will it to be done

... it takes classes, lots of education on the subjects of drugs and alcohol, sensitivity training for youths, strong security and most of all, self-discipline on the part of the students."

Johnson credits the school's guidance counselors and a team of teachers, parents and students with much of the work in bringing Spanish River about-face.

Spanish River guidance coordinator Sandy Hardy agrees it takes daily, ongoing effort to keep the school safe.

"I've been involved with CORE team as a leader for six years," Hardy said. "It's a program led by school staff that prevents the use of alcohol, tobacco and other drugs in school, as well as acts of violence."

The CORE team members have all been trained to educate students, parents and other teachers about drug prevention and other safe school attributes.

"The team gets referrals from parents, teachers and friends about students who may be in trouble," Hardy explained. "Say a person changes, is not doing well in school, gets there late, falls asleep in class or shows other danger signs. When we determine there is a problem, we confront the student and offer help."

# Vast majority of Boca's kids are law-abiding citizens



**Art Johnson**

As gang violence increases in Boca Raton, we are continually assessing the reasons for this phenomenon. However, we should not lose sight of the fact that there are more than 7,000 students in three Boca Raton high schools. The vast majority are law-abiding, young ladies and gentlemen who will become productive citizens. Yet the existence of youth gangs represents a serious problem. If you question



**LOCAL VIEW**

that, consider Joey Pymm's beating at the hands of gang members.

Why do young people join gangs? In our democracy, with its inherent forbearance to civil disobedience, the natural rebelliousness of teen-agers serves up a prescription for disaster. Young people look to adults as role models and, considering our crime rate in Florida, it is little wonder young people behave as they do. Couple these factors with the reality that our school system discourages principals from suspending students, and consider what message are we sending to our youth? Students believe there are no consequences for their actions! Only recently has there been a recognition that we need to "get tough" with violent youth. I trust that the pendulum will begin to swing back at this time.

Last, we do not give young people enough of our time, love and guidance to steer them away from gangs.

In my 13 years in Boca Raton, I have seen a steady deterioration in student behavior. The gang problem first appeared about five years ago. After subsiding for a while, increased gang activity in the community is clearly recurring. On campus, gang members keep a low profile for fear of being kicked out of school. Display of colors, tattoos, gang behavior are strictly prohibited.

For years, gangs were identified with deprived youngsters. Today, gang members come from affluence, as well. In fact, overindulgence creates problems equivalent to deprivation. Deprived youth need direction and support whereas, overindulged youth are often just looking for cheap thrills. By any definition, gangs are little more

than organized crime among juveniles and must be treated as such.

What is the solution? Education is the first and most important solution. And, in this regard, we are not doing a very good job of instilling moral and civic values in our youth. In all fairness to educators who do reach the majority of our young people, some youth defy any reasonable attempt to be educated. At Spanish River, I meet regularly with students to encourage them to quit gangs or risk being thrown out of school.

Another part of the solution is discipline. Consequences are a crucial part of human behavior, and young people, especially gang members, must know what is expected and what will not be tolerated.

Some may argue that no student should ever be thrown out of school for any reason. I disagree. Public education is a right, but you can lose that right if your behavior becomes too violent.

I can solve the immediate gang problem at our school by throwing gang members out, but that does not solve the problem for the community. Only the joint efforts of parents, our churches, schools, law enforcement, the judiciary and legislators can solve the long-term problem of gangs.

My message to gang members is "Education is in, gangs are out! Gangs are a dead end street. You will end up ruining your life."

My message to the parents of gang members is, "don't deny problems when you see them. Recognize the signs and get help!"

My message to all other parents is, "while I recognize your youngsters cannot live in a vacuum, you must know where they are going, with whom they are involved and set reasonable hours. There is no excuse for 14-and 15-year-old youth wandering around at 2 or 3 in the morning. As parents, know when and how to say 'No' to your youngsters."

My message to all students is "Stay away from gang members, and let your parents, school personnel or the authorities know of potential problems so we can prevent them."

Together we can solve this problem. But it will take all of us and it will take action! Drastic problems call for drastic measures.

> **O**nly recently has there been a recognition that we need to "get tough" with violent youth.

■ Art Johnson, Ph.D., is principal of Spanish River Community High School.

# Spanish River High shines on state test

By LYNETTE HOLLOWAY
Palm Beach Post Staff Writer

PALM BEACH GARDENS — Spanish River High exceeded all other Palm Beach County schools in the percentage of 10th-graders who passed a state minimum standards test required for graduation, according to statistics released Friday.

"Spanish River is about as high as you can get," Deputy Schools Superintendent Jim Daniels said of the Boca Raton school. "They're doing something right."

✓ Breakdown by school                                    5B

Results for the two-part State Student Assessment Test showed close to 100 percent of the Spanish River students passed each section. Overall, 88 percent of the district's 5,600 10th-graders passed the communications portion and 83 percent passed the mathematics exam.

Schools Superintendent Tom Mills said he is especially pleased that the percentage of Palm Beach County students passing the math test is considerably higher than the state's 78 percent.

"Generally, what principals do to get the passing rate up is identify the student who is having trouble and make sure the skills are mastered," Mills said. "The tests focus on skills you can teach. We don't know the test questions, but we know the skills."

Please see TEST/5B

## County above state average on math test

TEST/from 1B

Spanish River High Principal Art Johnson, who was accompanying seniors to Walt Disney World for Grad Night, could not be reached for comment.

Although Spanish River had the highest percentage of passing students, Palm Beach Lakes High in West Palm Beach saw the most dramatic increase.

Principal Terry Andrews "has done a good job demonstrating that students can pass these basic skills tests," Mills said.

The proportion of students passing this year compared to last year jumped 11 percent on the communication section and 22 percent on the math section.

Suncoast High in Riviera Beach, which boasted the highest proportion of students passing last year, experienced a drop this year. "This is the second year of the magnet program at Suncoast," Mills said. "If anything happened there, it may be a different student body."

Andrews, who has been criticized for his tough disciplinary style, was Suncoast principal at that time. His secret: Every week, 10th-graders took practice tests.

to parents asking for assistance and set up remedial afternoon sessions. Even students assigned to detention had to work on practice tests.

Andrews could not be reached for comment Friday.

## SSAT SCORES PART II

Percentage of Students Who Passed Functional Literacy Tests

| | COMMUNICATIONS | | | MATH | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1989 | 1990 | 1990 | 1989 | 1989 | 1990 |
| Atlantic | 87 | 92 | | 75 | | 85 |
| Boca Raton | 89 | 93 | | 88 | | 91 |
| Forest Hill | 87 | 80 | | 80 | | 73 |
| Glades Central | 82 | 80 | | 71 | | 76 |
| John I. Leonard | 84 | 86 | | 78 | | 77 |
| Jupiter | 90 | 90 | | 84 | | 82 |
| Lake Worth | 77 | 84 | | 78 | | 80 |
| Pahokee | 89 | 83 | | 69 | | 74 |
| Palm Beach Gardens | 88 | 87 | | 84 | | 80 |
| P.B. Lakes | 80 | 90 | | 68 | | 90 |
| Santaluces | 87 | 86 | | 83 | | 81 |
| Spanish River | *89 | 98 | | 84 | | 96 |
| Suncoast | 94 | 90 | | 95 | | 83 |
| Wellington | 93 | 91 | | 88 | | 88 |
| District | 85 | 88 | | 79 | | 83 |
| State | 85 | 87 | | 76 | | 78 |

# News

# He's Dr. J: the toughest principal around



DR. J ... Spanish River High School Principal Art Johnson is a commanding presence on the campus

Staff photo by ROBERT YORK

By Jim Holbrook
Staff Writer

Fences and gates block off the exits while people patrol the grounds in golf carts.

Doors have been removed from some bathrooms to keep a closer watch on activities inside.

A man with a bullhorn counts down the final seconds when everyone must be out of the halls and in assigned rooms.

If it sounds like a prison, think again. It's Spanish River High School.

Some of the students may not like the tough security and discipline, but most seem to respect, admire — and obey — the man behind the policies.

He's the man with the bullhorn: Principal Art Johnson.

A muscular man in his 40s, Johnson is a commanding presence at the campus.

### 'Simple philosophy'

"I have a very, very simple philosophy, extremely basic, but it's what I believe in — and it works," he says.

"Wherever I've gone, my emphasis is on discipline and structure."

Since coming to Spanish River High School from Boca Raton High at the beginning of the school year, Johnson says he has cut down student tardiness, stopped students from cutting classes and eliminated drug use on campus.

[Records indicate test scores went up during his three years as principal at Boca High.]

### Much stricter

"It's very much stricter, as was Boca [High School] after I arrived there," he says.

"You can't argue with its success. It's

something that's completely defensible."

Some of this policies include:

• Locking a chain across the student parking lot, that keeps students on campus, while keeping vandals and drug pushers out, he says.

• Locking some bathrooms and moving doors from other bathrooms that are monitored so students can't smoke or sell drugs there, he says.

• Enforcing strict tardiness guidelines; he stands outside with a bullhorn between classes, counting down the final seconds.

"They get to class on time. That's an equitable. That was a big problem."

### Student attitudes

It's not that the students haven't resented some of the procedures. They have.

Students at Boca Raton High School called him the "enemy of the people" when he first arrived there. And the Spanish River High Galleon newsmagazine staff was ready to criticize his policies as being too stringent. In ... cases, however, Johnson won the students over to his point of view, based on student news editorials.

He says he did it by being accessible to them.

### Role model

"I'm out there front and center. They know I mean business. I role-model what I expect and I get it.

"I am the toughest, strictest principal in Palm Beach County," he says. "But I am also accessible. I go into [all] class rooms every day.

"I'm very realistic about young people. We were all young once. He has

(Continued on page 27A)

# News

## ohnson

Continued from page 4A)

rincipal for 14 years, he adds.

e says progressive "democratic" schools where students could come or go freely on open campuses failed because the students could not handle the responsibility.

**Not democratic**

"We now know there's nothing inherently democratic about the operation of a school," he says. "Nor is it democratic in the operation of your amily.

"That was one of the fallacies in the pen school policy. The other thing is 's easy.

"As far as I'm concerned, you teach ids certain skills in school; that's just.

non-negotiable. You're going to be on time, you're going to work and you're going to behave.

"I don't know any way to do that unless you keep kids in class and teachers teaching.

"How in the world can we expect them to be on time for work, if they never had that experience?"

**Policies similar**

He says his policies are not much different from those at other schools.

Fran Gill, south area superintendent for the Palm Beach School Board, says general policies are countywide.

"We have a School Board policy that sets certain rules for discipline," Gill

says. "School centers do have some latitude in specific discipline. The guidelines countywide certainly are not loose.

"Dr. Johnson is tough, his methods

are effective and we consider him a very fine principal," Gill says.

"The real difference is I really enforce what I say are the rules," Johnson says.

# ATLANTA CONSTITUTION

For 119 Years, The South's Standard Newspaper

WEDNESDAY, MARCH 30, 1988

★★★★★

## Fla. city enlists tough principal to keep students toeing the line

*West Palm Beach Post-Times*

BOCA RATON, Fla. — A new species of principals is breeding in Boca Raton — they come with big muscles, stern stares and strict codes of ethics. The school district wants more of them.

A tenderhearted principal just doesn't cut it anymore, school officials say. The principal of the future represents a return to control and the tightening of authority.

"Bad kids" on campuses no longer just chew bubble gum and sneak cigarettes, they said. Teenage troubles have grown up to include drugs, weapons and newborn babies — and now it's the principal's job to turn those kids around.

School officials who pick principals point to Art Johnson of Spanish River High School as the model for this tough disciplinarian they crave. Usually decked in sunglasses, with shirtsleeves rolled above bulging biceps, Johnson patrols the Boca Raton campus toting a bullhorn, which he uses to remind students of how much time they have between classes.

He has locked students' cars in a fenced lot to keep them from leaving without permission and ripped off the doors of bathrooms to discourage smokers from using them as hangouts.

In the past two years as principal at Spanish River, Johnson has shown up at student parties on weekends with the police and made several citizen's arrests to "keep students from killing themselves."

In December, he fired the school's varsity football coach because he said the "program didn't have enough discipline."

"He's cut from a different mold," said Calvin Taylor, an area administrator who reassigned Johnson from Boca High to Spanish River in 1986. "He has what the doctor ordered. All schools need strict disciplinarians like that. We need a strong team of people. All schools need to adopt that style."

Two other principals already are spreading that style around this year in the north end of West Palm Beach County. Both served as assistant principals under Johnson at Boca High, and both were made principals in Riviera Beach schools because they "needed someone hard and firm like Johnson," Taylor said.

In a less tumultuous place like Palm Beach County, Johnson and other school officials said they dis-approved of some of Clark's para-

military styles to several years of watching Johnson in Boca Raton.

"He may be the best there is at being a principal," said Andrews, who calls Johnson his mentor. "I tally admire him. The most disci-plined school is the best school."

Most adults agree. This school year, the U.S. Department of Educa-tion selected Johnson from thou-sands of principals in eight states as a role model. The Rotary Club of Boca Raton voted him the year's outstanding community educator. A city publication made him the Boca Raton-ian Key Citizen of the Year.

Usually decked in sunglass-
es, with shirtsleeves rolled above bulging biceps, Prin-cipal Art Johnson patrols a Boca Raton campus toting a bullhorn, which he uses to remind students of how much time they have be-tween classes.

But students remain divided about this intimidating 43-year-old who pops in classrooms every day and sternly pokes sleepers on the shoulder.

"He has pros and cons," said Pam Chase, a senior at Spanish Riv-er. "In the beginning, it made me feel like a caged animal. Now we're used to it, but I still think a lot of it is unnecessary. It's good that he cares, but I feel like I should have some responsibility for my own actions."

Johnson's and Andrews' use of a bullhorn to clear hallways at their schools is one of the methods used by Joe Clark, the principal of East-side High in Paterson, N.J., who at-tracted national attention last year for expelling 60 failing students.

Armed with a baseball bat and a bullhorn, Clark kicked out 300 of his 3,000 students in his first year as principal in a school plagued by drugs and violence.

principal, and Clifford Durden, the new principal at John F. Kennedy Junior High, attribute part of their management styles to several years

"We live in a permissive so-ciety," Johnson said. "In my opinic-in the area of morality and ethic-conduct, we're going through a sl-deterioration. It's a violent atm-phere now. We need more control."

Though he disapproves of Cla-Clark is a good example of a su-cessful principal who made a difference.

"I believe in cooperation than control," said Fredva formerly Suncoast's pr "Some of the greatest pri needs to be two things in setting; the first is structur other is affection and cor

Though he disapproves of Cla-he calls him a "threat to edu-tion." School Board Chairman Arthur Anderson said principals lot must take on more responsibilit-for discipline because the ho-and community appear to be fail-"With today's single-par-homes, illiteracy rates and t-pregnancies, schools are be-called upon for more and more sponsibilities," Anderson s-"There's a need for more discipl-But let's not overdo this thin-and a humanitarian to treat-dents like people. These Thre-cipals are well-rounded like the-It takes a necessarily ta-man to take control either.-school officials, Anderson sai-male principals can be just as s-"I have strict enforcem-the rules, but I don't have a gressive style," echoed C.-Shelter, principal of Atlantic-in Delray Beach. "Some me-symbolic physical strength to g-spect, but it would be silly woman to try that. I kind of-the soft touch. It takes a woman and they respect me."

Amid complaints about l-control at Suncoast and Jo-Kennedy, two female prin-were removed from the schoc-year.

Taylor, who appointed Al-and Durden to replace th-women, said the schools didn-a "male role model," but the-cipals needed to be more res-cipals needed to have stric-and needed to have strict r-match up with the students. The men were "tailor-made" to deal with the students.

In a less tumultuous place like Palm Beach County, Johnson and other school officials said they dis-approved of some of Clark's para-

# Discipline & Democracy

*Why we must expect the best of our children.*

## By Art Johnson, Ph.D.



*Art Johnson is principal of Spanish River Community High School.*

**D**iscipline is the backbone of our democracy, and where self-discipline is lacking, our citizens function at their lowest possible level. By contrast, a disciplined citizenry produces remarkable accomplishments: The prosperity and progress that have occurred in South Palm Beach County are abundant evidence of disciplined people working toward tangible goals. Given the realization that discipline is the key element in productive citizenship, the importance of developing this attribute in our youth is clear.

Throughout the ages, youngsters have needed discipline, and parents have complained about the lack of it—but this is little consolation to the problems we face today in a technologically advanced society where youngsters grow up fast. Drugs, sex, suicide, violence, crime, and poor scholastic performance are all too frequent influences on an alarming number of today's youth. Yet these negative factors can—and must—be controlled if the next generation is to develop the discipline that will be necessary to keep our social ideals from collapsing. I believe, however, that there are some solutions.

**Role models.** The most effective method of developing discipline in our youth is for all adults, and most importantly parents, to serve as role models for our children. To accomplish this, adults must become more disciplined in their own behavior and

> "THE MOST IMPORTANT TEACHER OF ANY CHILD IS THE PARENT, THAT RESPONSIBILITY MUST BE REALIZED AND ASSUMED."

teach through example. Above all, we must demand the best of our youth. ◆

**Expectations.** There is no question that young people will rise or fall to the level of expectation. When we insist on quality work, punctuality, and good behavior, we will receive them. By contrast, when youngsters are allowed to slough off on their responsibilities and behave poorly, they are in fact being encouraged to continue their bad habits, which often lead to greater problems for themselves and others. Obviously, it is difficult to undo years of neglect, non-productivity, and bad attitudes. One simply cannot underestimate the importance of setting expectations for young people.

**Quality time.** Youngsters need time with their parents so they can learn what is right and wrong and realize that someone cares about them and what they do. Children of neglect are an extremely difficult social dilemma, because their parents are often equally disenfranchised from society. But here in South County, we face an additional problem, perhaps best exemplified by the popular movie *Fast Times at Ridgemont High.* Today, the "cornucopia kids" of the 1990s have been overindulged to the extent that they are burned out by the time they are 15 years old. Sometimes too much is too little. If children and teenagers are to know what is expected of them, then parents and educators must equally—

> The most important teacher of any child is the parent. That responsibility must be realized and assumed.

# Tattoo removal plan is welcome

The powerful attraction of gang membership for teen-agers may overcome common sense and parental wishes — for a while. The young person is dazzled by the "glory" of being accepted by peers to become part of a hard, tough unit, and proud to wear the gang's specific, distinctive tattoo on his arm, shoulder, ankle or elsewhere.

Eventually, though, the teen-ager may begin to mature and to see the gang for the anti-social, vicious and often criminal group that it is. Then what? The young person can resign from the gang, but there's usually the tangible evidence of membership on his skin.

A way to remove the tattoo, without charge, is being offered through the cooperation of a plastic surgeon, a hospital and a high school assistant principal. It's an intriguing method of helping a teen-ager cut off the last link to a past he wants to disavow.

The idea emerged because Douglas Markwardt, an assistant principal at Spanish River High School in Boca Raton, had a positive medical encounter nine years ago with Dr. Gary Rosenberg, a plastic surgeon. Rosenberg reattached a finger for Markwardt's daughter after it was nearly severed by a car door.

When Markwardt heard Delray Community Hospital was purchasing a state-of-the-art laser, he called Rosenberg, who is president of Palm Beach County's Society of Plastic and Reconstructive Surgeons. Markwardt proposed free tattoo removal so young people could blot out a stigma of their past and get on with a second chance.

At Spanish River, principal Art Johnson supports the plan but requires former gang members to show improvement in their academic work — and shed the gang mentality — before becoming eligible for free tattoo removal. Johnson sensibly doesn't expect an unrealistic leap in grade point average, just a clear demonstration of studying hard and making an effort.

Gang tattoos aren't always easy to remove because they're homemade jobs, often going deeper into the skin layers than is necessary. Some former gang members already have had the microsurgery, and there's a waiting list at Spanish River. Several plastic surgeons are expected to pitch in.

If the process helps gang members go straight, free tattoo removal could be offered in other high schools in South Palm Beach County. If so, this small but important move could be extended more widely, giving teen-agers who have wised up about gangs a helpful boost out of destructive behavior.

# Principal knows formula for successful school

Sunday, June 15, 1986 — THE NEWS — Page 7A

## Wayne Ezell

## OPINION




Herewith some thoughts on the matter of Dr. Art Johnson, the principal at Boca Raton High School, where some remarkable changes have come about, and his transfer to Spanish River High School, where some changes are said to be needed:

A few days ago I was among several people who interviewed 10 outstanding students at Boca High to help select Mr. and Ms. Boca High for next year. In the course of our questions, I asked each of the finalists to tell me one of the best things they could about Boca Raton High School.

"Dr. J," said one.

"Our principal," said another.

"Dr. Joumson," said two others.

Now can you imagine asking 10 students an openended question such as that one and have four of the 10 name the principal?

Later in the interview I asked each to describe for me the drug situation among students at Boca High. In summary, the consensus was that they don't have a drug problem at Boca High. Some students may have a problem at home or after school, but drugs are not a problem on this campus during school hours. That, of course, was not the case a few years ago.

"Our school," one student said proudly, "is the only high school in the county that doesn't have the drugs. At least one other student volunteered that the dope sniffing dog that have become a regular fixture at Palm

Beach County's middle and high schools don't ever visit Boca High. The implication is that they aren't needed there.

The reason seems to be Art Johnson.

He doesn't look like a principal. A coach maybe, but not a principal. At 41, he is a short, muscular man who was state weight-lifting champion six times. He is immediately confident, some would say cocky.

After working 14 years as principal — in such small Florida towns as Wakulla, Wachulla and Williston before coming to Boca — he seems to harbor no secrets about how to run a high school.

His priorities are simple: student discipline and effective teaching.

Now there are some frills in education these days. Johnson learned about those on his way to getting a doctorate at Florida State University and as he was doing post-doctoral work at Boston University and at Harvard.

But there aren't many frills in his approach, which some might say is a bit radical.

He visits every classroom at Boca High every day.

Every classroom every day.

"You can tell in just a few seconds what's going on," he said. In other words, whether the teacher is teaching and the students are paying attention.

He also puts a lot of premium on being available to students, which is why he is out on the grounds in the mornings when students arrive.

That also is why he spends his lunch hour among the students and staff. Every day.

Most schools allow a student to be tardy up to three times to each of his or her seven classes before the dean's office gets involved. That can amount to a lot of tardiness.

At Boca High, every tardiness gets attention.

"Being on time, behaving and paying attention are not negotiable," he said.

The results of Johnson's approach are easily measured. Student scores on the Scholastic Aptitude Test and other tests have gone up in each of the three years he has been there. The problems of truancy and on-campus drug activity have diminished.

Finally, the students appear to love him; school morale is definitely up and he gets much of the credit, according to the finalists for Mr. and Ms. Boca High. The school newspaper noted recently that the man who

once was called "the enemy of the people" when he first arrived not only improved tests scores, he even managed to make pep rallies more fun.

Increasing that pep rallies should be interesting.

When I talked to a group of finalists for Mr. Spanish River High a few weeks ago, several of them volunteered that their pep rallies needed a little more pep.

Maybe that will change when Johnson gets to Spanish River next year. He loves a good pep rally. Johnson, who talks about working hard and playing hard, came up with an assistant principal to do a blues-brothers routine at one pep rally.

But pep rallies probably aren't the only thing that will change at Spanish River next year.

One morning a few days ago, with less than a week to go before school was out, Johnson approached the front of Boca High. The pep rally boosters were full. He looked his left and to his right and toward the main building surveying the campus. Not a soul was in sight, nothing stirred. It was almost eerie. The principal smiled and swaggered just a little as he marched toward the front door.

"The students are in class," he explained proudly, and the teachers are teaching."

*Wayne Ezell is the editor of The News.*

# These principals have old-fashioned approach to school

FROM PAGE 1E

Terry Andrews, 35, principal of Suncoast High School, and Cliff Durden, 45, principal of John F. Kennedy Junior High School. Andrews and Durden both have worked as assistant principals under Johnson, 43, whose leadership earned him an award last fall from the U.S. Department of Education.

Working for Johnson "was one of the most enlightening experiences I have ever had, to see exactly that he has in terms of getting students to learn and to do what he expects them to do," Durden says.

One of these principals is the type of lot behind a desk and administer, but run the school front line. It is where Johnson got his start, years ago, eating before or after the students. Between classes, the men post themselves at the busiest spots on their campuses and bell out the ery day. "Guys, 'Rounds,' they call it. At Suncoast High, Andrews announced — on every teacher every day — and says a bulletin for this.

The principals also pop in — unannounced — on the classes before. Johnson always uses a bullhorn in the seconds.

The principals could be likened to baseball bat-wielding New Jersey high school principal Joe Clark, who walks his school's hallways demanding respect. But Clark is much more flamboyant and extreme. He is one of public education's most arresting figures, and this past month Time magazine pictured Clark on the cover and posed the question: "Is getting tough the answer?"

Johnson, Andrews and Durden all say yes, getting tough is the answer.

"Society in general now is very loose," Durden says. "I think it started with the home. I think parents now — I won't say that they don't have control, but there's less control in the home than there used to be. As a result of that, we have spilled over into the school system."

Says Andrews, who with his administrative team patrols his campus with walky-talkies (as do Johnson and Durden):

"I've never met a parent who doesn't want their child to be safe and educated. Not one. We've said we're going to be available, be visible, make your kids safe. I guess that's very simple when you think of it all: make the complex plain and really be very simple."

These principals' tactics differ from Clark's — no one of them totes a bat and no one tosses kids out of school wholesale — they do make sure students know who is boss. They are the drummers, urging everyone to march to Harvard and Boston University and 25 published articles, you

"What I'm saying is that with a means to an end: academic appraisal."

Law and order, he says, is a good because educational program you can push too far and make it oppressive.

Not that law and order should be the bottom line, Johnson says. "You can have a well-disciplined campus and not necessarily have a good educational program, see, because you can push too far and make it oppressive."

If all starts with their clear-cut expectations.

At Spanish River High, for example, three things are "non-negotiable," and this is what Johnson tells the students: "You are going to be the student," "You are going to be here, You are going to be on time, and you are going to do your work." Or else.

And you are going to do your part, three things are "non-negotiable," and know that once they park their cars in the lot, that is where their cars stay all day — locked behind chain link. Says Johnson, who wants a scrap of doubt, "Kids don't skip, smoke, whatever.

Durden: "Students want Guidelines and boundaries."

Durden, who likes the up in barbed in Class. One kid tied up in barbed bombing. Race riots. Kids stabbed his principals in seven years. Previously I took over, they had had a rough-and-tumble place to the Gainesville, Fla., southwest of spent six years at Williston High bers his toughest principalship. He ish River High, Johnson remembers the principal asserts, "Maybe not, but such an approach are going over his shoulder."

A. Johnson, whose leadership earned him an award from the Department of Education, talks with student Kathi Bond at Spanish River High School.



Staff photo/Phil Skinner

But wandering is hardly the word for what Johnson does. Preferably swaggering is a more apt description. "This is your principal," he mocks) and prefers the intercom. "This is your principal," (he mocks) and prefers using the intercom. The man spackers using the rolled shirt-sleeve to suits. "You peculiarly swaggering is a more apt description by wandering that management by wandering around works, I was pleased to read that I have been doing that for 16 years.

Mentor Johnson didn't need to tell him any other middle school in the county.

"Our school improved more than 8 percent in math.

"Reading, 8 percent in writing and the have improved 5 percent at the middle school this year, state test scores for JFK's eighth-graders as proof. Since Durden set up camp at the middle school, has produced.

Some accomplishments he ticks off: "Above-grade level in academic or performance. A tremendous student attendance, a 96 percent attendance among the students."

Says Andrews, who worked as an assistant principal for Johnson, first at Williston and then at Spanish River: "He's one of the best there is. He stresses the basic principles, which are structure and discipline.

"He's just a basic, old-fashioned principal. I think you're already seeing a trend toward those in public education: kids-in-class-and-quiet, teachers-teaching principals."

A Johnson story: When Johnson was principal of Boca Raton High School, Durden was one of his vice principals. He recalls a sticky situation that Johnson handled with typical tenacity.

"One morning, we came to school and found that someone had put glue in all the locks of all the classrooms. You couldn't put the key in and unlock the doors. We came on campus, he said, 'We're going to open the doors — no matter what it takes.' The students will be in class on time."

"He got a crowbar, he got a hammer, and we had to break the window in every door.

"He said, 'I want every student to be in class on time.'"

With a little help from the man he said, urging everyone to march to Harvard and Boston University and 25 published articles, you

When it comes to school
discipline, three area
principals very definitely
have something to say —

# LOUD AND CLEAR

By JILL YOUNG MILLER
Staff Writer





Above, Terry
Andrews
monitors
activity at
Suncoast High
School. At
right, Cliff
Durden
directs
students to
class at John
F. Kennedy
......

■ Students' opinions of
the principals. 4E

A rt Johnson slings a
bullhorn over his
shoulder.

"Let's go," he says.
And the principal is
off, zooming out of his cushy, air-
conditioned office and into the
courtyard of Spanish River High
School.

The courtyard is as quiet as a de-
sert. As Johnson zips along, he es-
pouses a key point in his education-
al philosophy. It is astonishingly
simple, and he knows it.

"Kids," he says, "should be in
class."

At 10:23 sharp, the bell rings.

"Everybody knows where
they're going."

And they have six minutes to get
there.

Five.
Four.
Three.
Two.
Johnson raises the bullhorn.
"One minute! One minute!"

Kids start to run.

"Forty-five seconds! Forty-five
seconds!"

Run, run, run.
"Thirty seconds!"
"Fifteen seconds!"

The bell rings, and the courtyard
is silent again.

"That," Johnson says, "is how
you move 3,000 kids in six min-
utes."

■

Johnson is principal of the larg-
est high school in Palm Beach
County. He is a short, muscular,
confident man with a firm grip on a
formula he says spells success:
Kids should be in class. Teachers
should be teaching. And a principal
should be seen and heard, even if it
takes a bullhorn.

Discipline, Johnson says, is the
glue that holds it all together.

"You will never have a good edu-
cational program if you don't have
a well-disciplined campus."

Johnson's amplified, get-tough
style has inspired two other Palm

"Thousands of Boca Raton teen-
agers wind through the courtyard,
laughing, flirting, hollering to each
other. Johnson stands firmly in the
midst of it all, cracking a smile
now and then, and occasionally
cupping his hands to holler out
what he likes.

## A recognition for authoritarians

Most adults agree: This school year, the U.S. Department of Education picked Johnson from thousands of other principals in eight states as a role model. The Rotary Club of Boca Raton voted him "the year's outstanding community educator" and a city publication made him "The Boca Raton-ian Key Citizen of the Year."

But students remain divided about this intimi-dating 43-year-old, who pops in every classroom every day and sternly pokes sleepers on the shoul-der.

"He has pros and cons," said Pam Chase, a senior at Spanish River. "In the beginning, it made me feel like a caged animal. Now we're used to it, but I still think a lot of it is unnecessary. It's good that he cares, but I feel like I should have some responsibility for my own actions."

Johnson and Andrews' use of a bullhorn to clear hallways at their schools is one of the methods used by Joe Clark, the principal of Eastside High in Paterson, N.J., who attracted national attention last year for expelling 60 failing students.

Armed with a baseball bat and bullhorn, Clark kicked out 300 of his 3,000 students in his first year as principal in a school that had more drugs and violence than education.

In a less tumultuous place, like Palm Beach County, Johnson and other school officials said they disapproved of some of Clark's paramilitary man-ners. But Johnson said that Clark was a good exam-ple of a successful principal who made a difference.

"He shouldn't have released those kids like he did, but overall I support what he has done in that school. I'm not sure if someone with less discipline could have done that," said Johnson, who grew up on Army bases and was a principal for 10 years in north Florida, where "corporal punishment was very accepted.

"We live in a permissive society," he said. "In my opinion, in the area of ... especially ... morality and ethical conduct, we're going ... deteriorating. ... It's a ...

Although he disapproves of Clark and calls him a "threat to education," School Board Chairman Arthur Anderson said that principals, today, must take on more responsibilities for discipline since the home and community appear to be failing.

"With today's single-parent homes, illiteracy rates and teen pregnancies, schools are being called upon for more and more responsibilities," Anderson said. "There's a need for more discipline. But let's not overdo this thing. A principal has to be a disciplinarian and a humanitarian to treat students like people. These three principals are well-rounded like that."

### Complaints about lack of control

It doesn't necessarily take a man to take con-trol either, said school officials. Anderson said fe-male principals can be just as strict.

"I have strict enforcement of the rules, but I don't have an aggressive style," agreed Carole Shetler, principal of Atlantic High in Delray Beach.

"Some men use symbolic physical strength to get respect, but it would be silly for a woman to try that. I kind of have the soft touch. I respect students and they respect me."

Amid complaints about lack of control at Sun-coast and John F. Kennedy, two female principals were removed from the schools last year.

Taylor, who appointed Andrews and Durden to replace the two women, said that the schools didn't need a "male role model," but that the "principals needed to be more restrictive and needed to have strength to match up with the students."

The men were "tailor-made to turn things around," Taylor said.

Now in specialty with "child ... instruction, ..." John F. Kennedy Junior ... principal at ... Marylynn Larocca-Schultz, the former principal at ...



HILLARY SLOSS/Staff Photographer

Suncoast High School Principal Terry Andrews says he got his authoritarian style from watching his mentor, Art Johnson.

"prepared" to take on the task of improving the school, Mills said.

Suncoast's former principal, Fredern Nelson, is now a specialist for student services in south area schools. When she was at Suncoast, Nelson ran the school with a motherly touch and was known to say "Chargers, I love you" during the morning an-nouncements.

"I believe in cooperation rather than control," Nelson said. "Some of the greatest principals I know are females. I think there needs to be two things in a school setting: the first is structure and the other ... for another ...

# Students react to get-tough principals

## Art Johnson

They'd heard it all before Art Johnson came to Spanish River High School. That he would make the place a prison, that he would spy from classroom closets. Here's what they're saying now about the man they call Dr. J.

**Tarita Virtue, Student Council president**

■ "No one really hates him. He's intimidating. You just don't want to do anything wrong around him. I guess he's just kind of a perfectionist, and that puts off on everyone else."

■ "He makes time for the students. Our last principal, we never saw. He was always in his office at his desk."

■ "There's no way around it. Teachers are in the room teaching and kids are learning... He walks around the classes every day, just to check up on the teachers."

■ "When he first came into the school, I heard so many rumors. I'd heard that he would hide in closets then come out just to surprise the teacher and the students. I've never caught him doing that yet."

■ "I heard that the school was going to be a jail. I just heard that he was an extremely tough principal and that no one would get away with anything — he said they were right about that one."

**Heather Jaynes, editor-in-chief, Spanish River's Galleon news magazine:**

■ "I think he's a good principal. I would describe him as someone who believes in discipline and someone who believes you need to have a good, strict environment. In order to have fun, He's often said if you work hard, then you can play hard."

■ "He's given the students a lot more voice in what we do."

■ "He gives everyone a sense of having real high standards. You kind of want to have high standards..."

## Terry Andrews

This is Terry Andrews' first year at Suncoast High School. No more graffiti, no more litter, no more lunch outside. Some students say they're not missing a thing.

**Wilbert Moffler II, Student Council president**

■ "I can tell you one thing about him. He's very punctual. Pep rallies have to be to the minute. Actually, I like it. You don't have people going home. Everybody's in there."

■ "I believe some of his rules are too strict. They're not flexible enough to work around each other. His rules sometimes are like two bars just clanging against each other. But we're in transition. The school was looser than it is now."

■ "The only time I've ever spoken to him socially was during football season. We talked about weightlifting and practice in general... Sometimes he would come out to practice and watch us... He would just watch us, not saying anything but then just leave. I was like when he comes to class... was like when he comes in he... had a lot of pride in us..."

■ "He's always motivating us to do better. At the first pep rally, he came out in big, green Mickey Mouse glasses. He talked to the students, motivating us to work hard-er and do better."

**Tanjee Daniel, Student Council vice president**

■ "You're under very close watch. Some students say it's like prison. Some students feel like they're in high school and they can take some responsibility for themselves. Some students do feel that way. I have mixed feelings. I think his degree of supervision is good to an extent... It doesn't seem like a prison to me. It's all right."

■ "Compared to last year, it's more organized, more controlled, and security-wise, it's safer. The campus is cleaner. And we just don't have all the unidentified people wandering around."

■ "The kids know that he cares."

## Cliff Durden

Not too strict, not too loose. That's how students at John F. Kennedy Junior High School describe Cliff Durden, the big man on campus.

**Erica Bailey, eighth-grade president**

■ "There's not going to be any fights like there were last year, because they're very strict rules. We have very strict rules, we know better now."

■ "It's mostly boys who don't like him, because they want to be bad and they don't want to get in trouble."

■ "Mr. Durden is not too strict, and he's not too loose. He's just right. He makes the right decision most of the time. But he's a real mean assistant principal. If the teacher sends you down to the office for talking, they may give you A.E. (Alternative Education). That's like in-house suspension. It's a nerve-breaker. Nothing but work."

**Ira Bryant, Student Council president**

■ "Most people like him, except the people who want to be wild and rowdy and do what they want. Last year was 'real hectic. There were fights every day. They did what they wanted to do."

■ "I like him. He's someone you can count on. This year, some of the students, we wanted to have school rings this year, and he helped us out a lot. He called and got the price, got the man to come down here from Boca. Our rings will be down by May."

■ "I think he's fair."

**16A**   THE PALM BEACH POST   SATURDAY, MARCH 26, 1988   lo   s   c

## SCHOOL DAYS, TOUGH DAYS

# New breed of principal tough, stern

**PRINCIPALS/from 1A**

He has locked students' cars in a fenced lot to keep them from leaving without permission and ripped off the doors of bathrooms to discourage smokers from using them as hangouts.

In the past two years as principal at Spanish River, Johnson has shown up at student parties on weekends with the police and made several citizen's arrests to "keep students from killing themselves."

In December, he fired the school's varsity football coach because he said the "program didn't have enough discipline."

### Discipline 'what the doctor ordered'

"He's cut from a different mold," said Calvin Taylor, an area administrator who reassigned Johnson from Boca High to Spanish River in 1986. "He has what the doctor ordered. All schools need strict disciplinarians like that. We need a strong team of people. All schools need to adopt that style."

Two other principals already are spreading that style around this year in the north end of the county. Both men served as assistant principals under Johnson while he was principal at Boca High, and both men were made principals in Riviera Beach schools because they "needed someone hard and firm like Johnson," Taylor said.

Terry Andrews, Suncoast High's principal this year, and Clifford H. Durden, the new principal at John F. Kennedy Junior High, both attribute part of their strict management styles to several years of watching Johnson in Boca Raton schools.

"He may be the best there is at being a principal," said Andrews, who calls Johnson his mentor. "I totally admire him. The most disciplined school is the best school."



☞ JOHN J. GREENE/Staff Photographer

Vol. 20 No. 8

# PREDATOR

Boca Raton Community High School

October 1993

# Dr. Johnson

## A New Face

### By HANK PEARLMAN

In the midst of Florida's screw on better publication education, Boca High's new Principal, has brought new philosophies and a new approach.

The 1993-94 Boca High School year has been destined for change for a long time. This is the first time in many years that the school has been off double sessions. Due to the single sessions, the school is becoming more students than it ever has in the past.

Dr. Arthur Johnson replaces Dr. Dick Lloyd, who has gone on to become an area superintendent. Johnson was most recently principal at Williston High School in central Florida where he served for six years. Boca High is his fourth principalship and marks his 11th year as a principal.

According to Dr. Johnson, only two major changes have been made in school policy since last year. The first change concerns the tardy and attendance policy which makes it difficult for students to repeatedly arrive late or miss class. Dr. Johnson believes that change is only necessary where there are obstacles that stand in the way of the learning process.

"If kids are not in class, they are not learning," said Johnson. Along with the tougher tardy and attendance policies, an overall greater stress on



change has been explained and clarified Johnson as he sees it. "It is the purpose of education to teach productive citizenship and to attain and emphasize an academic program and foundation of discipline."

With these ideas in mind, Dr. Johnson has set standards for Boca High that he feels the school can accomplish. Obtaining more National Merit Scholarship and raising PSAT, SAT, and SSAT and other test scores are two such goals. With all those goals met, Johnson feels Boca High's real challenge is to become the best school in Palm Beach County and later the state in academic achievement can be met.

Although, Dr. Johnson agrees that ambitious as these are that are the aims of most schools, he says they are more realistic in Boca with the right work and effort applied. "There's a higher level of appreciation here due to the type of kids", said Johnson.

One of the major changes that was made at Boca High this year was the elimination of the smoking area, a decision that had strong supporters on both sides of the issue. The smoking area apparently went against school board policy and thus was done away with. However there are still students who feel it was unfair to eliminate the smoking area. "No one should be able to tell us what to do or cannot do

In addition to the violation of school board policy, Dr. Johnson thinks that the school's maintaining of a smoking area would be incongruent with what is being taught in health classes and would mean the school is condoning smoking.

Dr. Johnson says he hopes students with adverse feelings will soon comprehend what he is doing.

"I wish they would take the time to understand the purpose of school and the changes that have been made," Johnson said.

Dr. Johnson admits that he likes to have fun just like everyone else but that the demands in this day in time, education are serious business and you never can lose sight of purpose in school."

Dr. Johnson goes on to clarify, "There should be good times in pep rallies and other such events and teaching and learning in the classroom."

Although Dr. Johnson has only been our principal a short while, judgment has it good or bad is already being passed. However, Johnson says he expects a certain amount of opposition. "Negative attitudes are always to be anticipated", said Johnson.

Student opinion of Johnson is as expected divided.

Senior Blair Stephens, is a student who supports Dr. Johnson



*Dr. Johnson shows his lighter side at Pep Rally.*

"I think Dr. Johnson is going about the transformation of Boca High in the right way," said Stephens.

A junior however, disagrees with Stephens. "His motives are all good but his tactics are all wrong."

Assistant Principal Mr. Cestone also feels that this year started off heading in the right direction.

Cestone says, "People are taking more pride in their school, our community has been working hard for this goal. According to Cestone this year's success can be attributed to many different places. "It's a combination of Dr. Johnson and what we've been trying to do for the last few years.

Teachers and students have been saying that the attitudes are the best this year than they

# Boca Raton News

# Letters to the Editor

## *Boca High*
## *principal praised*

This school year should not end without praise for a man who has gained our respect, Dr. Art Johnson, principal of Boca Raton High School.

Parents and students should be aware of how fortunate we are to have Dr. Johnson at the helm of our high school. High standards, structure, and discipline, although not always popular words, are what Art Johnson represents.

Having moved here from an "Ivy League" town in Massachusetts, and having taught for many years in school systems that were nationally acclaimed for their excellence, I was a bit reluctant, in September, as was my son, when he entered Boca High as a senior. Not only was I pleased with Dr. Johnson, but his teachers also deserve credit.

Dr. Robbe has devoted much time and effort to establish strong community support for the school. I feel confident that my son is well prepared to tackle a strong, academic college curriculum because he improved his research skills with Mr. Grof.

Even in the busy office, with so many senior applications to process, Geri Bunch handled her responsibilities like a pro. Our thanks to all of Neal's teachers for a fruitful, productive year. There are many discerning professionals in this community who appreciate high standards.

Gloria and Kenneth A. Quinten
Boca Raton

# Spanish River's 'Dr. J' brings tough, but sensible, changes

*"Spanish River Shark Tales" is a monthly column about news, events and activities at Spanish River Community High School. It is written by three students — Eliot Silver and Lillie Alexander, who are "Mr. and Mrs. Spanish River," and Jenny Strauss, vice president of the Senior Class.*

When the average person hears the name "Dr. J," he probably thinks of the famous basketball player, but make that same statement to a Shark (student at Spanish River) and the odds are very high he'll picture our new principal, Dr. Art Johnson.

"Dr. J" is easily recognized — sleeves rolled up, dark sunglasses on, cap squarely placed on his head, with a huge megaphone in one hand through which he tends to scream things like, "You have 15 seconds to get to class!!!" or, "Seniors, school is over, please clear the halls!!!"

His presence on our campus has brought some changes. Let's be frank, the man is strict. Yet his rules make sense — there's a method to his madness, so to speak.

For instance a fence was erected around the student parking lot this year. It is locked every school day at 7:35 a.m. and opened again until the students leave. At first, this seemed a violation of our rights, not to mention decor, but the reason behind our "iron curtain" make sense. The first is to help eliminate drug trafficking in the school's parking lot, the second is to protect student vehicles from vandalism; and the third is to discourage students from leaving school early.

Other changes include a more stringent tardy policy and a revised attendance policy.

Not only have the rules been changing around SRCHS lately, but there's been a change in the student body as well. School spirit is definitely growing in the "shark pit."

This year's pep rallies have proven this, and our communication is growing between the students and the administration. Almost all administrators, including Dr. Johnson, are easily accessible during the course of an average school day. All in all, Dr. J and his policies, although strangers to us Sharks not too long ago, have established themselves as being tough but reasonable.

## Homecoming celebrates 'the years'

As this year's graduating class will be the first to have attended Spanish River since it opened, the

## SPANISH RIVER SHARK TALES

Homecoming promises to be filled with sun (well maybe not), fun and excitement. The event kicks off Nov. 17, and continues until the homecoming game and dance Nov. 22.

The week will be filled with numerous activities to raise school spirit for the big game. Each day, students and faculty will dress up for a certain theme, such as Baby Day or Nerd Day.

On Nov. 19, there will be a barbecue, then the female Sharks will have it out on the field during a Powder Puff game. Each team will be backed by a skillful troop of cheerleaders, composed of the opposite sex.

All of this activity will lead up to the big night, Nov. 22. After the bonfire, the Sharks will (undoubtedly) beat the Pope John Paul II Eagles, and will have enough energy left to enjoy the dance.

## Pep rallies 'the best in history'

There's only one word to describe this year's pep rallies — outrageous. They have been called "the best in Spanish River history."

Each has been 43 minutes of unrestrained spirit and they have featured such activities as a water balloon toss, a doughnut eating contest, a shaving cream contest, and even a bench pressing contest for class competition.



Eliot, Jenny and Lillie, writers of 'Shark Tales'

Homecoming theme is "through the years."



Shark photo by George W. Barton

'Dr. J' with his megaphone

## Class, council officers announced

With the Freshmen Class elections finished, the list of Spanish River class and Student Council officers is finally complete.

Because these people are to be commended for their recent victories and future successes, and because they deserve some sort of recognition for standing up in front of hundreds, and in some cases thousands, of their classmates to recite their speeches, we would like to take the opportunity to list these brave people.

STUDENT COUNCIL: Gail Pun, president; Tanti[...] Virtue, vice president; Lillie Alexander, recordi[...] secretary; Rachel Cohen, corresponding secretary; a[...] Kenda Leppart, parliamentarian.

SENIOR CLASS: Theresa Sorrentino, president; Jenny Strauss, vice president; Tracy McCutchen, secretary; and Tim Stuar[...] parliamentarian.

JUNIOR CLASS: Michele Marple, president; Jennifer Kaminock, vice president; Kristen Klein[...] secretary; and Kathrine Mortensen, treasurer.

SOPHOMORE CLASS: Debra Kaminock, president; Ora Shaktinge, vice president; Cindy D'Anton[...] secretary.

FRESHMEN CLASS: Andreana Makridis, president; Tracy Kump, vice president; Dawn Birely, secretar[...]; and Jason Leppart, treasurer.

## Clubs humming when class is out

And now a few little duties to let you know what Sharks do when they're not in class.

RADIO CLUB: The Radio Club has begun its planning of an official SRCHS radio station to be completed by the year 1988. The club expects to receive its FCC license at the end of this year.

BAND: Not wanting to break its winning tradition, the Spanish River Silver Sound did incredibly well at the recent Deerfield Invitational. The band, walked away with awards for best field commander, best percussion, best woodwind, best brass and best overall.

INTERACT: Interact is a club designed to improve relations and communications between local schools and the community.

This year, the Interact Club has already made plans to set up a clean-up of the nature trail at Spanish River Park. When they're not in class[...] school exchange day, a car wash to benefit The Haven[...]

NATIONAL HONOR SOCIETY: NHS has begun to offer free tutoring to other students through the guidance department. The society also plans to create volunteer help service for teachers.

SADD: The SADD (Students Against Driving Drunk) members have been spreading their time informing their peers of the dangers of drunken driving through poster announcement and a general attitude[...]

PEP CLUB: The Pep Club has been active with such projects as printing the schedules for all Fall-Winter sports, decorating the athletic fields with streamers and banners at games and decorating the lockers of football and volleyball players.

Sun-Sentinel, Wednesday, November 25, 1987 ▼

## EDUCATION

'He has so much energy you can't help but feel it.' — senior Jennifer Kamstock



STATE CHAMP
Girls 86
Girl...

'97

...e 10- Shark Country
Girls 87

…rving th… …mmunities of Boca Raton, Delray Beach, Highl… …d Beach and surrounding areas.

PALM BEACH PLUS

# Nothing elementary about principal's style

By LORI CROUCH
Education Writer

Forget [illegible] gray hair, the [illegible] imposing figure behind the giant desk. The principal of the future wears rolled-up sleeves and shades, carries a bullhorn, and is [illegible] figure in the hallways.

Meet Spanish River High School Principal Art Johnson. He is a man with a simple philosophy that has carried him from his first days as an elementary school principal in a small town 16 years ago to his role as administrator of a 3,000-student high school in a metropolitan area: Students are in class and teachers are teaching.

"I've had this philosophy all my professional life," he said. "I have become more sophisticated. I've made my mistakes. I think I've developed a strong set of beliefs, developed diplomacy skills. But fundamentally, I know what I believe."

His five rules for an effective school: Strong leadership; high expectations; an orderly, structured environment; [illegible] tone; and strong community support.

And the ways he has imprinted the deceptively simple [illegible] of Boca Raton students: lunch hours spent at school. No smoking areas; no smoking in the restrooms. Chainlink fence with a locked gate around the parking lot.

When these rules emerged with his descent upon Boca Raton High School in 1983, the students dubbed him "an enemy of the people."

But when he left to take over Spanish River last year, many students bid him a regretful farewell.

"Just three years later, though, anti-Johnson feelings have subsided, teachers have gained greater student control, and his administration proved to be 'just what the doctor ordered,'" wrote Boca High *Predator* editor Nate Adams.

Johnson's style of leadership earned him recognition from the U.S. Department of Education with an award he received last week.

The award calls him an administrator [illegible]

…school to learn to be good citizens. His administrative style is to expect students to be on time for class as well [illegible] and pay attention and for teachers and [illegible] to perform in a professional manner."

Murmurs preceded Johnson's arrival at Spanish River. This is a man who hides in closets to scare you, students heard. This is a man who rules with an iron fist, a dictator, the teachers heard.

And yes, his reforms were startling and students and teachers were full of misgivings — at first.

"I think we were expecting it to be that way, but we started realizing it was for the best," senior Jennifer Kamstock said. "He's intimidating, but not to the point of extreme fear. His appearance is intimidating, but also friendly. He has so much energy you can't help but feel it."

The first time Johnson walked into his classroom, English teacher Scott Zucker found himself stuttering for the first [illegible]

…of my turf; [later] I saw it as positive for the classroom atmosphere," Zucker said. [illegible] were given more time to teach and students were held accountable for what they learned.

But daily visits to every classroom became routine and sometimes, English teacher Liz Hilton said, "you don't even notice the door opening and closing. Not so for students.

"I can say personally how it feels to have the principal wake you up," senior Randy Giles said. "He's effective and consistent in his policies. It's unusual when I don't see him three or four times a day."

But more than the classroom visits, the symbol for the Spanish River principal is his megaphone.

A cartoon in the Spanish River H[illegible] School *Galleon* said it all: Students in whirling cloud and the stocky Johnson, shades, hat, bullhorn and all, calling "Fifteen seconds!" As Giles put it, doors may be shutting when the bell starts ringing, but [illegible]

See PRINCIPAL, 5



Johnson uses bullhorn in hallway to get student's attention.

Staff photo/SEAN DOUGHE...

## PRINCIPAL

to tackle it," he said.

"It was a challenge and I wanted...

Johnson came from an elementary school and stayed there for six years until he was recruited in Boca Raton.

Johnson's high school principal career began 10 years ago when he applied to become principal of Williston High School in a town near Gainesville. The school was full of racial strife, drug problems, and other ills. It also went through six or seven principals in six years.

## Principal installed several changes at high school

FROM PAGE 1

when it finishes ringing, they're shut.

Johnson didn't only leave elementary administration behind because he thought high schools would be more challenging. The man who's called Dr. J has long-range ambitions. How about ... College President Art Johnson? Or Superintendent Art Johnson?

But that's somewhere in the future. He has some ambitions for Spanish River in the nearer, clearer future. Raise test scores even more. With the number of college-bound students at the school, test scores can be higher and more national merit scholars can emerge from Spanish River, he says.

And being a principal is not only a job, it's a lifestyle, according to Johnson. He arrives at 6 a.m. and finishes work at 6 p.m. and then lifts weights with students and teachers until 7.

"Paper work is not important to me. I can leave papers and type ...

said. "The more I look, the more I know, the more I know, the better able I am to administer the sch... Philosophically, I think the role of principal today is to make a di... ence in people's lives. If you w... your school to go the extra m... you have to go the extra mile.

Not an office man, John... roams the school during lu... chatting with students and s... learning their concerns, probl... complaints.

Until the bell rings.

Students sedately stroll to ... until the familiar voice bel... "Thirty seconds!" Then they b... into a trot. "Fifteen seconds!" ... trot becomes a run, and even a ... lop.

Randy Giles is one of those dents.

"See?" he said as he dash...

THE NEWS — Saturday, November 28, 1987

# What's Going On

## Johnson noted for job well done

The Rotary Club of Boca Raton recently honored Spanish River Community High School principal Dr. Arthur Johnson as "the year's outstanding community educator" at its weekly meeting. The club periodically recognizes citizens in the community who exemplify high achievement in their respective fields. Dr. Lee McCormick, regional representative for the U.S. Department of Education, was the guest speaker.



THE NEWS — Saturday, March 5, 1988

# What's Going On

## Photos recall Hollywood's glory

### NAMELINE

Photographs by noted photojournalist Zinn Arthur are on display now through March 27 in the lobby of the Caldwell Theatre in Boca Raton.

The show is taking place during the six-week State Theater run of Thomas Wolfe's "Look Homeward, Angel."

Arthur's exhibit centers around the great film actors and actresses of Hollywood's "Golden Era." His color mounted enlargements include those of Audrey Hepburn from the film "Love in the Afternoon," Kim Novak from "Pal Joey," ~ ~nny Goodman playing the clarinet, Judy `   rland from her Palace Theatre show, Frank Sinatra and Bing Crosby from the film "High Society," Ingrid Bergman and Helen Hayes from "Anastasia" and Yul Brynner as the king from "The King and I."

Arthur's photo stories were featured in Life and Look magazines and major international magazines. He's living in Pompano Beach, where he created and produced a video tribute to Josh Logan, "Josh, the Logan Legend." His book on Hollywood film legends is scheduled for release in the fall.

■ Hundreds of theater-goers and members of the cast joined in singing and wishing Caldwell Cabaret bass player Rupert Ziawinski a "Happy Birthday" at the recent Caldwell Theatre Company's "Angel" Signature Night opening, held on the promenade of the Boca Raton Mall.

### School principal honored

Dr. Arthur Johnson, principal of Spanish River High School in Boca Raton, recently was honored as "Key Citizen of e Year" by R.L. "Doc" Lenhart, publisher of a local magazine, the Boca Ratonian.

He was selected for his "outstanding success in the educational field."



R.L. 'Doc' Lenhart presents Dr. Art Johnson with the 1988 Key Ci
of the Year award



# OFF TO THE FORUM

## Spanish River students and their principal meet weekly to exchange candid comments.

By LORI CROUCH
Education Writer



T o whom do Spanish River High School students turn when they want to gripe?

Their principal.

And they don't have to worry about their names being taken down in a notebook. Or being blacklisted for asking tough questions.

Principal Art Johnson wants the tough questions, and the Spanish River students aren't shy.

"I think it's a tremendous vehicle for communication," Johnson said. "You can tell by the attendance and by the candidness of the students that it is effective."

Every Wednesday at 8:35 a.m., one student per classroom is invited to attend a forum with Johnson to ask or complain about any issue that concerns him or her.

A hot issue at one forum, for instance, was whether teachers should be a little more lenient in giving out restroom passes.

Another was soda machines and juke boxes in the cafeteria. Still another was traffic problems outside the school on Jog Road. All Johnson could tell the students is it's going to get worse, although a traffic light is scheduled to be installed in one year.

"There's going to be additional problems when they put four lanes in and put medians in," he said. "Stopping four lanes of traffic is going to be more difficult than two."

Problems that have been resolved through the forums include the creation of a senior parking lot, establishment of breakfast in the morning and the place-

ment also must attend the meeting, as well as key administrators and members of the faculty senate. Sometimes parents from the School Advisory Committee also will monitor the forums.

Johnson was inspired to start the program after student leaders who campaigned on the theme of better communication were voted into office by the student body.

He originally used a forum at a high school at Willis-ton High, a school in northwest Florida.

"The difficulty is that there is a government representing the student body, but it isn't representative of the student body because Spanish River is so large," he pointed out.

And Johnson had other painful lessons he learned about lack of communication. Students organized a boycott of cafeteria food, complaining that the food was poor and the conditions unsanitary.

The forum should keep him aware of student complaints before they reach crisis proportions, he believes.

"That certainly was the result of communication problems," he said. "Students like the idea. They don't feel threatened by administration in the forums and they also believe the administration is sincere in its efforts to answer their concerns."

"You know he'll take care of it right away," said Theresa Brown, student council vice president. "They'll really come here and say what they feel don't appreciate it' and Dr. J. handles it well."

Even the ninth-graders appreciate the forums.



## Putting pep into rally

Spanish River High Principal Art Johnson pre-
pares to do a belly flop into a wading pool on the
gymnasium floor during a pep rally on Friday.
The rally helped kick off the football season.

Photo/JIM VARGA

# EDUCATION



A STICKLER
FOR
PUNCTUALITY...
Art Johnson,
principal of
Spanish River
Community High
School in West
Boca, uses a
bullhorn to cajole
students to get to
class on time.

Staff photo by
GINA FONTANA

MARCH 20, 1989   MONDAY PAPER,   PAGE 7A



# A matter of principal

## The leader of Spanish River High believes good discipline makes good students

By Eva Fellows
Staff Writer

Art Johnson runs a tight ship at Spanish River Community High, but he makes no apologies.

"I want to make sure my students get disciplined at least once in their life," said Johnson, who is principal of the West Boca school at Jog and Yamato roads. "Many parents are so busy with their career

### SCHOOL ❑ REPORT

This is the last in a series about the quality of our local high schools and of our school system.

or their social life, they don't have much time left over for their kids. That's not an indictment — that's a fact."

Johnson isn't just hot air. He practices what he preaches every day in the school yard, where he stands, bullhorn in hand, cajoling students to get to class on time.

"Only 30 seconds left," he bellows as a few stragglers scamper to their destinations.

Those who don't make it by the bell are automatically locked out of class.

In the 1987-'88 school year, there were four expulsions and 363 out-of-school suspensions at Spanish River, compared with 196 suspensions and no expulsions at Boca Raton Community High School. Just last month, two more Spanish River students were expelled — one for assaulting a student with brass knuckles, the other for selling marijuana on campus.

Almost 80 percent of the students agreed that "discipline at Spanish River is strict," according to a survey conducted by the school. Perhaps more surprising is that 72 percent of the parents surveyed

the cornerstone of a successful school system, but the underpinning of our society as well. "Without self-discipline, there is no democracy," he said.

Despite his austerity, Johnson has been known to poke fun at himself — a trait that has endeared him to many students. He has appeared at football games dressed as Elton John, the flamboyant pop singer, and once dove into a pool fully dressed.

And he is visibly proud of his students. "They're a good-looking bunch of kids, aren't they?" he asked. "They'll appreciate the discipline when they have kids of their own."

Since Johnson assumed the helm at Spanish River, student attendance has increased and the dropout rate has decreased. Also, students are getting higher scores on the Scholastic Aptitude Test and other standardized tests, he said.

Last year, Spanish River was designated a Center of Excellence by the Palm Beach County School Board, one of only a handful of county high schools

### Psst! The answer is ...

Think quick. If someone asks you tough questions about Spanish River Community High School, you might find the answers here.

**About students:**

•Almost 2,800 students attend Spanish River High, from ninth grade through 12th grade.

•Student population is 86 percent white, 7 percent black, 5 percent Hispanic and 2 percent Asian.

•In the 1987-'88 school year, 116 students dropped out of school.

•About 86 percent of the Class of 1988 continued their education after graduation.

•The Class of 1987 earned $363,635 in scholarships.

**About faculty:**

to receive the honor. The award is given for academic achievement, outstanding sports programs, attendance, and other criteria.

The school's debate team is often referred to as the "best and brightest of Spanish River." The team is ranked first in the state in a number of categories and has made it to state competition every year since the school opened in 1983. Last year, it won top honors at the nationals in New Orleans.

Spanish River also has a winning reputation when it comes to sports.

The Class of 1988's roster included the girls' tennis state champion, the girls' swimming state champion, the boys' tennis district champions, and the boys' and girls' soccer conference champions.

Small wonder Johnson scoffs at those who are skeptical about the quality of education in Boca Raton.

"I would match Spanish River against a school anywhere," he said.

including 10 assistant principals.

•About 46 percent of the staff hold master's degrees or higher diplomas.

**About curriculum:**

•Spanish River has courses at regular, honors and basic levels.

•There are five advanced-placement courses for college credit.

•Gifted programs are available for all grades.

•Elective courses include journalism, marketing and distribution, drama, computer education, child development and parenting, and driver education.

Sources: The 1987-1988 Annual Report of School Progress; The Greater Boca Raton Chamber of Commerce; Spanish River Community High School Course Description, 1988-'89.

# Perspective

Sunday, September 3, 1989 — THE NEWS

# The best education starts at home

**Art Johnson**

Guest Columnist



The good news today is that never before in the history of our country are we attempting to educate more citizens. In addition, today's youngsters know more than their counterparts from any decade in the past.

But the bad news is known to us all: 40 million Americans are illiterate, our annual high school drop out rate is a staggering 30 percent to 80 percent in the inner cities, drug abuse persists, violent crimes pervade our communities and the most threatening malady of all is the increasing number of have-nots who are unable to function as productive citizens or meet the challenges of an increasingly complex world.

When I consider the number of foreign-born youngsters who excel in our schools, I must conclude American schools can and do work. The problem is that too many American youth have not tried them!

I believe that there are several reasons for this problem. I will address only two.

The first is that we simply do not expect enough from all our youth.

As a principal, I do see thousands of teenagers who are extremely successful. I know that behind each of these youngsters

are parents and teachers who support, encourage and demand the best. Unfortunately, however, I encounter far too many who do not receive this same nurturing. They range from cornucopia kids so pampered and indulged by their parents that they are burned out by the time they are 16, to street kids whose parents provide little or no supervision. Both of these groups of youngsters are often so recalcitrant that their parents cannot control them and their teachers cannot teach them without great difficulty.

I know it is possible to motivate even the most difficult youngsters. Most educators work extremely hard and go far beyond the call of duty in this attempt. But they alone cannot educate our youth.

The second reason is more complex. To a great extent, adolescent learning is a function of adult role models.

When these adult role models do their job, the school's responsibility becomes one of academic refinement and intellectual polishing. When adults do not do their job, the school deals almost exclusively with disciplinary issues and value development since these considerations are prerequisite to any serious academic or intellectual study.

If we are going to become a better society, we all must set a better example before we demand more of our children. At present, I am *not* very optimistic that society at large will rise to the task without exceptional leadership at all levels.

I can only hope and pray that, one by one, many other adults and teachers will share the belief that it is their responsibility to do everything they can to make society a better place to live and to make sure that their own children are loved, guided and taught at school and at home.

*Art Johnson is principal of Spanish River High School in Boca Raton.*

# Local

Classified ads — 3-7B

Thursday, March 22, 1990

Briefs ........... 2
Crossword ....... 7
Comics .......... 8

**B**

Boca Raton News
Delray Beach News

## Spanish River's principal garners '90 press award

**By Carol Lewis-Bohannon**
Staff Writer

Spanish River High School Principal Arthur Johnson has been named Southern Interscholastic Press Association's Principal of the Year for 1990, school officials said Wednesday.

The award has been given annually since 1988 to the principal who nurtures scholastic journalism by supporting more than one publication, the professional growth of the adviser, the educational growth of students and the support of academics.

"I was very honored and flattered that the youngsters nominated me," Johnson said. "Winning it was the icing on the cake."

Betsy Owen and Theodore Backes, the school's publication advisers, and Valerie Banks, an editor of the Tiburon yearbook staff, nominated Johnson for the award.

"He is the only principal for whom I have worked that day has commanded this respect of



his students and peers while at the same time being able to re-ceive a pie in the face at a pep rally and not losing one degree of his respect or honor," Owen said Wednesday.

"He has maintained an arm's length approach to our department, and never asked for prior readership."

Johnson began his career in 1968 as a teacher at Pineview Gifted School in Sarasota. He has been a principal since 1972, and has been at Spanish River since 1986.

"What means the most to me is the spirit and support Dr. J. shows our staffs around school," said Valerie Banks, an editor of the Tiburon year-book staff. "Whether he is wearing a tuxedo in degree weather for our yearbook [...] in [...] sporting a staff shirt at a pep rally, he makes it clear that he constantly [...]



Serving Boca Raton, Delray Beach, Highland Beach and surrounding areas

PALM BEACH Plus

Sun-Sentinel, Thursday, April 26, 1990

STUDENT JOURNALISTS' PAL

# Spanish River High's 'Dr. J.' is honored as 'Principal of the Year.'

**By ARDEN MOORE**
Education Writer

The principal who packs a bullhorn is also bullish on First Amendment rights for high school journalists.

Spanish River High School principal Arthur Johnson's support and respect for yearbook and newspaper staff members at the Boca Raton campus has earned him honors as "Principal of the Year" by the Southern Interscholastic Press Association.

The award is presented annually based on nominations submitted by high school journalists and their publication sponsors.

Johnson was joined by about 80 high school journalists from Palm Beach County to receive his award at the recent ceremony held at the University of South Carolina in Columbia, S.C.

"He is real cooperative and trusting," said Caroline Springgate, editor of the *Tiburon* yearbook staff at Spanish River. "He has faith in his students."

Teen-age pregnancy? AIDS? Condoms? These and other controversial topics have been tackled by the school's *Galileon* newspaper staff with no interference from Johnson.

"Some principals are notoriously thin-skinned, but here, we've never had a run-in with Dr. Johnson," said Ted Backes, newspaper sponsor. "Even when we've run editorials critical of administrative policies, he has not stepped in to censor."

Johnson explains: "The whole purpose of our educational system is to teach youngsters to deal with tough issues, and you can't do that by hiding them."

He adds: "I have never been embarrassed by the *Galileon* or the *Tiburon*. I think their coverage has been accurate. If it's the truth, then you accept it or deal with it."



**PEOPLE**

The Southern Interscholastic Press Association honors Arthur Johnson of Spanish River High as Principal of the Year. 7

Photo/NADINE SHOC

Caroline Springgete, 18, left; Arthur Johnson, principal of Spanish River High School; Val Banks, 18; and Deena Kalai, 17, put together pages for the school's yearbook. The studer are on the school's yearbook and newspaper staffs.

Recent monthly editions of the *Galileon* criticized school officials for wasting water from fountains that ran continuously and for not using a high-priced information ... n in the cafeteria. Backes said ... reaction was almost immediate.

"The problem with the fountains was corrected, and they now advertise activities on the sign in the cafeteria," Backes said. " 'Dr. J' does read the *Galileon* very, very closely."

Johnson's motto: work hard, play hard. It is well-known on this campus of about 3,000 students. He demands discipline and high academics and does not tolerate tardiness.

"He expects them to be responsible reporters," said Betsy Owen, yearbook sponsor. "He has ma tained an arm's length approach our department and has nev asked for prior readership, even the most controversial issues. C budding journalists are trained be ethical, responsible a thorough."

## Palm County In Brief



## Not yet breathless

Spanish River High School Princi-pal Art Johnson plays Dick Tracy in the West Boca Raton school's annual kickoff pep rally this week. He rolled into the gym in a gleaming red Excalibur and busted "Big Boy," played by assistant principal Doug Markwardt. Each year, Johnson pulls off a surprise performance at the kickoff rally, last year playing Batman.

## ▶ MORE ABOUT DROPOUTS AND DRIVING

# Educators still unconvinced of license law's effectiveness

By KIRSTY GOODFELLOW
SPECIAL TO THE NEWS

The Florida Department of Education contends that dropouts who lost their driver's licenses are coming back to school in hordes, but educators and students still are waiting for the proof.

The law is intended to curb the dropout rate by suspending a student's license. After he or she misses 11 consecutive days or 20 total days, the school asks the state to suspend the license. To get it back, the dropout must re-enroll and attend classes for 45 days with out an unexcused absence.

Dr. Arthur Johnson, principal of Spanish River Community High School, said he thinks the law is an effective tool for keeping some kids in school, but said many principals are asking for more proof.

Betty Castor, state education commissioner, told skeptics recently that 43 percent of dropouts who gave a reason for returning to school said they came back to get their license. But what she didn't say was that the survey included less than half of the state's dropouts. Once dropouts who haven't returned or who



> **S**panish River Community High Principal Dr. Arthur Johnson said he thinks the law is an effective tool for keeping some kids in school, but said many principals are asking for more proof.



> **S**tate Education Commissioner Betty Castor has said that 43 percent of dropouts who gave a reason for returning to scho[ol] said it was for the license.

did not fill out a questionnaire are counted, only 21 percent of the kids cited the law the reason they returned to school.

Hazel Lucas, an attorney for the Palm Beach County School Board who handles driver's license suspensions, said from suspension requests filed with the state, she thinks about 10 to 15 percent of the students returned.

At Spanish River, Johnson said, the dropout rate is low primarily because of the ''emphasis on the importance of education out you're going to be successful,'' not because of the license law.

Art Bicknell, director of the dropout-driving law at Boca Raton High School, said most kids who come back go to night school to earn a General Equivalency Diploma.

But Laurie Walnland, a Boca High night school teacher, said the law ''might get them here, but it doesn't keep them here.''

In the under-18 night school class, only two of the 25 who were registered showed up for one class last week. The teachers say that's a typical night's attendance.

Delores Russo, director of the program, said one dropout came to class asking for the form to get his license back. When she told him he would have to stay in the GED program for 45 days, with a minimum of six hours a week, he left and never came back.□

# METRO

Sun-Sentinel, Thursday, December 20, 1990   Section B

# Gang expert may be hired

## Schools seek to head off problems

By LORI CROUCH
Education Writer

The home-grown "North Side Nation" leaves graffiti at Boca Raton parking garages and teen-agers wear its crown tattoos. Rumors fly that the Fort Lauderdale-based Zulus are moving north.

Palm Beach County school district officials want to stop a northern migration of Broward and Dade gangs before they enter Palm Beach County schools. In an effort to block gangs from making inroads, the School Board will consider on Jan. 8 hiring a consultant to train school administrators in the warning signs.

The principals of the two Boca Raton high schools already kept members of the local, loosely organized North Side Nation from bringing their activities onto campus.

And other principals and administrators say they are seeing indications of the approach of gangs.

In fact, one North Side member who had been enrolled at Spanish River High School was involved in a shooting in Broward County, but that's not the norm, Principal Art Johnson said.

"They do not tend to be kids who would normally consider to be rough and tough or mean. Rather they're youngsters that are looking for an identity," he said. Boca Raton High School Principal Norm Shearin, with his experience with gangs at a West Palm Beach high school, saw signs that a loose-knit group of teens was starting to organize this summer into the North Side Nation. The school worked to break up the group before it became a problem on campus.

"I can tend to spot some of these things early," he said. "We've been able to split up the activity. We've also taken some awfully strong security measures, not be-

measure."

The members of North Side Nation remaining at Spanish River are brought in regularly to meet with administrators, Johnson said. The ringleaders, however, are gone.

"We basically sit those gang members down and tell them in no uncertain terms that education is in and gangs are out," he said. "We establish with all students, but especially with gang members, what is expected and what will not be tolerated."

Atlantic High administrators forbid students to wear gang colors or insignia and what will be tolerated, Principal Carole Sheter said, although she said no violence or other signs of gang activity have appeared.

District security director Jim Kelly will propose hiring Joe Melita, an assistant principal at Stranahan High School in Fort Lauderdale, as a consultant at $250 a day to help train administrators. Melita has conducted workshops in Broward

> "We basically sit down those gang members and tell them in no uncertain terms that education is in and gangs are out. We establish with all students, but especially with gang members, what is expected and what will not be tolerated."

## OTHER ACTION

The School Board will consider on Jan. 9:

- **ESTABLISHING** a new policy that allows students to form religious, philosophical and political clubs.
- **BUYING** 5 acres for $335,000 to add to 10 acres already owned near Morikami Park west of Delray Beach. The district will then trade its 15 acres for another 15 owned by the county in the vicinity. The land will eventually be used for an elementary school.
- **HIRING** the architecture firm of Jackson-Reeger Inc. as consultants for the conversion of the old Twin Lakes High School into the new School of the Arts.
- **ESTABLISHING** a joint program with the Private Industry Council to track down dropouts and offer them vocational training.

GANGS

FROM PAGE 1B

# Schools may use consultant in effort to keep gangs out

County for parents and teachers.

Melita already has worked with security personnel on the issue. Kelly wants to work with Melita to develop a program to help middle and high school students stay away from gangs in the first place.

"Broward and Dade have a large gang problem," Kelly said. "That's going to happen here eventually. We have the same kinds of things gangs are attracted to. I see no reason to wait until we're inundated. The first step is bring everybody's awareness level up."

Police departments already are keeping an eye on possible gang activities by meeting monthly to share intelligence. Three years ago, the West Palm Beach and Riviera Beach departments broke up the Avenue S and Stonybrook gangs by prosecuting ringleaders, Riviera Beach police Lt. David Harris said.

Shearin warns that there is a fine line between a group of teens hanging out and a gang.

"Just because some kids get together, sometimes we panic," he said. "On the other hand, you've got to keep your eyes open. You don't want to frighten people but you've also got to keep awake."

*Staff Writer Mike Folks contributed to this report.*

**TWO VIEWS**

# School crisis: Is it fact or fear?

## Schools can learn to cope with the minor shortages

*We are hearing the screams of pain and anger as the state budget ax hacks away at Florida's education budget. Is the money really there? If so, who has it and why is it not being spent properly — to teach our children?*

As a parent of a sophomore at Spanish River High School, I attended the annual "open house" on Sept. 24. As I made the rounds following a compacted version of my son's daily schedule, I was impressed by the quality of the teachers and the facilities.

However, it was jarring to hear the English teacher say that a student teacher training in her class is required to deal students — a month into the school year? The situation in Algebra I is even worse: no textbooks for any of the 36 students.

The sciences fare no better than the 3 Rs. In biology, a lab class for which 25 is the maximum, 38 students use photocopies of the lab manual. It seems the teacher has only one original and cannot get more.



**Raymond M. Rahn**

So there you have the situation at the self-proclaimed bastion of academic excellence in our area. The principal and staff blame state cutbacks for the overcrowded classrooms and lack of textbooks.

I'll buy that for the big-ticket items, such as teacher staffing. But I can't believe there aren't "discretionary" funds somewhere for English and math books.

If the administrators can't come up with a way to deal with this crisis, let the parents advisory groups hold fund-raisers to finance book purchases.

*Raymond M. Rahn is a certified public accountant living in Boca Raton.*

## Politicians ignore education as one of our top priorities

I t is no secret that money for education is becoming increasingly scarce. Last year, Palm Beach County schools cut $80 million from a $600 million budget. This year an additional $15 million cut is being considered. I believe that sufficient state funds are available without raising taxes. The problem is that the right priorities have not been set. As a nation we give lip service to education, but the buck stops there!

Despite all the obstacles, many schools have performed well. Spanish River Community High School students have produced the highest academic achievement in the school's nine-year history in the areas of state assessment testing, National Merit Scholars, SAT scores, scholarship dollars and graduate placement in post-secondary institutions. But this is due to the hard work of teachers and administrators who triumphed in the face of the message to handle students in the following manner: "track 'em high and teach 'em cheap."

Dr. Arthur Johnson is the principal of Spanish River Community High School.

Obviously we refuse to accept this short-sighted view by our state legislators and our governor on the importance of educating our youth. However, there can be no question that overcrowded classes, dropped programs, limited textbooks and supplies and the reduction of college enrollments will eventually frustrate even the most dedicated and enthusiastic teachers and more importantly, it will undermine the greatest asset of our state ... young people.

"Right sizing" and "cutting fat" are catchy phrases, but they don't mean much to a teacher struggling with 200 students a day or an administrator trying to defend a safe school when the public cites discipline as problem No. 1. Solving Mr. Rahn's concern is important. But eliminating the growing underclass of America is more important. It will not happen until we make education our first priority.

What can you do? Parents can do the most for their children by demanding high expectations. And the public can do that. Register your outrage by insisting elected officials fund property fund education. And if they don't, vote in those who will.

# Students say they feel safe without weapons detector

By DEBBIE CENZIPER
Education Writer

A new metal detector wand at [illegible] River High School in [illegible] has been put to use a [illegible] in the past two [illegible] students report they [illegible] safe at the school.

[illegible] always have.

"[illegible] don't think the metal detector made a difference in the way I [illegible]," senior Dana [illegible] "[illegible]n't really felt [illegible] safety issue as being a big [illegible] Spanish River. I've al[illegible] there."

[illegible] Arthur Johnson spent [illegible] dollars for the [illegible] wand, which is used [illegible] suspected of [illegible] knife or a gun and [illegible] cooperate with [illegible]ators.

"[illegible] would confront the stu[illegible] we'd like to have [illegible] pockets or their [illegible]," Johnson said. "If [illegible] that, then the metal [illegible] would tell us what we [illegible] know."

[illegible] Spanish River is a [illegible]ly violence-free school, [illegible] said, there are still some troubled students with police re[illegible]. In cases where the school [illegible] probable cause, the wand [illegible] handy.

[illegible] said the school has so far confiscated a knife found by using the metal detector, but could not cite other weapons.

> "I haven't really felt the safety issue as being a big thing at Spanish River. I've always felt safe there."
> — Dana Nacson, senior

"We have some pretty tough kids," he said. "Consequently, if they say, 'I'm going to shoot you,' or 'I have a gun,' you tend to listen to them. These kids may really be angry enough that if they have a weapon, we don't know what they might do with it."

Earlier this year, Johnson was in the process of expelling five students for gun possession, including one student who allegedly threatened to shoot and kill an assistant football coach. Some of the expulsions were carryover actions from last year.

Junior Manny Masony said most students generally stay within their own circle of friends and avoid trouble.

"If you mind your own business, then you'll be OK," he said. "There are a couple of troublemakers, but you know who they are and try to stay away from them. I feel pretty safe going to school there."

Masony said the wand was pictured in the school newspaper and thinks it was purchased [illegible] to scare students.

But Johnson said that with the rise of violence in society, schools must be prepared.

A machete, Chinese star, spiked ring, tear gas, slingshots and cigarette lighters were among the items confiscated [illegible] Palm Beach County school campuses last year. In the past [illegible] years, the number of guns taken from students has almost tripled. Last year, 23 handguns were confiscated.

A metal detector is used at the School of Choice in Pahokee, where one student was killed and two were injured in 1991 when another student fired a .38-caliber semiautomatic gun after a fistfight.

Yet even with the higher rate of violence, dwindling budgets forced Palm Beach County school district officials to ax some school-based jobs, and that means fewer adults to monitor halls and classrooms, Johnson said.

With 2,200 students this year, Johnson is down to four assistant principals. Last year, he had five.

Schools across the county face similar situations.

But, at least at Spanish River, said senior Todd Greenbarg, most students focus on academics and don't attend school in fear.

"That's one thing they promote here, discipline and safety," he said. "I've never had any trouble."

SUN 12/2/92

# Guns invade classrooms

News 9/31/92

## Principals report rise in weapons

**BY BRAD SULTAN**
STAFF WRITER

Students at Palm Beach County schools sometimes carry more than books and pencils in their knapsacks. Occasionally, they bring knives and guns to the classroom, a threat administrators are facing reluctantly.

"Something's getting worse. It really seems to be that way," said Loggers' Run Middle School Principal Juanita Lampi. "It's strange out there."

Reports of students carrying weapons to school have almost tripled in two years, as teachers and principals face children with knives, guns and other dangerous materials in their book bags.

A Spanish River High School student, whose name was not released, allegedly threatened assistant football coach Lenzer Burton in a locker room. The student was charged by the school with possession of a loaded .22-caliber automatic handgun.

"This is the fifth expulsion for gun possession I've recommended in the last six months," Principal Arthur Johnson said. "I'm shocked that it continues to happen at this school."

### Metal detectors coming

Johnson has ordered metal detection wands for his campus. He said he is working with Jim Kelly, director of security, to determine how often the wands should be used.

But the problem goes deeper, school officials say. As the world outside schoolyards gets more dangerous and more violent, the troubles spill over into the once-placid schools, and there's little anyone can do about it, they say.

Most schools already have armed security guards, and Spanish River may be setting a precedent with metal detectors. Only last year, school officials called metal detectors a last resort.

☐

■ *Dana Yvette George contributed to this story.*

■ **Administrators struggle to cope with the increase, 3C.**

---

### THE WEAPONS

The Palm Beach County School Board classifies any item used to harm another person as a weapon. These are some of the items confiscated by administrators at schools last year.

- One volleyball
- Five pencils
- One machete
- Three books
- 23 firearms
- One apple
- One purse
- Five chairs



Metal detecting wands are Spanish River High School's response to the increase of weapons.
THE PALM BEACH POST

---

## WEAPONS IN SCHOOLS

■ A Spanish River High School student faces expulsion for allegedly threatening an assistant football coach with a handgun loaded BB gun to the bus stop this week to show his friends. His mother was afraid of a football game.

■ A sixth-grader at Loggers' Run Middle School in Boynton Beach was brought an unloaded BB gun to the bus stop this week to show his friends. His mother ...

■ A 5-year-old first-grader at Galaxy Elementary in Boynton Beach was bringing a kitchen knife to school. His teacher found a ...

# Gang crime in schools is targeted

By LARRY KAPLOW
Palm Beach Post Staff Writer

When the principal at Spanish River High School in Boca Raton ordered a hand-held metal detector in the third week of school, it highlighted growing concern by Palm Beach County school officials about violent and gang-related crime on campus.

School officials are taking action to keep what they call a controlled crime problem from escalating. They have begun warning students about the dangers of gangs and created a program to cut down on truancy. The county is establishing a juvenile crime council, which is expected to hold its first meeting this fall.

Twenty-three guns were confiscated in Palm Beach County schools during last school year — up from 16 the year before and eight in the 1989-90 school year.

Gang members were linked to 170 crimes, including 15 shootings, in the Boca Raton area from October 1990 until last June, said Detective Barry Zeeuw of the Boca Raton Police Department. County-

Please see OFFICIALS/3B

9/28/92 Post

# Officials targeting gang crime in schools

OFFICIALS/from 1B

wide figures were not available.

Spanish River High School Principal Art Johnson said two of five students he has recommended for expulsion in the past six months may be gang members.

He ordered a hand-held metal detector after two students threatened to shoot a teacher on Sept. 4. The two students did not draw a gun, but Johnson says another student saw a gun.

He said he will not use the metal detector for general searches but that he needs it to maintain tight discipline and high standards he expects from his more than 2,100 students.

"This is a very, very high-flying school, so for us to have a problem with guns in the school, it is really a surprise," Johnson said, noting the school's academic and athletic achievements.

Johnson, known as a disciplinarian who sends students scurrying to class as he shouts through a bullhorn during class changes, says he will "take all precautions necessary" to make sure guns and gangs don't penetrate the campus.

In talks with students at the beginning of the school year, Johnson warned of the dangers of gang activities and declared they would not be tolerated on campus.

As in other schools, clothing or jewelry recognized as insignia for gangs is not allowed. Students must cover tattoos, often used to show gang affiliation.

Another metal detector wand is already being used at The School of CHOICE in Pahokee. Principal Antoine Russell ordered it after a 15-year-old student was shot and killed at the school in May 1991.

## Palm Beach County schools closed today

WEST PALM BEACH — Today is a fall vacation day for Palm Beach County students. Classes in the county's public schools will be dismissed for the day.

School district offices will be open, however, and all year-round employees will be on duty.

In Martin and St. Lucie counties, schools will be open as usual.

information from the kids," Russell said. He said students often turn over weapons before letting them be found by the metal detector.

But he adds that it probably would not have prevented the shooting last year, because Russell had no reason beforehand to suspect the student had a gun.

School systems in Dade and Broward are not using metal detectors.

Dade school officials confiscated 186 guns from students last school year, but spokesman Henry Fraind said Dade officials choose to provide gun education in the schools to attack the problem instead of using metal detectors.

Broward County does not use metal detectors either, according to Andrew Thomas, director of the district's special investigations unit.

Both districts have gang problems. Thomas said Broward schools have had a "couple all-out brawls" between gangs. In Dade

keep the peace.

"I think the gangs are out there," said Palm Beach County Deputy Superintendent Bernard Shulman, who spent a morning last week at a seminar on criminal gangs. "I don't want to glamourize the gangs, but I don't want to go through denial that they exist."

School Police Chief Jim Kelly, who attended a seminar on gangs at Florida Atlantic University Tuesday, said his officers have found gang-related drawings and graffiti at schools and know gang members are present but they "are not out of control. Not well organized."

Kelly said he wants to keep gang recruiting out of the schools by restricting gang clothing and literature and by keeping students occupied.

A new program that begins in October, made possible with a $100,000 grant, will take aim at truancy by making it easier for local law enforcement officers to turn in truants to the school system.

The DARE drug education program in middle schools, coupled with formal and informal talks his officers have in schools, help to keep students from looking to gangs for identity and power.

Kelly also looks forward to the formation of the Juvenile Delinquency and Gang Prevention Council this month, which was prompted by the Legislature and will join school, police and community leaders together to make long-term recommendations.

Wayne Nagy, principal at Forest Hill High School in West Palm Beach, said a rivalry between two youth gangs has been confined to

new program to teach students m[illegible] diation techniques could eventua[illegible] be used to prevent gang flare-up[illegible]

Eight students were suspend[illegible] and one treated and released a[illegible] hospital after a fight at Forest H[illegible] between African-Americans a[illegible] Haitian-Americans on [illegible]. Nagy has brought in [illegible] community leader to spe[illegible] to s[illegible] dents.

# METRO

ntinel, Monday, December 7, 1992 Section B

# Racial balance elusive in county school system



By DEBBIE CENZIPER
Education Writer

Out of 855 students at Whispering Pines Elementary School in Boca Raton, 13 are black, the latest county figures show.

At Loggers' Run Middle School, west of Boca Raton, the 1,513-student school has 32 black children.

And at Sandpiper Shores Elementary in Boca Raton, there are 29 black students in the student body of 1,247.

The Boca Raton schools, among others throughout the district, fall considerably short of federal desegregation guidelines that aim for black enrollment at between 6 percent and 40 percent of a school's population. School district guidelines are stricter, requiring a 10- to 40-percent black student population.

But, for now, educators are zeroing in on orders from the U.S. Department of Education's Office of Civil Rights. The district has until 1995 to correct the imbalances or risk losing millions in federal funding.

Progress has been at a crawl.

About one-third of the district's 121 schools, excluding those not monitored by the Office of Civil Rights, do not meet federal guidelines according to the most recent statistics. And that number has remained steady for the last few years.

Most of the schools out of kilter are elementary schools.

"We still have quite a bit of work to do," said Abbey Hairston, School Board attorney. "Our elementary schools are still a concern. The majority white elementary schools and majority black schools are still majority white and majority black."

Boca Raton, Riviera Beach and Jupiter represent the regions that still house a majority of the segregated schools, Hairston said.

West Riviera Elementary School, for example, maintains a black student population of 85 percent.

The district was supposed to meet the Office of Civil Rights requirements by 1992 in an agreement reached in 1990 after it was determined county schools had resegregated.

The district was granted more time to determine if magnet schools — the specialty programs that draw students from a wide area — and community agreements could do the job without busing.

Hairston said the district is facing a tough task.

"We don't control population shifts. We don't control where people live," she said. "We don't have enough black kids to go around, and it's been really difficult"

SEE INTEGRATION / 8B






INTEGRATION

FROM PAGE 1B

# Population growth hampers efforts to desegrate schools

to come up with a strategy."

Principals do not assign students to their schools, but sometimes communities pressure the district for favorable boundaries that keep schools segregated.

Arthur Johnson, principal of Spanish River High School in Boca Raton, said the district is trying to integrate naturally by forming agreements with developers.

These interlocal agreements state that developers will racially mix the community in exchange for neighborhood schools.

But, at least in Boca, community integration has taken a back seat to other growth concerns during the last 20 years, he said.

"We have continued to grow fast and furious, and there has not been the provision to bring in an integrated community as we moved west," Johnson said. "Therefore, schools are not naturally integrated without busing. The community hasn't tried block integration, but I think what you have in our society is cultural preferences. People tend to want to live with their own culture."

Spanish River fell below the Office of Civil Rights guidelines at the end of the 1990-91 school year, but recently managed to forge ahead of the standard by busing in students from Delray Beach.

Steven Abrams, a former Boca Raton council member, said the city has made an effort to encourage black families to settle in the area by promoting the high quality of life. The city has also developed affordable housing, he said.

"I don't know if there's anything we could do except continue to make Boca a hospitable community," he said. "We're trying our best to do our part."

But Hairston said that may not be enough.

"I think some communities are almost there already, but it's not as many as I would like to see," she said. "There has been very little encouragement for folks to [illegible] segregrated."

Vol 22   No. 4

BRCHS

May 1986

PHYCHOGRAPHOLOGY  p.4

POVERTY  p.7

# A fond farewell

By Nate Adams

He was dubbed "the enemy of the people," an unfeeling, strict principal who wished to stamp out fun and destroy school spirit. Students were enraged when they were forbidden to smoke in the west parking lot, forced to enter classes on time, stripped of illegal substances within their lockers, kept from skipping school (due to increased security), and, yes - horror of horrors – encouraged to strive for educational excellence. Hisses issued from Boca High's bleachers, and many Bobcats cried, "Who does this country-boy think he is? Do ya, think we want to learn something?" Just three years later, though, anti-Johnson feelings have subsided; teachers have gained greater student control, and his administration has proved to be "just what the doctor ordered."

Since Dr. Johnson took control of Boca High's administration, SAT scores, SSAT scores, and truancy records have improved. The school's A.P. program has expanded and, now, Boca High is moving towards becoming a magnet school – a learning institution that draws students wishing to participate in a superior educational program from areas outside of its district. Additionally, Johnson's administration has supported the athletic program, gaining county funds for weight equipment and the resodding of the football field. He pushed for air-conditioning repairs, which will be completed this summer, and for the construction of a new campus science building, scheduled to be built next year. If the country's bond issue passes. In retrospect, it's amazing what progress Dr. Johnson has encouraged. Even pep-rallies became more exciting. Although many resent his tough-guy image, Doc has been a great asset to Boca High. Besides, as A.M. talk-show host Rick Hill pointed out, "With the 12-inch biceps he has, what other image could he project?"

Dr. Johnson's strict behavioral policies have improved teaching conditions for school instructors. The majority of teachers agree that his educational philosophy has made their jobs easier and gained them more respect.

# School candidate has simple goal: achievement

## Safety, performance candidate's top priorities

*Editor's note: This is the sixth in a series of profiles on the nine finalists for the position of St. Lucie County superintendent for schools.*

**By Andi Schabo**
of the News staff

A superintendent must address budgets and desegregation orders and possess communication skills, but nothing is more important to Arthur Johnson than the safety and education of students.

"Those issues are subservient and secondary to students," said Johnson, principal of Spanish River Community High School in Boca Raton.

"I know how to produce the highest level of student achievement and teacher performance, and that is the basis of the school system," Johnson said. "Take away the schools in a school system" and what do you have?"

Johnson has been a principal in the Palm Beach County School

District since 1986. Before that, he served in various elementary and middle school capacities — from teacher to principal — in Hardee, Levy and Wakulla counties.

Johnson said he has a hands-on approach to children in the classroom and will carry that ideal with him to St. Lucie County, along with his dedication to a school-based management approach.

"My goal is very simple: student achievement," Johnson said.

He cites his track record of improving academic performance and attendance and parental satisfaction with the past three high schools where he has been chief administrator, as well as a decrease in the dropout rate at those schools.

Achieving those goals is simple when you outline your expectations, he said.

"You organize a school in such a way that people would understand what is expected and what will not be tolerated both of students and teachers," said Johnson.

"I expect students to be here, be on time, be well-behaved and do their work — these things are not negotiable. When you set those type of goals, people will respond. I've never seen it fail."

Johnson said he puts those expectations to the test every day, visiting every classroom in his school. If chosen superintendent, Johnson said, he will continue his practice of spending plenty of time at schools.

Though he prefers to discuss the desegregation issue in his interview with the School Board rather than talking about it beforehand, John-

son said he has some questions and solutions of his own.

"It doesn't take a rocket scientist to realize that across the nation, what the community wants is by and large what the school board wants, which is neighborhood schools," Johnson said. "But that's not what the courts want, so the question is what you're going to do about it."

Those who have worked with Johnson in Palm Beach County support his candidacy and confirm his achievements.

*Please see JOHNSON on B2*

## ARTHUR CHARLES JOHNSON

**POSITION:** Principal, Spanish River Community High School, Palm Beach County School District.

**SALARY:** $75,000 plus $19,650 in benefits.

**PERSONAL:** Age, 46; wife, Ruth; two children, Rick, 24; Gloria, 22.

**EDUCATION:** Bachelor of arts degree in physical education, University of South Florida, 1967; master's degree in physical education, Florida State University, 1970; doctorate in educational administration and reading development, Florida State University, 1977.

**QUOTED:** "I know how to produce the highest level of student achievement and teacher performance, and that is the basis of a school system."

# JOHNSON

■ CONTINUED FROM B1

Raton High School as a difficult one. He said Johnson brought order and parental support back to the school.

Mills doesn't foresee Johnson having any difficulty making the switch from principal to superintendent.

"There's no question that he's going to be a little bit green at first, but he's a very quick study and an extremely bright person."

"This man has a high energy level, and he is one who is not content to have too much idle time on his hands — he's not one to wait for projects to come to him," said Palm Beach School Board member Arthur Anderson. "He has an excellent rapport with every segment of the community. He would make an outstanding superintendent."

Palm Beach County Superintendent Thomas J. Mills agreed.

"He's probably one of the finest educators I have ever come in contact with," said Mills.

Mills described Johnson's first assignment as principal at Boca

*The reception for applicant Arthur Johnson is at 5:30 p.m. today in White City Elementary School. The interview at 9:30 a.m. Friday at the School Board offices, 2909 Delaware Ave., Fort Pierce, is open to the public.*

# Playful principal strikes a blow for school spirit

By DEBBIE CENZIPER
Education Writer

His motto is "Work Hard, Play Hard."

And Spanish River High School Principal Arthur Johnson really means it.

He pushes students at the Boca Raton school to excel in academics, but when it's playtime, the principal known as "Dr. J." lets loose.

He becomes a wacky stuntman.

At a rowdy pep rally on Friday afternoon to gear up for a football game, Johnson ran into the gym in front of more than 1,000 cheering students wearing a toga and wielding a sledgehammer.

He called over the class presidents in each grade level, armed them with sheets of plastic to shield themselves and then proceeded to smash watermelons, chocolate milk, red grapes, fruit punch, eggs and orange juice all over them.

"If you demand as much as I do from them in terms of academic achievement, then there's got to be a

> "He [Principal Arthur Johnson] likes school spirit. He makes the school more exciting."
> — Allison Wean

healthy outlet," he said after the show, arms dripping with fruit juice. "Now, I've got to go take a shower."

At school pep rallies in the past, Johnson has bungee jumped in the gym, jumped off a two-story tower to land in a kiddie pool and shot himself out of a rocket ship. Students expect his circuslike stunts each year.

"It's pretty cool," said sophomore Allison Wean. "He likes school spirit. He makes the school more exciting."

Test scores show Spanish River ranks near or at the top of the pack among Palm Beach County schools.

On last year's Scholastic Aptitude Test, Spanish River students scored highest in the country in math and second in verbal abilities.

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 5

June 10, 1996

**ADVISORY LETTER FY97**

To:      ARTHUR JOHNSON     SSN: 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

From:    DR. WALTER H. PIERCE, ASSISTANT SUPERINTENDENT
         PERSONNEL & EMPLOYEE RELATIONS

This advisory letter is for instructional personnel who are on
continuing employment status.  We wish to advise you of the
following information:

Present Location:   SPANISH RIVER HIGH

Present Position:  PRINCIPAL HS/VC

Bargaining Unit:   P

FY96 Month Basis:  12

FY96 Contract Status: 3-YEAR

xFY96 Salary:   $  76,754.67

x Note - Salary does not include any supplements for which
you may qualify.

You have been assigned to the same or a similar position as
shown above for the 1996-97 school year.  Your location,
assignment , assigned hours and salary may be modified based on
available budget, the negotiation process, and district
personnel needs.
You will be notified by your school or department of your
1996-97 assignment once a final determination has been made.

loca:  1681

Department of Information Management - 434-8526

# JOHNSON V KOWAL, <u>ET AL</u>

# PLAINTIFF'S EXHIBIT

# 6



THE SCHOOL BOARD
OF PALM BEACH COUNTY, FLORIDA

**DIVISION OF PERSONNEL**
3368 FOREST HILL BOULEVARD, SUITE A-152
WEST PALM BEACH, FLORIDA 33406-5870

FAX (407) 434-8383

**September 25, 1996**

SUPERINTENDENT
OF SCHOOLS
Dr. Joan P. Kowal



MR. ARTHUR JOHNSON
SOUTH CENTRAL AREA 2
LAKE WORTH MIDDLE SCHOOL

SSN: 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

Dear MR. JOHNSON :

At a recent meeting of The School  District of Palm Beach County, your
position for FY97 was changed as follows:

    To: AREA EXECUTIVE DIRECTOR

    Fm: PRINCIPAL HIGH/VOCATIONAL

    School/Department:  SOUTH CENTRAL AREA 2

    Effective Date: September 19, 1996

    Duty Days:  N/A        Months Basis:  12

Your  appointment is  subject to  annual reappointment  effective each
July 1.

If you have any questions  concerning this appointment, please contact
the Department of Information Management.

                    Sincerely,

                    *Amy B. McKay*

                    Ann B. McKay
                    Director
                    Information Management

lrc/instprom/agend

cc:  JOAN P. KOWAL

*An Equal Education Opportunity Provider and Affirmative Action Employer*

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 7

June 10, 1997

## NOTIFICATION OF REAPPOINTMENT FY98

To:   ARTHUR JOHNSON     SSN: 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

From:  DR. JOANNE K. KAISER, CHIEF PERSONNEL OFFICER
       PERSONNEL SERVICES

Present Location: SOUTH CENTRAL AREA 2

Present Position: AREA EX DIRECTOR

Bargaining Unit:  S

FY97 Month Basis: 12

*FY97 Salary:  $  85,000.00

*  Note -  Salary  does not  include  any  supplements for  which
          you may qualify.

You have been assigned to the same or a similar position as shown
above for  the 1997-98  school year.   Your location,  duty days,
work hours and salary may be  modified based on available budget,
the negotiation process, and district personnel needs.

You will be notified by your school or department of your 1997-98
assignment  and duty  days once  a final  determination has  been
made.

loca:  9292

Department of Information Management - 434-8526

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 8

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



# PALM BEACH COUNTY SCHOOL DISTRICT

# ADMINISTRATIVE PERFORMANCE MANAGEMENT SYSTEM (APMS)

**The first year of implementation of this Evaluation System was FY 87.**

NAME ____Dr. Arthur C. Johnson____ DATE __June 30, 1995__

LOCATION __Spanish River Community High School__

POSITION __Principal__

YEARS OF SERVICE IN PALM BEACH COUNTY __12__

YEARS OF SERVICE IN CURRENT POSITION __12__

CONTRACT STATUS: ANNUAL __X__  MULTI-YEAR _____  CONTINUING _____

TYPE OF EVALUATION:   MIDYEAR _____  ANNUAL __X__

PBSD 1132 (Rev 8/90)

01-9547

# PALM BEACH COUNTY SCHOOL DISTRICT
## INSTRUCTIONS FOR THE
## ADMINISTRATIVE PERFORMANCE MANAGEMENT SYSTEM

The annual evaluation is a joint effort of the evaluator and the person being evaluated. The design of the evaluation form is multi-purpose:

- Increase understanding of the basis for evaluation.
- Improve communication between the supervisor and the employee.
- Lead to better decisions in selecting employees for promotion.
- Aid in making valid decisions about compensation.
- Aid in retaining employees.
- Improve future performance.

There are three (3) major supervisory/employee conferences that are needed to support the Administrative Performance Management System (APMS).

### Conference I

The first conference is held in July, August or September to accomplish:

1. Objective setting with subordinate.
2. Review and clarification of performance expectation related to the competency areas.
3. Career planning and counseling.

Conference Preparation:

1. The employee completes Individual Objective Statement Forms.
2. The employee completes the Career Planning and Counseling Record.
3. The supervisor studies but does not complete the Administrative Performance Evaluation Form.

Filing Requirements:

Copies of the Individual Objective Statement Forms and the Career Planning Record should be distributed as follows:

1. Immediate Supervisor
2. Employee

### Conference II

The second conference is held in November, December or January to accomplish:

1. Review of objectives vs. objectives accomplishment.
2. Review of action plan for accomplishment of objectives and/or renegotiate the objectives in unusual circumstances.

Conference Preparation:

1. The supervisor rereads the previously completed Individual Objective Statement Forms.
2. The supervisor completes the Administrative Performance Evaluation Form. Completion of this form is optional unless employee's performance is below expectation.

Filing Requirements:

If the Administrative Performance Evaluation Form is completed, copies should be distributed as follows:

1. Department of Information Management, Division of Personnel
2. Immediate Supervisor
3. Employee

1

**Conference II** (continued)

If the Individual Objective Statement Forms are <u>renegotiated</u>, they should be <u>modified</u> and distribute as follows:

1. Immediate Supervisor
2. Employee

**Conference III**

The third conference is held in April, May or June to accomplish:

1. Evaluation of performance competencies.
2. Evaluation of objective attainment.
3. Discussion of future objective selection.

Conference Preparation:

1. The immediate supervisor discusses with his/her supervisor all draft evaluations before discussio with employees.
2. The immediate supervisor completes the Administrative Performance Evaluation Form.

Filing Requirements:

Copies of the completed Administrative Performance Evaluation Form should be distributed as follows

1. Department of Information Management, Division of Personnel
2. Immediate Supervisor
3. Employee

**Appeal Process**

If the employee disagrees with the evaluation, the employee has the right to file a written response within ten working days to be attached to the evaluation. If the employee feels further action is necessary, the employee may appeal to the evaluator's immediate supervisor.

**Overall Evaluation Rating**

The most difficult task in using the APMS is to reach a fair and even-handed decision on the overall rating for each of the administrative employees being evaluated. The following statements are provided to assist in reaching the best possible decision for each evaluation:

1. An employee rated "at expectation" is an employee who consistently met the requirements of the position The amount of experience the employee has in the position is a factor which affects the level of expectation.
2. Employees rated "at expectation" are considered qualified to compete for promotions.
3. An employee rated "above expectation" is an employee who consistently demonstrated exceptional performance considering the experience of the employee in the position.
4. The evaluator utilizing the "above expectation" rating with an employee must provide complete written documentation to support the rating.
5. An employee rated "below expectation" is an employee who did not meet the requirements of the position based on the experience of the employee in that position.
6. The evaluator utilizing the "below expectation" rating with an employee must provide complete written documentation to support the rating.
7. The evaluation of an employee should not be used either as a reward or a punishment. It should accurately reflect the evaluator's best judgment of the employee's performance considering the high standards of the school system.

2

**Overall Evaluation Rating** (continued)

8. Although the final evaluation rating rests with the supervisor of the employee, it is required that the evaluation rating be reviewed with the evaluator's immediate supervisor before it is shared with the employee.

9. In addition to reviewing an evaluation rating with the evaluator's supervisor, it is suggested that, where practical, evaluators with similar responsibilities (example: area administrators) review the frequency of proposed ratings with each other to further enhance district consistency in the application of performance criteria.

10. Transfer the rating for each competency and the rating for objectives to the summary sheet which is the last page of the Administrative Performance Evaluation Form.

11. The overall evaluation rating is based on the twelve (12) competencies and the summary rating for objectives for a total of thirteen (13) areas. The total may be fourteen (14) areas if a position specific competency is utilized.

12. The overall evaluation is based on the following:

Above Expectation = At least seventy percent (70%) of the competencies checked as "above expectation" with all others "at expectation." The competencies evaluated as "above expectation" must include Leadership, Decision Making, Planning and Organization, and Communication Skills.

At Expectation = No more than two (2) competencies marked "below expectation" with all others "at expectation" or "above expectation."

Below Expectation = Three (3) or more competencies marked "below expectation" with all others "at expectation" or "above expectation."

13. The Position Specific Competency may be used at the discretion of the evaluator **only if** notice is given in Conference I.

Veteran Administrators

14. It is difficult for a veteran administrator to receive a rating higher than "at expectation" because of the high level of performance expected from a veteran administrator to reach the "at expectation" level.

15. A veteran administrator is defined as one who has completed six years in the position.

16. Veteran administrators may submit proposals for a special project to their immediate supervisor. This project must be above and beyond the regular assignment, and have county-wide impact and benefit. Projects which are submitted will be reviewed by a committee made up of peers of the immediate supervisor. If all competencies are rated "at" or "above expectation" and the approved special project is successfully completed, an employee will be rated "above expectation" and granted the same pay increase as other employees rated "above expectation".

17. At times, the Superintendent or his designee may assign a special project to an administrator. When this occurs, this information should be communicated to the administrator's immediate supervisor so that the special project is considered in determining the final evaluation rating.

18. The evaluation ratings of all employees must be reported in writing to the Department of Information Management, Division of Personnel, by June 1 of each year to provide lead time for calculating and implementing salary adjustments prior to the start of a new contract year.

19. The actual evaluation forms must be submitted to the Department of Information Management by June 15 of each year.

# PALM BEACH COUNTY SCHOOL DISTRICT
# ADMINISTRATIVE PERFORMANCE EVALUATION FORM

## MANAGEMENT COMPETENCIES

**LEADERSHIP:** √ Above Expectation ____ At Expectation ____ Below Expectation ____ No

- *Readily assumes overall responsibility for projects and tasks (as well as for students or staff if appropriate).
- Sets challenging objectives for self and ensures that others set and achieve challe objectives.
- Establishes priorities, schedules activities, and uses other human resources effectiv accomplish goals.
- Delegates authority and responsibility in accomplishing projects or assignments.

Comments:  A mentoring program was initiated to offer a support system fo: students in need of academic or emotional support.  Mentors (instructional, non-instructional, community) send a clear message that a personal advoca: is there to assist.

**DECISION
MAKING:** √ Above Expectation ____ At Expectation ____ Below Expectation ____ No :

- Shows a willingness to make decisions, render judgments, take action, and commit se: others in a timely manner.
- Demonstrates assertiveness and confidence when a decision is made.
- Makes high quality decisions which reflect appropriate action based upon circumstances data available and which are in keeping with the philosophy, goals, objectives, and po of the district when applicable.

Comments:  Elevation and amplification of Spanish River's radio station broa: casting facilities enable enhanced communication related curricula.  Program and professional development direction include integrated technology and a curriculum-based focus.  A CD-Rom program that accesses magazines wa: installed on the network - a first in the district.

**ANALYTICAL ABILITY AND
JUDGMENT:** √ Above Expectation ____ At Expectation ____ Below Expectation ____ No :

- Identifies important issues and problems.
- Searches for and gathers many different kinds of information before arriving at an understar: of an event or a problem.
- Uses analytical skills to review information and formulate alternative solutions to problems

Comments:  Dr. Johnson and staff make effective use of data in order to monitor and evaluate program effectiveness.  A review of the minutes of the IIT and Department Heads reflect on-going attention to performance and reference program direction.  Accountability updates are routine.

* The statements listed under each competency are to be used as a guide in determining the ratings. The statements m. all apply to each administrative position.

# MANAGEMENT COMPETENCIES

**SENSITIVITY AND WORK CLIMATE:** _√_ Above Expectation  ____ At Expectation  ____ Below Expectation  ____ No Basis

- Creates a work climate which reflects trust, openness, and good relations among personnel.
- Emphasizes fairness in dealing with personnel.
- Is aware of the effects of his/her behavior and decisions on other people.
- Considers the position, feelings, and perspectives of others when planning, organizing, and making decisions.
- Tailors style of interaction to fit the situation or audience.
- Is tactful in oral and written responses to others.

Comments: Dr. Johnson creates an environment of achievement which prizes and recognizes excellence. He is highly visible at Spanish River and makes frequent informal contacts with students and staff.

**PERSUASIVENESS:** _√_ Above Expectation ____ At Expectation ____ Below Expectation ____ No Basis

- Persuades or influences others through a number of possible means.
- Changes tactics or strategies when original plan fails to persuade.

Comments: Dr. Johnson is resourceful in pursuing solutions for problems. The unique needs of ESE students commanded creative non-instructional personnel assignment adjustments.

**TEAMWORK/INTERPERSONAL RELATIONSHIPS:**

_√_ Above Expectation _____ At Expectation _____ Below Expectation _____ No Basis

- Stimulates others to interact, work together, resolve conflicts, and encourages others to reach mutual agreement.
- Works as part of the team with district and school staffs.
- Coordinates efforts with other departments or staff.
- Compromises when necessary for the benefit of the district.
- Uses own ideas and ideas of others to initiate and stimulate dialogue and facilitate the group process.

Comments: Spanish River teachers received recognition for the (ESE/SNAP) Community-Referenced Instruction pilot program.

## MANAGEMENT COMPETENCIES

**COMMITMENT TO MISSION AND IMAGE:**

_____ **Above Expectation**   √___ **At Expectation** _____ **Below Expectation** _____ No

• Presents a positive image of the school and district.

• Conveys a commitment to the mission and values of the school and the district.

Comments: _____

_____

_____

**PLANNING AND ORGANIZATION:**

___√___ **Above Expectation** _____ **At Expectation** _____ **Below Expectation** _____ No

• Formulates plans which are compatible with the district's organizational goals and objectiv

• Develops written comprehensive plans based upon an assessment of needs.

• Assesses budget needs and stresses cost effectiveness in budget administration.

• Ensures that sound property control procedures are in operation.

• Adheres to the financial and record keeping procedures of the district.

• Works with district staff and/or consultants to plan for program development and improve as well as for other technical assistance.

• Anticipates, plans, and schedules for future needs.

Comments:  Spanish River continues to totally include a moderately involved trainable mentally handicapped student.  This student attends three academic regular classes and one varying exceptionalities class and is in a community-based works training program for the remainder of the day.  S River High School has also begun a community-based instructional program

**PERSONNEL DEVELOPMENT:** appropriate students.

___√___ **Above Expectation** _____ **At Expectation** _____ **Below Expectation** _____ No

• Views developing others as a primary objective and helps individuals grow by prov assistance.

• Is actively involved in selecting a well-trained and qualified staff.

• Complies with the district's established hiring procedures, guidelines, and goals.

• Conducts an ongoing program of personnel evaluation, utilizing observations, conferences other appropriate evaluation techniques to help personnel increase their effectiveness.

• Ensures that a continuing, effective program of staff development exists for instructional or support personnel based upon identified needs.

• Helps individuals grow by providing challenging assignments, working with them as a c discussing performance, and providing feedback regarding their strengths and weaknesse

Comments: Performance concerns are addressed; documentation reflects care and thorough attention to process and procedures.  Dr. Johnson provided Assistant Principals opportunity for position enlargement and variation.

6

## MANAGEMENT COMPETENCIES

**COMMUNICATION SKILLS:**
__√__ **Above Expectation** _____ **At Expectation** _____ **Below Expectation** _____ **No Basis**
- Ensures that there is effective dissemination of information to and from all staff members.
- Provides for the effective exchange of information between centers, schools, and the district.
- Writes clear, concise, and properly structured letters, memos, and reports.
- Demonstrates effective oral expression when presenting ideas or tasks to an individual or group.
- Shares ideas with others in a clear and informative manner.
- Uses summary clarification, paraphrasing, and perception checks to test the accuracy of his/her understanding of another's perspective.

Comments: A brochure showcasing Spanish River Community High School was prepared for public distribution. The student-parent handbook is a model for others to follow. This comprehensive guide details expectations, policies and procedures, as well as academic opportunities (i.e. awards, scholarships).

**PRODUCTIVITY AND PERFORMANCE MANAGEMENT:**
__√__ **Above Expectation** _____ **At Expectation** _____ **Below Expectation** _____ **No Basis**
- Completes assignments within time schedules while meeting quality requirements.
- Ensures that required reports and information are submitted in accordance with established deadlines.
- Adjusts to new situations resulting from new laws, decisions, or circumstances with the flexibility needed to adapt and operate.
- States and demonstrates high work standards for self and others.

Comments: Dr. Johnson demonstrates an achievement orientation. He makes expectations of high performance known to others. He continues to seek and plan for improvements to the school center and its programs. Although he delegates effectively, he maintains a pulse on programs and assignments.

**PROFESSIONAL AND TECHNICAL KNOWLEDGE:** __√__ **Above Expectation** ___ **At Expectation** ___ **Below Expectation** ___ **No Basis**
- Is knowledgeable of and adheres to state laws, regulations and district policies.
- Understands and practices principles and theories of specialized subject area or professional discipline.
- Participates in a continuing program of self-improvement activities.
- Remains up-to-date on developments in field of expertise.

Comments: Dr. Johnson attended the National Association of Secondary School Principals (NASSP) Convention. He continues to serve on the Visions 2000 (Boca Raton) Steering Committee. He represented the Senior High Principals as division chairperson.

## MANAGEMENT COMPETENCIES

**POSITION SPECIFIC COMPETENCY:**

_____ **Above Expectation**   √   **At Expectation** _____ **Below Expectation** _____ **No**

• (Please define)   Improvement toward the achievement of District Performanc
Objectives.

Florida Grade 10 Writing Assessment improved in both area

expository by .5 and persuasiveness by .6.  CTBS/4 scores were above
and district in math and reading although school scores dropped in readi
Comments:  5% and in math by 7%.  GTAT scores showed improvement and i

reading, out-performed the district for all quartiles and in quartiles 1,2

4 for mathematics.  HSCT scores in communication and mathematics were 1
than the state and district.  PSAT scores, both verbal and math, exceed

national, state and district averages.
**OBJECTIVES REVIEW:**

_____ **Above Expectation** _____ **At Expectation** _____ **Below Expectation** _____ **No**
(from Individual Objective Statement Form)

1. _____

2. _____

3. _____

4. _____

5. _____

## SUMMARY COMMENTS ABOUT OBJECTIVE ACCOMPLISHMENT

_____

_____

_____

_____

_____

_____

_____

_____

# PALM BEACH COUNTY SCHOOL DISTRICT
## ADMINISTRATIVE PERFORMANCE EVALUATION
### SUMMARY

| Above Expectation | At Expectation | Below Expectation | No Basis | |
|---|---|---|---|---|
| √ | ___ | ___ | ___ | Leadership |
| √ | ___ | ___ | ___ | Decision Making |
| √ | ___ | ___ | ___ | Analytical Ability and Judgment |
| √ | ___ | ___ | ___ | Sensitivity and Work Climate |
| √ | ___ | ___ | ___ | Persuasiveness |
| √ | ___ | ___ | ___ | Teamwork/Interpersonal Relationships |
| ___ | √ | ___ | ___ | Commitment to Mission and Image |
| √ | ___ | ___ | ___ | Planning and Organization |
| √ | ___ | ___ | ___ | Personnel Development |
| √ | ___ | ___ | ___ | Communication Skills |
| √ | ___ | ___ | ___ | Productivity and Performance Management |
| √ | ___ | ___ | ___ | Professional and Technical Knowledge |
| ___ | √ | ___ | ___ | Position Specific Competency |
| ___ | ___ | ___ | ___ | Objectives |

```
OVERALL EVALUATION:

Above            At              Below
Expectation      Expectation     Expectation
    √                ___             ___
```

Evaluator Comments: ___Spanish River will benefit from facility improvement due to mutual cooperation between Bell South Mobility and the School District. The school's radio broadcasting facilities will be amplified. Communication related curricula will be enhanced. This veteran earns, and is therefore accorded, an ABOVE EXPECTATION rating.___

This evaluation has been discussed with me.
(Check One) ( ) I agree with its content.
            ( ) I disagree with its content.

_____    _____    *Elizabeth M Decker*  6/30/95
Signature of Employee           Date          Signature of Evaluator    Date

I understand that I may submit a letter within ten working days stating reasons for this disagreement to the Assistant Superintendent for Personnel Relations, with a copy to the Evaluator.

9

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 9

# School District of Palm Beach Count

## *Administrative Performance Managemer. System (APMS)*



# Principals

New 12/94
PBSD 1485

©School District of Palm Beach Cou
Division of Research and Information Services 1!

# School District of Palm Beach County
# Administrative Performance Management System (AP
# Principals

# PROCEDURES

The annual evaluation is a joint effort of the Area Superintendent and the Principal being evalu
design of the evaluation form is multi-purpose:

- Increase understanding of the basis for evaluation.
- Improve communication between the Area Superintendent and the Principal.
- Aid in making valid decisions about compensation.
- Aid in retaining Principals.
- Improve future performance.
- Provide a focus on goal achievement.

There are three (3) major Area Superintendent/Principal conferences that are needed to s
Administrative Performance Management System (APMS) - Principals.


## CONFERENCE I

The first conference is held in July, August, or September to review and clarify performance ex
related to the competency and outcome areas.

Conference Preparation:

1.  The Principal reviews the District objectives as they relate to the school, the
    stated in the School Improvement Plan and any additional school/personal obj
2.  The Area Superintendent reviews but does not complete the Administrative Pe
    Evaluation Form.

Filing Requirements

Copies of the objectives that were identified during the conference, as negotiated be
area superintendent and principal, should be distributed as follows:

1.  Area Superintendent
2.  Principal

## CONFERENCE II

The second conference is held in November, December, or January to accomplish:

1.  Review of progress toward achievement of identified objectives.
2.  Review of action plan for achievement of identified objectives.

© School District of Palm Bea
Division of Research and Information Servi



**Conference Preparation:**

1. The Area Superintendent rereads the previously agreed upon expectation Competencies and Outcomes.

2. The Area Superintendent completes the Administrative Performance Evaluatio Principals, if such action is considered appropriate.

   **Completion of this form is optional unless the Principal's performance i expectation. Mid-year review must be completed for all Principals who migh a "needs improvement" or "ineffective" rating. If the APMS is completed of performance concerns, the Principal should be given clear indica strengths and weaknesses and a development plan for the rest of the yea be established.**

**Filing Requirements:**

If the Administrative Performance Evaluation Form - Principals is completed be performance concerns, copies should be distributed as follows:

1. Assistant Superintendent for Personnel and Employee Relations
2. Area Superintendent
3. Principal

## CONFERENCE III

The third conference is held in April, May, or June to accomplish:

1. Evaluation of performance.
2. Discussion of future objectives and performance expectations.

**Conference Preparation:**

1. The Area Superintendent reviews all draft evaluations with his/her supervis discussion with the Principals.

2. The Area Superintendent completes the Administrative Performance Evaluatio Principals.

**Filing Requirements:**

Copies of the completed Administrative Performance Evaluation Form - Principals distributed as follows:

1. Assistant Superintendent for Personnel and Employee Relations
2. Area Superintendent
3. Principal

**APPEAL PROCE**

If the Principal disagrees with the overall evaluation, a written response should be attached of the evaluation and transmitted to the Assistant Superintendent of Personnel and Employe Relations within ten (10) working days. If the Principal feels further action is necessary, an ; may be made to the Area Superintendent's immediate supervisor.

## OVERALL EVALUATION RATING

The most difficult task in using the Administrative Performance Management System (APMS Principals is to reach a fair and even-handed decision on the overall rating for each of the P; being evaluated. The following statements are provided to assist in reaching the best possit decision for each evaluation:

1.  A principal rated **"very effective"** consistently demonstrates exceptional performance. The Area Superintendent utilizing the rating must provide complete written documentation to support the rating.

2.  A principal rated **"effective"** consistently meets the requirements of the positio and is considered qualified to compete for promotions.

3.  A principal rated **"needs improvement"** needs to increase present effectivenc in order to meet the requirements of the position. This rating indicates that the principal did not meet all the expectations of the position. Complete written documentation must accompany the rating.

    If a principal is rated **"needs improvement",** the Area Superintendent must develop a personal development plan with the principal to correct any areas of weakness. Such a plan might normally include selection of a peer mentor, assigned readings, observation of peers, participation in specific staff development seminars, or other similar activities.

4.  A principal rated **"ineffective"** demonstrates behaviors that negatively impact results. The Area Superintendent must provide complete written documentatio to support the rating. A principal rated "ineffective" does not meet the expectations for the position.

    If a principal is rated **"ineffective",** the Area Superintendent must develop an intensive personal development plan with the principal. Plans of this nature might include such activities as: intensive coaching by another individual from within or outside the school system; focused readings; video-taping of activities for personal review only; participation in a planned sequence of staff development activities.

5.  Responsibility for the evaluation rests with the Area Superintendent. It is required that the evaluation rating be shared with the Area Superintendent's immediate supervisor before it is shared with the principal.

6.  Area Superintendents with similar responsibilities, will meet with the Deputy Superintendent, the Assistant Superintendent for Personnel and Employee Relations and the Assistant Superintendent for Research and Information Services at least once each year to review rating procedures, insure agreemen regarding standards and to enhance consistency in the assessment process.

7.    The overall evaluation rating is based on the degree to which the twenty-eight (28) competencies and nine (9) outcomes are achieved. Those items (#1-28), that are used as a basis for assessing Instructional Leadership, Administrative Leadership, Climate, Professional Development (Personal and Staff), and Personal Qualities are referred to in this document as **Competencies**. Items #29-34 are referred to as **Outcomes** and are included in a section under that designation.

8.    The overall evaluation is based on the following:

**Very Effective**

- Twenty (20) out of twenty-eight (28) **Competencies** marked **"very effective"** with all others **"effective."**

and

At least six (6) of nine (9) **Outcomes** must also be marked **"fully achieved"** and none **"not achieved"**.

**Effective**

- No more than two (2) **Competencies** may be rated as **"needs improvement"**.

and

At least five (5) of nine (9) **Outcomes** must be rated **"fully achieved"** and no more than one (1) **"not achieved"**.

**Needs Improvement**

- No more than three (3) **Competencies** may be rated **"needs improvement"** or **"ineffective"**.

and

No more than two (2) outcomes rated **"not achieved"**.

**Ineffective**

- Four (4) or more **Competencies** rated below the level of **"effective"**

and/or

Three (3) or more **Outcomes** rated **"not achieved"**.

Copies of the completed Administrative Performance Management System (APMS) - Principals should be distributed as follows:

1.    Assistant Superintendent for Personnel and Employee Relations
2.    Area Superintendent
3.    Principal

iv

# School District of Palm Beach County

## Administrative Performance Management System (APMS)

### Principals

NAME: ARTHUR JOHNSON

LOCATION: SPANISH RIVER HIGH

SOCIAL SECURITY NO. 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

DATE: JUNE 21, 1996

| INSTRUCTIONAL LEADERSHIP | VERY EFFECTIVE | EFFECTIVE | NEEDS IMPROVEMENT | INEFFECT |
|---|---|---|---|---|
| 1. Focuses on learning for all as a primary mission. | √ | | | |
| 2. Communicates high expectations for student achievement and staff performance. | √ | | | |
| 3. Allocates and reallocates time and resources to accomplish priorities. | √ | | | |
| 4. Provides recognition for goal-directed performance and for change initiatives developed by school personnel. | √ | | | |
| 5. Works collaboratively with the Area Superintendent and designated Instructional Support Team. | √ | | | |
| 6. Utilizes disaggregated data to adjust the instructional program. | √ | | | |

COMMENTS: Spanish River is Area 1's high school accessible cluster site serving a lo
incidence population.  An inclusive education initiative for TMH students has been .
The needs of ESE students are given careful regard.

| ADMINISTRATIVE LEADERSHIP | VERY EFFECTIVE | EFFECTIVE | NEEDS IMPROVEMENT | INEFFECTIV |
|---|---|---|---|---|
| 7. Maintains appropriate records related to pupils, instructional and non-instructional personnel. | √ | | | |
| 8. Utilizes effective decision-making strategies. | √ | | | |
| 9. Appropriately implements local, state, and federal laws and regulations. | √ | | | |
| 10. Performs other duties as may be assigned by the Superintendent or the Area Superintendent. | √ | | | |
| 11. Demonstrates ability to communicate openly and effectively with staff, students, and parents. | √ | | | |

COMMENTS: A review of department head/instructional innovation team meeting minutes
discussion items that address programmatic planning, operational issues, distributio
available funds, i.e., STIA.

© School District of Palm B.
Division of Research and Information S

PBSD 1485 (Rev. 9/94)

| CLIMATE | VERY EFFECTIVE | EFFECTIVE | NEEDS IMPROVEMENT | INF |
|---|---|---|---|---|
| 12. Maintains a climate which supports innovative effort. | √ | | | |
| 13. Establishes a clean, safe, and orderly school environment. | √ | | | |
| 14. Establishes positive working relationships with students, teachers, staff, parents, and the community. | √ | | | |
| 15. Functions collaboratively with the School Advisory Council. | √ | | | |
| 16. Provides a climate in which all relevant shareholders are involved in instructional issues. | √ | | | |
| 17. Involves faculty in meaningful decisions, problem solving, and evaluation of school programs. | √ | | | |
| 18. Fosters a climate in which an attitude of respect for cultural differences prevails. | √ | | | |
| 19. Establishes a climate in which an attitude of respect for the individual differences of students, including students with disabilities and gifted students, prevails. | √ | | | |

COMMENTS: Dr. Johnson took a leadership position in the community's initiative to a
youth gangs.  A school-wide atmosphere prevails which prizes & recognizes excellenc

| PROFESSIONAL DEVELOPMENT        PERSONAL | VERY EFFECTIVE | EFFECTIVE | NEEDS IMPROVEMENT | INEF |
|---|---|---|---|---|
| 20. Develops new skills and approaches to the successful operation of the school. | √ | | | |
| 21. Participates in professional development programs and utilizes research to implement improvements in school practices. | √ | | | |

COMMENTS: Dr. Johnson leads by example with his practical application of computer u:

| PROFESSIONAL DEVELOPMENT        STAFF | VERY EFFECTIVE | EFFECTIVE | NEEDS IMPROVEMENT | INEF |
|---|---|---|---|---|
| 22. Provides school-wide staff development that is related to the school's instructional program and the identified needs of the school. | √ | | | |
| 23. Conducts an ongoing program of personnel evaluation which includes appropriate techniques for increasing personnel effectiveness. | √ | | | |
| 24. Ensures opportunities for staff members to learn new skills and to use technology for supporting innovative instruction. | √ | | | |

COMMENTS: Early Release training addressed technology & master scheduleing.  All fac
were required to begin using PAR SCORE.

| PERSONAL QUALITIES | VERY EFFECTIVE | EFFECTIVE | NEEDS IMPROVEMENT | INE |
|---|---|---|---|---|
| 25. Exhibits a professional manner and dress. | √ | | | |
| 26. Projects a positive image - - exhibiting initiative, enthusiasm, and optimism. | √ | | | |
| 27. Demonstrates personal and professional ethics when carrying out duties. | √ | | | |
| 28. Serves as a model for all staff members. | √ | | | |

COMMENTS: Dr. Johnson excels in planning, forecasting, setting objectives & detern courses of action. As senior high principal representative, he very effectively his peers by sharing their perspective during Superintendent's Staff meetings.

| OUTCOMES | FULLY ACHIEVED | PARTIALLY ACHIEVED | NOT ACHIEVED | COMMENTS |
|---|---|---|---|---|
| 29. A School Improvement Plan which satisfies school district guidelines has been established. | √ | | | |
| 30. Student achievement objectives established by the district/area/school have been met. | √ | | | |
| 31. Closing the gap objectives established by the district/area/school have been met. | √ | | | |
| 32. Upper level math and science objectives established by the district/area/school have been met. | | √ | | |
| 33. Suspension objectives established by the district/area/school have been met (students removed from school for criminal acts of any type will not be included in this data). | √ | | | |
| 34. Identified school-level needs have been met. | √ | | | |
| 35. A comprehensive plan for monitoring student progress has been established. | √ | | | |
| 36. A School Advisory Council that satisfies Department of Education/district guidelines is operational. | √ | | | |
| 37. An Instructional Innovation Team that satisfies school district guidelines is operational. | √ | | | |

COMMENTS: _____
_____

| COMPETENCIES | Very Effective | Effective | Needs Improvement | Ineffective |
|---|---|---|---|---|
| Instructional Leadership | 6 | | | |
| Administrative Leadership | 5 | | | |
| Climate | 8 | | | |
| Professional Development Personal | 2 | | | |
| Professional Development Staff | 3 | | | |
| Personal Qualities | 4 | | | |
| **TOTALS** | 28 | | | |

| OUTCOMES | Fully Achieved | Partially Achieved | Not Achieved |
|---|---|---|---|
| TOTALS | 8 | 1 | |

| OVERALL RATING | Very Effective | Effective | Needs Improvement | Ineffective |
|---|---|---|---|---|
| | ✓ | | | |

Summary comments of evaluator:

_____
_____
_____
_____

Specific plan of action for employee if over-all rating is less than "effective."

_____
_____
_____
_____
_____

Employee comments: _____
_____
_____
_____
_____

*Elizabeth M Decker*                                    6/21/96
Evaluator Signature                                     / Date

This evaluation has been discussed with me.  Check one:  ( ) I agree with its content.   ( ) I disagree with its content

[signature]                                             6/21/96
Employee Signature                                      Date

I understand that I may submit a letter within ten working days stating reasons for this disagreement to the Assistant Superintendent of Personnel and Employee Relations, with a copy to the Evaluator.

**Distribution of APMS - Principal:**

    Area Superintendent
    Assistant Superintendent of Personnel and Employee Relations
    Principal

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 10



THE SCHOOL DISTRICT
OF PALM BEACH COUNTY, FLORIDA
DIVISION OF PERSONNEL SERVICES
3362 FOREST HILL BOULEVARD, A-128
WEST PALM BEACH, FL 33406-5870
(561) 434-8953 PX 4-8953  FAX (561) 434-8093

DR. JOAN KOWAL
SUPERINTENDENT
OF SCHOOLS

June 2, 1997


Dr. Arthur Johnson
Palm Beach County School District
Area 2 Office
101 Davis Road
Lake Worth, FL  33461

Dear Dr. Johnson:

This is to advise you that I am requesting you attend a meeting with me in my office at 3362 Forest Hill Boulevard, Suite A-128, West Palm Beach, Florida, on Thursday, June 5, 1997, at 11:30 a.m.

Please be further advised that I have asked Dr. Joan Kowal and Glen J. Torcivia to be in attendance.

Since this is a matter concerning job performance or other matters of job responsibility, you are advised that you are entitled to representation at this meeting.

Sincerely,

Joanne K. Kaiser, Ed.D.
Chief Personnel Officer

JKK:nc

c:    Dr. Joan P. Kowal

An Equal Education Opportunity Provider and Affirmative Action Employer

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 11



THE SCHOOL DISTRICT
OF PALM BEACH COUNTY, FLORIDA
DIVISION OF PERSONNEL SERVICES
3362 FOREST HILL BOULEVARD, A-128
WEST PALM BEACH, FL 33406-5870
(561) 434-8953 PX 4-8953 FAX (561) 434-8093

DR. JOAN P. KOWAL
SUPERINTENDENT
OF SCHOOLS

July 7, 1997

**HAND DELIVERED**

Dr. Arthur Johnson
Palm Beach County School District
Area 2 Office
101 Davis Road
Lake Worth, FL  33461

Dear Dr. Johnson:

You are requested to attend a meeting in the Personnel Conference Room at 3362 Forest Hill Boulevard, Suite A-128 on Thursday, July 10, 1997, at 3:00 p.m.

Please be further advised that I have asked Glen Torcivia, Esquire and Dr. Benjamin Marlin, Associate Superintendent for School Administration, to be in attendance.

Since this is a matter concerning your employment, you are advised that you may bring a representative to this meeting.

Sincerely,

*Joan P. Kowal*

Joan Kowal
Superintendent

JPK:nc

c:    Glen Torcivia
      Benjamin Marlin

A:\JohnsnMt.ltr jk d4

An Equal Education Opportunity Provider and Affirmative Action Employer

# JOHNSON V KOWAL, <u>ET AL</u>

# PLAINTIFF'S EXHIBIT

# 12

## SETTLEMENT AGREEMENT AND
## FULL AND FINAL RELEASE

This Settlement Agreement and Full and Final Release is made this ___ day of July, 1997, by and between DR. ARTHUR C. JOHNSON (hereinafter "DR. JOHNSON") and the SCHOOL DISTRICT OF PALM BEACH COUNTY (hereinafter "SCHOOL DISTRICT").

WHEREAS, the parties wish to amicably and fully resolve all issues between them pertaining to DR. JOHNSON'S employment with the SCHOOL DISTRICT, including all issues related to the conclusion of his employment.

NOW THEREFORE, the parties, intending to be legally bound, for good and valuable consideration, the sufficiency of which is hereby acknowledged, do hereby agree as follows:

1.      The purpose of this Settlement Agreement and Full and Final Release is to fully and finally resolve any and all prior and existing disputes and controversies between the parties and to terminate any and all claims that DR. JOHNSON or his heirs, executors, administrators or successors now has or may have against the SCHOOL DISTRICT, including the SCHOOL DISTRICT'S current or former employees, agents, board members, attorneys or representatives, (collectively "SCHOOL DISTRICT").

2.      DR. JOHNSON does hereby, unconditionally and irrevocably agree not to commence, initiate or participate in any manner except as required by a lawful subpoena, in any action, lawsuit, proceeding or other matter against, or adverse to, the SCHOOL DISTRICT.

1

3.      DR. JOHNSON does hereby, unconditionally and irrevocably release and forever discharge the SCHOOL DISTRICT from any and all causes of action, claims or demands whatsoever, known or unknown, at law, in equity, or before any agency or commission of any local, state or federal government, including, but not limited to, claims, causes or action or claims arising, alleged to have arisen, or which might have been alleged to have arisen, or which may arise, under any law including, but not limited to, federal, state, county or municipal anti-discrimination laws including, but not limited to, the Public Employees Relations Act, Title VII of the Civil Rights Act of 1964, 42 U.S. Code § 2000 et seq., the Civil Rights Act of 1991, 42 U.S. Code Sections 1981 through 1988, the Employee Retirement Income Security Act of 1974, the Americans with Disability Act, the Age Discrimination in Employment Act, the Rehabilitation Act of 1973, the Florida Civil Rights Act of 1992, the Fair Labor Standards Act, the Family Medical Leave Act, the Equal Pay Act, any state or federal whistle blower law, or any other law, rule, regulation, or ordinance, including but not limited to, any claims under any public policy, contract, or common law claims, including but not limited to, any tort claims (e.g. negligent or intentional infliction of emotional distress, defamation, assault, battery, false imprisonment, wrongful termination, etc.), or any federal or state constitutional claims that DR. JOHNSON, on behalf of himself and on behalf of persons similarly situated, ever had, now has, or which his heirs, executors, administrators, or assigns, or any of them, hereafter can, shall, or may have for or by reason of any cause whatsoever, including, but not limited to, any and all matters arising out of, or even arguably involving, DR. JOHNSON'S employment with the SCHOOL DISTRICT, as well as all issues involving the

2

negotiation and execution of this agreement. DR. JOHNSON acknowledges that the waiver and general release provisions of this paragraph 3 also bars any claim or demand for costs, fees or other expenses including attorney's fees incurred or claimed in connection with any of the claims referenced in paragraph 3. DR. JOHNSON further acknowledges and agrees that the listing of claims, waived in this paragraph 3 is intended to be illustrative rather than exhaustive.    Accordingly, DR. JOHNSON acknowledges and agrees that this agreement constitutes a full and final bar to any and all claims of any type that he had or now has against the SCHOOL DISTRICT..

4.      It is understood and agreed by  the parties that this agreement does not constitute any admission by the SCHOOL DISTRICT or by DR. JOHNSON of any violation of any applicable laws, rules or policies.

5.      DR. JOHNSON hereby resigns and retires from employment with the SCHOOL DISTRICT effective July 31, 1997.

6.      The SCHOOL DISTRICT shall pay DR. JOHNSON the total sum of Thirty-One Thousand and No/100 Dollars ($31,000.00) by August 1, 1997. In the event that the Internal Revenue Service should make a determination that these settlement proceeds are taxable, DR. JOHNSON shall be fully responsible for the payment of any taxes, including but not limited to, income tax, social security payments or other such payments or taxes related to the payment received by him and the SCHOOL DISTRICT shall not have any responsibility for the payment thereof. The parties agree that the settlement sum of Thirty-One Thousand and No/100 Dollars ($31,000.00) does not represent wages or any other earned or unearned income, and therefore the SCHOOL BOARD shall not

3

report it as such to any taxing authority, nor shall the SCHOOL BOARD make any deductions therefrom.

7.    The parties agree that no additional performance evaluations will be completed as to DR. JOHNSON;  specifically, a performance evaluation shall not be completed for school year 1996-1997.

8.    It is understood and agreed to by all parties hereto that this agreement is not now and will not be in the future admissible against the SCHOOL DISTRICT in any legal and/or administrative proceeding, except in proceedings to enforce this agreement.

9.    The SCHOOL DISTRICT agrees to release, hold harmless, and defend DR. JOHNSON in any claim, litigation, or any administrative proceedings related to, or in conjunction with, his employment with the SCHOOL DISTRICT.

10.    The terms of this Settlement Agreement and Full and Final Release are contractual and not a mere recital and no other contract, promise or inducement has been made to DR. JOHNSON, other than as set forth herein.

11.    DR. JOHNSON states and acknowledges that he has entered into this Settlement Agreement and Full and Final Release voluntarily and of his own free will, that he has had the opportunity to consult an attorney or other advisor prior to executing this Settlement Agreement and Full and Final Release, and that he fully understands and agrees with all of the terms of this Settlement Agreement and Full and Final Release. DR. JOHNSON acknowledges that he has had a sufficient amount of time to consider this agreement, in accordance with all federal and state laws, including those referred to in paragraph 3 herein, prior to his execution of this agreement.

4

12.     This Settlement Agreement and Full and Final Release embodies the whole understanding of the parties.  There are no promises, terms, conditions, or obligations other than those contained herein, and this Settlement Agreement and Full and Final Release shall supersede all previous telecommunications, representations, or agreements, either verbal or written, between the parties hereto.

IN WITNESS WHEREOF, the parties have set their hand and seal.

DR. ARTHUR JOHNSON

STATE OF FLORIDA
COUNTY OF PALM BEACH

Sworn to and subscribed before me this _16th_ day of July, 1997, by DR. ARTHUR JOHNSON.

HOPE E. VEVERKA
MY COMMISSION # CC 473964
EXPIRES: June 19, 1999
Bonded Thru Notary Public Underwriters

NOTARY PUBLIC

Personally known X or produced identification _____. Type of identification produced _____.

Agreed to by the SCHOOL DISTRICT OF PALM BEACH COUNTY.

By: _____

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 13

Plaintiff's Exhibit Thirteen

# SEPARATION AGREEMENT AND GENERAL RELEASE

## DOUGLAS M. LONG

THIS SEPARATION AGREEMENT AND GENERAL RELEASE (hereinafter "Agreement")
is entered into this ___ day of April, 1997, between the School District of Palm Beach County,
Florida (hereinafter, the "School District") and Douglas M. Long (hereinafter "Long").

WHEREAS, Long has been employed by the School District pursuant to a continuing
contract of employment as a high school principal and has elected to voluntarily retire effective

WHEREAS, the parties hereto recognize that an amicable resolution of the employment
relationship which presently exists between them is desirable and in their best interests;

NOW, THEREFORE, in consideration of their mutual promises contained herein, the
School District and Long, intending to be legally bound, hereby stipulate and agree as follows:

1.    All of the above statements are true and correct to the best of the parties'
knowledge and belief.

2.    Long has provided the School District with a fully executed letter of resignation/
retirement, effective on March 20, 1997.  Long understands and agrees that his decision to
retire will become irrevocable upon acceptance by the School Board of Palm Beach County.

3.    Long agrees that he will not seek employment or reemployment with the School
District in the future following the date of his execution of this Agreement.

4.    In consideration for Long's execution of this Agreement, the School District
agrees to provide Long with financial assistance in obtaining extended health insurance
coverage for a period of ten (10) years or until he becomes Medicare eligible in an amount not
to exceed a maximum of $2,300 per year.  Long will be responsible for any cost in addition to
the School District's contribution.

5.     Long will be paid for his accrued and unused annual and sick leave upon retirement in accordance with School Board policy.

6.     Long, being of lawful age, for and in consideration of the extended health benefits identified in paragraph 4, above,  and other valuable consideration received from or on behalf of the School District, receipt whereof is hereby acknowledged, hereby does release, acquit, satisfy and forever discharge the School District, the elected members of the School Board, the Superintendent of Schools, the General Counsel, as well as each and every one of the School District's former and current officers, agents, attorneys, employees and officials (whether elected or appointed) — in both their official capacities and as individuals — and their successors and assigns, hereinafter collectively referred to as "the School District" from any and all manner of action and actions, cause and causes of action, grievances, suits, debts, dues, sums of money, wages, accounts, commissions, bonuses, reckonings, benefits, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, unfair labor practice charges, grievances, claims of employment discrimination, claims of retaliation, any tort claim(s), any and all anticipated or possible litigation, any claims under the Public Employees Relations Act, any claims under Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991, any claims under Sections 1981 through 1988 of Title 42 of the United States Code, any claims under the Americans with Disabilities Act, any claims under the Fair Labor Standards Act, any claims under the Age Discrimination in Employment Act, any claims under Florida's Civil Rights Act of 1992, any claims under the Equal Pay Act, any claims under the Family Medical Leave Act of 1995, any claims under any state or federal whistleblower statutes or provisions, any claims under any federal, state or local civil or human rights law or any other federal, state or local law, regulation or ordinance, any claims

_____
School District

Page 2 of 5

_____
Long

under any public policy, contract, or common law claims, including any tort claims (e.g., negligent or intentional infliction of emotional distress, defamation, assault, battery, false imprisonment, wrongful termination, etc.) whether based on common law or otherwise, and demands whatsoever, in law or in equity, which Long, now has, or hereafter can, shall or may have against the School District for reason of any matter, cause or thing whatsoever from the beginning of the world until today, including, but not limited to, any and all matters arising out of or even arguably involving Long's  employment with the School District, as well as all issues involving the negotiation and execution of this Agreement.

7.    Long acknowledges that the waiver and general release provisions of paragraph numbered 6 also bars any claim or demand for costs, fees or other expenses including attorney's fees incurred or claimed in connection with any of the claims referenced in paragraph 6. Long further acknowledges and agrees that the listing of claims, waived in paragraph 6 is intended to be illustrative rather than exhaustive.  Accordingly, Long  acknowledges and agrees that this Agreement constitutes a full and final bar to any and all claims of any type that he had or now has against the School District or the individuals identified in paragraph 6.

8.    Long acknowledges that, as of the date of this Agreement, he has not had any on-the-job work-related accident or injury, occupational disease or disability, whether temporary, permanent, partial or total.

9.    It is understood and agreed by the parties that this Agreement does not constitute any admission by the School Board, the Superintendent of Schools, or the School District (including any of its officers, agents, directors, supervisors or employees) or by Long or any violation of any applicable laws.

10.   Long acknowledges that, prior to executing this Agreement, he has received and reviewed this Agreement; that he was afforded a period of up to twenty-one days to consider

whether or not to sign this Agreement  and that he was aware at the time he decided to sign it that he could use all or any part of that period.   Long further acknowledges that he was encouraged  to  discuss this Agreement  with legal counsel of his own choice and that he fully understands the terms of this Agreement (including the general release provisions contained in paragraph numbered 6, above) and that he is voluntarily signing it and agreeing to be legally bound by it.   Long further understands that following his execution of this Agreement, he will have a period of seven calendar days within which he can revoke this Agreement by providing written notice of such revocation by hand delivery to the School District's General Counsel. Long acknowledges and agrees that if he chooses to revoke this Agreement,  it will not become effective or enforceable and he will not receive the extended insurance benefits identified in paragraph 4, above. Long further understands that the laws and claims listed above are merely examples of the claims he is  waiving and releasing herein and that this release does not waive any claims which arise out of events which occur after the date he signs it. Long understands that this release precludes him from recovering any relief as the result of any charge, lawsuit, or proceeding brought by him or on his behalf arising out of his employment with School District or separation from that employment but that nothing in this release prohibits him from filing a charge with or participation in any investigation or proceeding before any federal, state or local governmental agency.

✓    11.    Long agrees that the extended insurance benefits identified in paragraph 4 above, constitutes adequate and ample consideration for the rights and claims he is waiving under this Agreement and for the obligations imposed on him by virtue of this Agreement.

12.    It is understood and agreed to by all parties hereto that this  Agreement  is not now and will not be in the future admissible against the School District in any legal and/or administrative proceeding, except in proceedings to enforce this Agreement

School District                    Page 4 of 5                              Long

13.     It is understood and agreed that, should any provisions of this Agreement or any part thereof, be rendered or declared invalid by any decree of court of competent jurisdiction, all other provisions of this Agreement shall remain in full force and effect.

14.     This Agreement constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

15.     The parties have read, understood and fully considered this Agreement and are mutually desirous of entering into such Agreement. The terms of this Agreement are the product of mutual negotiation and compromise between Long and the School District. Having elected to execute this Agreement, to fulfill the promises set forth herein, and to receive thereby the benefits set forth above, Long freely and knowingly, and after due consideration, enters into this Agreement intending to waive, settle and release all claims he has or might have against the School District.

THIS AGREEMENT is dated this ___ day of _____, 1997, in Palm Beach County, Florida.

BY_____          _____
Joan P. Kowal                        Douglas M. Long
Superintendent of Schools

Date:_____           Date:_____

Witness:_____           Witness:

_____            _____

_____            _____

_____            _____
School District                Page 5 of 5              Long

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 14



THE SCHOOL DISTRICT
OF PALM BEACH COUNTY, FLORIDA
SUPERINTENDENT'S OFFICE
3340 FOREST HILL BOULEVARD, C-316
WEST PALM BEACH, FL 33406-5869
(561) 434-8200   FAX (561) 434-8571

DR. JOAN P. KOWAL
SUPERINTENDENT
OF SCHOOLS

PAULETTE BURDICK
CHAIRMAN

SANDRA S. RICHMOND
VICE CHAIRMAN

JODY GLEASON
WILLIAM G. GRAHAM
BOB HAYES
DIANE K. HEINZ
DOROTHY B. MONTGOMERY

August 8, 1997

Dr. Arthur C. Johnson
2900  NE 6th Drive
Boca Raton, Florida   33431

RE:   Settlement - Arthur Johnson

Dear Dr. Johnson:

Receipt of your letter dated August 7, 1997, and your Check No. 107 in the amount of One Hundred Thirty-Five Thousand, Six Hundred Fifty-Six Dollars and 43/100 ($135.656.43) are hereby acknowledged. On July 16, 1997. you signed a Settlement Agreement, in which you agreed to resign from the School District effective July 31, 1997.  That resignation became effective upon receipt and approval by the Board.  The Board approved of the resignation and settlement on July 30, 1997.

We are hereby returning your check, which will not be negotiated.  The District's position is that your resignation, once accepted by the Board, is binding.

Sincerely,

Joan P. Kowal
Superintendent

JPK/lmw

RUTH JOHNSON
ARTHUR JOHNSON
2900 NE 6TH DR
BOCA RATON, FL  33431

**CMA** Cash Management Account*

107

25-80 440

PAY TO THE
ORDER OF _____  $ 135,656.43

_____ DOLLARS

Merrill Lynch

BANK ☰ ONE.   BANK ONE, COLUMBUS, NA

MEMO _____

⑆044000804⑆ 048111310671⑈ 0107

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 15

Plaintiff's Exhibit Fifteen

*Law Offices*

*Glen J. Torcivia, P.A.*

One Clearlake Centre
Suite 1504
250 South Australian Avenue
West Palm Beach, Florida  33401

COPY

*Glen J. Torcivia* •
*Paulette Torcivia*
*•Also Admitted in New York*
*Lisa A. Dibble, Paralegal*

July 15, 1997

*Telephone*
(561) 832-0644
*Telefax*
(561) 832-0302

Joan Kowal, Superintendent
School Board of Palm Beach County
3318 Forest Hill Blvd., #C-302
West Palm Beach, Florida  33406

Re:   Spanish River High School

Dear Dr. Kowal:

At your request, I have investigated the in-school suspension program at Spanish River High School.  As you are aware, my investigation was a continuation of an investigation commenced by the school police department which was then referred to administrative staff, particularly the personnel department.  During the course of my investigation I reviewed various documents, and spoke to members of both the school police department and personnel department.  In addition, I have interviewed several individuals in regard to this matter and have reviewed evidence, consisting primarily of several hundred drawings created by students in the in-school suspension program, a videotape taken of the in-school suspension program by the school police department, as well as other documents.

I would advise you that the following facts are clearly established:

1.   Jeff Tytler, who was the in-school suspension program teacher, permitted the students to display drawings which depicted, and in many cases glorified, the use of violence. Mr. Tytler acknowledged discussing his personal life, including his marriage difficulties with his ex-wife as well as military matters, with the students.  It is clear that this discussion of his personal life influenced the students as reflected in their drawings, many of which have, as a recurring theme, violence directed to Mr. Tytler's former wife as well as violence affiliated with the military, in particular the

Vietnam war (although Mr. Tytler served in the military, he did not serve in Vietnam, however, he did discuss his feelings about Vietnam with students). Several of the items displayed on the wall could also be considered racist. A number of other items could be considered as demeaning to females and sexist. It is clear that the display of these types of materials in this classroom was permitted, and perhaps encouraged, by Mr. Tytler, for approximately four years (several pictures which were observed on the walls in March of 1997 bear dates from 1994 and 1995).

In addition, the room contained a "slacker box" as depicted in the videotape. The "slacker box" was used for approximately two years; during this time approximately 200 students spent time (generally 20-60 minutes) in the "slacker box". The room also contained other military type items (i.e., machine gun belt with 22 spent rounds) and a 10-foot length of rope with a hangman's noose (discovered in a drawer).

2.   It is clear that the former principal at Spanish River High School, Arthur Johnson, either knew, or should have known, of the display of these violent drawings and other materials. Mr. Johnson visited this classroom on well over a hundred occasions during the three school years 1993-94, 1994-95 and 1995-96, as well as during the beginning of the 1996-97 school year (Dr. Johnson was principal at Spanish River until September 19, 1996). At least one, and possibly two, administrators reported to Dr. Johnson that material in Mr. Tytler's classroom may have been inappropriate, however, Dr. Johnson took no action to have this material removed, nor did he ever counsel, discipline, or take any other action relative to Mr. Tytler and the display of this material in the in-school suspension classroom.

3.   Barbara Porcher, has been the interim principal at Spanish River since October 17, 1996. As you are aware this material was discovered by the school police department in March of 1997. During the period of October 17, 1996 through March, 1997, Mrs. Porcher allegedly visited the in-school suspension classroom on several occasions. There is no evidence that any administrators reported, or complained, to Mrs. Porcher about anything unusual in the in-school suspension program or classroom during this time. However, Mrs. Porcher, should have been aware of the pictures displayed on the walls. She took no disciplinary or other action as to Mr. Tytler prior to the reporting of this matter in March of 1997.

I trust that this report is of assistance to you.  Naturally, please feel free to contact me if you have any questions or would like to dismiss this matter.

Sincerely,

Glen J. Torcivia

GJT:dm

# JOHNSON V KOWAL, ET AL

# PLAINTIFF'S EXHIBIT

# 16

August 7, 1997


Dr. Joan Kowal
Superintendent
Palm Beach Schools

Dear Dr. Kowal:

After careful deliberation, I am withdrawing from the July 16, 1997, resignation/retirement settlement.

Respectfully,

Art Johnson, Ph.D.


**RECEIVED**

**AUG   7 1997**

**SUPERINTENDENT'S OFFICE**